IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMTRUST FINANCIAL SERVICES, INC., <br><br> Plaintiff, <br><br> -against- <br><br> FORGE UNDERWRITING LIMITED, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY DEMAND** |

### COMPLAINT

Plaintiff AmTrust Financial Services, Inc. ("AmTrust"), by and through its undersigned counsel, hereby files this Complaint against Defendant Forge Underwriting Limited ("Defendant" or "Forge") and alleges as follows:

### NATURE OF THE ACTION

1. This is an action for declaratory judgment and breach of the excess directors' & officers' ("D&O") liability insurance policy No. B0509 FINFW1800560 (the "Forge Excess Run-Off Policy") sold by Forge to AmTrust specifically to cover losses resulting from securities claims made after a transaction in which AmTrust's majority controlling stockholders acquired the company's minority common shares (the "Take-Private Transaction"). A true and correct copy of the Forge Excess Run-Off Policy is attached hereto as Exhibit 1.

2. Yet when precisely such a claim was filed against AmTrust after the Take-Private Transaction, namely the securities class action lawsuit *Martinek v. AmTrust Financial Services, Inc. et al.*, Case No. 19-8030, in the U.S. District Court, Southern District of New York (the

"Martinek Action"), Forge denied coverage on the basis that the Martinek Action—despite being brought by preferred stockholders after the de-listing of their preferred shares following the Take-Private Transaction—"related back" to pre-Transaction claims filed by common stockholders and arising out of years-old alleged derivative liabilities.

3. In the period before the Take-Private Transaction, from October 21, 2017 to the November 29, 2018 closing date, AmTrust maintained a tower of primary and excess D&O liability insurance policies (collectively, the "2017-2018 Policies" or the "2017-2018 Tower"). The coverage terms were set by the primary policy issued by Indian Harbor Insurance Company ("XL"). As is typical for D&O insurance policies, the 2017-2018 Policies covered claims that were made during the 2017-2018 policy period.

4. In the lead-up to the Take-Private Transaction, AmTrust sought "run-off" D&O liability insurance to cover claims made after the November 29, 2018 closing date relating to pre-Transaction conduct. Certain of the 2017-2018 Policies extended their coverage to the November 29, 2018 – November 18, 2024 period after the Take-Private Transaction, while AmTrust replaced other 2017-2018 Policies with new policies that only covered claims during that post-Transaction period (collectively referred to as the "Run-Off Policies" or the "2018-2024 Run-Off Tower").

5. As a result, each of the Run-Off Policies correspond to, and are linked by, policy language and/or endorsement to one of the 2017-2018 Policies. Each Run-Off Policy's tie-in provisions also link that Policy's limits of liability to its corresponding 2017-2018 Policy, such that a payment made under one of the 2017-2018 Policies (or a release of that Policy that exhausts the Policy entirely) has the effect of eroding the limit of its corresponding Run-Off

Policy by the amount of the payment (or in the case of a Policy release, exhausting the corresponding Run-Off Policy entirely).

6.  The below chart illustrates the layers of coverage provided in the 2017-2018 Tower and the corresponding 2018-2024 Run-Off Tower:

| Layer | 10/21/2017 – 11/29/2018 | 11/29/2018 – 11/29/2024 |
|---|---|---|
| $80M–$85M | LLOYD'S/HISCOX – $5MM (SIDE A) | RUNOFF – ALLIANZ – $2.5MM (SIDE A) / RUNOFF – HCC – $2.5MM (SIDE A) |
| $75M–$80M | AIG – $5MM (SIDE A) | RUNOFF – AIG – $5MM (SIDE A) |
| $70M–$75M | ZURICH – $5MM (SIDE A) | RUNOFF – ZURICH – $5MM (SIDE A) |
| $65M–$70M | XL CATLIN – $5MM (SIDE A) | RUNOFF – XL CATLIN – $5MM (SIDE A) |
| $55M–$65M | LANDMARK AMERICAN (RSUI) – $10MM (Incepts 11/28/17) | RUNOFF – IRONSHORE/HCC/MARKEL – $10MM |
| $45M–$55M | HISCOX/FORGE/CHUBB/ASPEN/PEMBROKE/BARBICAN – $10MM | RUNOFF – LLOYD'S/ASPEN/FORGE/ARCH/MARKEL/ALLIANZ – $10MM |
| $30M–$45M | FORGE/CHUBB/ASPEN/BARBICAN/PEMBROKE/TALBOT – $15MM | RUNOFF – LLOYD'S/ASPEN/ARCH/MARKEL/FORGE – $15MM |
| $20M–$30M | LLOYD'S/HISCOX – $10MM | RUNOFF – HISCOX – $5MM / RUNOFF – MARKEL/ALLIANZ – $5MM |
| $15M–$20M | AXIS – $5MM | RUNOFF – AXIS – $5MM |
| $10M–$15M | ZURICH AMERICAN – $5MM | RUNOFF – ZURICH AMERICAN – $5MM |
| $5M–$10M | INDIAN HARBOR (XL) – $5MM | RUNOFF – INDIAN HARBOR (XL) – $5MM |
| $0–$5M | RETENTION – $5MM | RETENTION – $5MM |

7.  Years before the Take-Private Transaction, in 2015 and 2017, derivative lawsuits were filed against AmTrust's directors and officers by AmTrust's common stockholders in connection with (a) an alleged usurpation of corporate opportunity and (b) a financial restatement, captioned *Cambridge Retirement System v. DeCarlo, et al.*, No. 10879-CB, in the Delaware Court of Chancery (the "Cambridge Derivative Lawsuit") and *In re AmTrust Financial Services, Inc. Derivative Litigation*, No. 1:17-cv-00553, in the District Court for the District of Delaware (the "Pompano Derivative Lawsuit" and, together with the Cambridge Derivative Lawsuit, the "Derivative Lawsuits").

8.  In April of 2015, Cambridge Retirement System ("Cambridge"), a holder of AmTrust common stock, filed the Cambridge Derivative Lawsuit. As in all derivative lawsuits,

3

AmTrust was named as a nominal defendant in the derivative lawsuit, and the claims were asserted on behalf of AmTrust against the named officers and directors. A true and correct copy of the operative complaint in the Cambridge Derivative Lawsuit is attached hereto as Exhibit 2.

9. The Cambridge Derivative Lawsuit generally alleged that AmTrust's controlling shareholder group, acting through a related company, misappropriated an AmTrust corporate opportunity in connection with a series of transactions related to the acquisition of a property and casualty insurer, and that the AmTrust Board of Directors breached its fiduciary duties to AmTrust by approving that transaction.

10. AmTrust defended the Cambridge Derivative Lawsuit for years. In March 2018, AmTrust announced that it intended to take the company private (the "Announcement"), after which Cambridge would no longer have a right to pursue derivative claims on behalf of AmTrust. Cambridge thus filed a new lawsuit, captioned *Cambridge Retirement System v. DeCarlo, et al.*, No. 2018-0402-AGB, this time in state court in Delaware against AmTrust directors and officers only, that re-framed the derivative allegations as direct breaches of fiduciary duty by AmTrust's management to AmTrust's common stockholders for the alleged failure to value the Cambridge Derivative Lawsuit in the Take-Private Transaction (the "2018 Cambridge Lawsuit"). A true and correct copy of the operative complaint in the 2018 Cambridge Lawsuit is attached hereto as Exhibit 3.

11. The 2018 Cambridge Lawsuit was subsequently consolidated with several lawsuits filed against AmTrust management into the Consolidated Stockholder Litigation. A true and correct copy of the operative complaint in the Consolidated Stockholder Litigation is attached hereto as Exhibit 4.

12. On January 30, 2019, the court dismissed the Cambridge Derivative Lawsuit by way of stipulation. A true and correct copy of the Stipulation and Order of Dismissal in the Cambridge Derivative Lawsuit is attached hereto as Exhibit 5.

13. The Pompano Derivative Lawsuit was filed on behalf of AmTrust in May of 2017 by the City of Lauderhill Police Officers' Retirement Plan, Pompano Beach Police & Firefighter's Retirement System, and West Palm Beach Policy Pension Fund (collectively, "Pompano"), all common stockholders of AmTrust. As in the Cambridge Derivative Lawsuit, AmTrust was named a nominal defendant in the Pompano Derivative Lawsuit, and the claims were asserted on behalf of AmTrust against the named officers and directors. A true and correct copy of the operative complaint in the Pompano Derivative Lawsuit is attached hereto as Exhibit 6.

14. The Pompano Derivative Lawsuit generally alleged that AmTrust management breached their fiduciary duties and violated SEC regulations by ignoring signs of accounting manipulation with respect to loss reserves, requiring AmTrust to restate its financial statements in 2017 and causing damage to AmTrust.

15. As in the Cambridge Derivative Lawsuit, the Pompano Derivative Lawsuit plaintiffs filed a new lawsuit in June 2018 in Delaware state court following the Announcement captioned *In re AmTrust Financial Services, Inc. Stockholder Litigation,* Case No. 2018-0396-AGB, re-framing the derivative allegations as direct claims for breaches of fiduciary duty against AmTrust management for failing to value the Pompano Derivative Lawsuit in the Take-Private Transaction (the "2018 Pompano Lawsuit"). A true and correct copy of the operative complaint in the 2018 Pompano Lawsuit is attached hereto as Exhibit 7.

16. The 2018 Pompano Lawsuit was also consolidated into the Consolidated Shareholder Litigation, and on February 14, 2019, the Pompano Derivative Lawsuit was dismissed. A true and correct copy of the Stipulation and Order of Dismissal in the Pompano Derivative Lawsuit is attached hereto as Exhibit 8.

17. AmTrust ultimately settled the Consolidated Stockholder Litigation, with the settlement funded in part by payments under the primary policy and several excess layers of the 2017-2018 Tower. AmTrust entered into payment and settlement agreements with the primary insurer XL and several of the excess insurers, releasing their 2017-2018 Policies. As a result of defense costs and settlement payments for the Consolidated Stockholder Litigation, and by virtue of the Tie-In of Limits Endorsements, the currently triggered "working layer" of insurance is the $15M xs $25M Excess Run-Off Policy.

18. The Martinek Action was filed on August 30, 2019—nearly a year after the closing of the Take-Private Transaction and the inception of the Run-Off Policies' policy period. The Martinek Action plaintiffs were former holders of AmTrust preferred shares who had remained stockholders after the Take-Private Transaction—not common stockholders whose shares had been bought out in the Take-Private Transaction. The Martinek Action plaintiffs asserted claims against AmTrust and its management for alleged pre-Transaction misrepresentations that AmTrust's preferred stock and notes would remain publicly listed following the Take-Private Transaction, as AmTrust later delisted them. The Martinek Action was timely reported to Forge after its filing, well into the policy period of the Excess Run-off Policies. A true and correct copy of the operative complaint in the Martinek Action is attached hereto as Exhibit 9.

19. AmTrust paid Forge substantial premiums for the Forge Excess Run-Off Policy to obtain D&O insurance coverage protecting AmTrust and its management against losses from securities claims made during the run-off period for alleged conduct prior to the Take-Private Transaction and, in all likelihood, involving the Take-Private Transaction. AmTrust seeks just that: coverage for the defense costs and settlement amounts incurred by AmTrust in connection with the Martinek Action under the Forge Excess Run-Off Policy, subject to its attachment point, limit of liability and participation, and a declaration of its coverage rights under the Forge Excess Run-Off Policy.

20. AmTrust previously sought coverage for the Martinek Action from Forge and certain other excess insurers in the 2018-2024 Run-Off Tower[1] in Delaware Superior Court, in a lawsuit captioned *AmTrust Financial Services, Inc. v. Forge Underwriting Ltd., et. al.*, C.A. No. N22C-04-010 MMJ CCLD, in the Superior Court of the State of Delaware (the "Martinek Coverage Lawsuit"). AmTrust dismissed the other Excess Run-Off Insurers after settlements and, in the case of Markel, proceeding in arbitration. Forge removed the Martinek Coverage Lawsuit to the U.S. District Court for the District of Delaware, C.A. No. 22-1210-GBW, based on diversity of citizenship between AmTrust and the remaining insurers. The District Court ruled that, because only Forge remained in the case, the Forge Excess Run-Off Policy's New York forum selection clause applied. Accordingly, AmTrust now brings this action in this Court to recover the insurance proceeds owed under the Forge Excess Run-Off Policy.

---

[1] The other excess run-off insurers included Aspen Syndicate 4711, Markel Bermuda Limited ("Markel"), Allianz Global Risks US Insurance Company, Arch American Insurance Company, Ironshore Indemnity, Inc., and U.S. Specialty Insurance Company (together with Forge, the "Excess Run-Off Insurers").

## PARTIES

21. Plaintiff AmTrust Financial Services, Inc. is a property and casualty insurance holding company incorporated in the state of Delaware with its principal place of business in New York.

22. Upon information and belief, Defendant Forge Underwriting Limited is a United Kingdom based private limited company, with its principal place of business in London, England, that regularly conducts business in the State of New York.

## JURISDICTION AND VENUE

23. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as this action is between a citizen of the United States (AmTrust) and a citizen of a foreign state (Forge), and the amount in controversy exceeds $75,000.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Parties contractually agreed and consented to this forum in the terms of the Forge Excess Run-Off Policy.

## FACTUAL ALLEGATIONS

**A.      The AmTrust 2017-2018 and Run-Off D&O Insurance Towers.**

25. AmTrust purchased various D&O insurance policies for the policy period of October 21, 2017 through November 29, 2018 to protect against the risk of losses for claims made against AmTrust's management and securities claims against AmTrust itself. To insure against claims made after the 2017-2018 policy period ended with the closing of the Take-Private Transaction, AmTrust paid substantial premiums for six-year run-off coverage by way of various endorsements and stand-alone policies for each layer of the 2017-2018 Tower, extending coverage for the period of November 29, 2018 through November 18, 2024 (the "Run-Off Period").

26. XL issued the primary D&O liability policy (bearing policy no. US00080794DO17A) for the 2017-2018 Tower (the "XL Primary Policy"). The XL Primary Policy provides $5 million of coverage above a $5 million self-insured retention. A true and correct copy of the XL Primary Policy including its Run-Off Endorsement is attached hereto as Exhibit 10.

27. The XL Primary Policy contains the following tie-in language, which links the limit of liability under the XL Primary Policy's 2017-2018 policy period to its Run-Off Period: "It is expressly understood and agreed that the maximum aggregate Limit of Liability set forth in Item 3 of the Declarations [*i.e.*, $5 million] shall continue to be the maximum aggregate Limit of Liability for the entire Policy Period, as amended in paragraph (2) above." *See* Ex. 10 at Endorsement No. 16, ¶ (3). Paragraph (2) amends the policy period to October 21, 2017 – November 29, 2024. *Id.*

28. The relevant excess policies in the 2017-2018 Tower and the 2018-2014 Run-Off Tower, including the Forge Excess Run-Off Policy, follow form to the XL Primary Policy in all material respects. *See, e.g.*, Ex. 1, Forge Excess Run-Off Policy, Section 1.1.

29. Insuring Agreement (B) states "The Insurer shall pay on behalf of the **Company Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act** to the extent the **Company** is required or permitted to pay on behalf of the **Insured Persons** as indemnification." Ex. 10, XL Primary Policy, Section I (Insuring Agreement), subdiv. (B).

30. Insuring Agreement (C) states: "The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act**." *Id.*, Section I, subdiv. (C).

31. As relevant to this action, "**Company**" means AmTrust. *Id.*, Section II (Definitions), subdivs. (D), (Q); Declarations, ITEM 1.

32. A "**Securities Claim**" means a "**Claim**, other than an administrative or regulatory proceeding against or investigation of the **Company**:

> made against any **Insured** for any actual or alleged violation of any federal, state or local statute, regulation, or rule or common law regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities, which is:
>
> brought by any person or entity resulting from, the purchase or sale of, or offer to purchase or sell, securities of the **Company**; or brought by a security holder of the **Company** with respect to such security interest in securities of the **Company**; or brought derivatively on behalf of the **Company** by a security holder of the **Company** . . . .' (*Id.*, Section II (Definitions), subdiv. (S).) (*id.*, Section I, subdivs. (A)-(B)).

33. "**Insured Persons**" is defined to include "any past, present or future natural person director or officer, or member or manager of the board of managers, of" AmTrust. *Id.*, Section II(J)(1).

34. "**Wrongful Act**" is defined as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an **Insured Person** while acting in his or her capacity as such or due to his or her status as such." *Id.*, Section II(U)(1). "**Wrongful Act**" is further defined to mean "solely with respect to Insuring Agreement (C) of the Policy, any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by the Company." *Id.*, Section II(U)(3).

35. "**Claim**" is defined to include "(1) any written demand (other than an **Investigation Demand**) for; (a) monetary or non- monetary relief, including injunctive relief; or (b) arbitration, mediation or other alternative dispute resolution proceeding; (2) any civil, criminal

administrative or regulatory proceeding commenced by: (a) service of a complaint or similar pleading… ." *Id.*, Section II(C).

36. "**Loss**" is defined to include, among other things, the following: "damages, judgments, settlements, pre-judgment and post- judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any Insured is legally obligated to pay and **Defense Expenses**." *Id.*, Section II(O).

37. "**Defense Expenses**" is defined as "reasonable and necessary legal fees, expenses and other costs (including experts' fees) incurred in the investigation, adjustment, settlement, defense and/or appeal of any **Claim**." *Id.*, Section II(F)(1).

### B. Payments Toward the Consolidated Stockholder Litigation Settlement Exhausted the First $25 Million of Coverage Under the Run-Off Tower.

38. AmTrust had previously sought and obtained coverage under the 2017-2018 Policies for the Consolidated Stockholder Litigation. The Consolidated Stockholder Litigation alleged breach of fiduciary duties by AmTrust directors and officers owed to AmTrust's minority common stockholders for purportedly failing to secure an adequate price for their shares. In particular, the consolidated lawsuit re-framed the derivative claims against AmTrust management as direct breaches of fiduciary duty by failing to adequately value the Derivative Lawsuits as assets of the company. *See, e.g.,* Ex. 4, Sections IV(B), VI(B). The core allegations of the Consolidated Stockholder Litigation focus on pre-Transaction conduct, including that AmTrust management and members of the Special Committee were incentivized to recommend the Take-Private Transaction and take AmTrust private to avoid liability for the alleged breaches of fiduciary duty in the then-pending Derivative Actions.

39. XL as the primary insurer and three of the excess insurers in the 2017-2018 Tower—Zurich American Insurance Company, AXIS Insurance Company, and Hiscox—paid all

11

or substantially all of their 2017-2018 Policies' limits, totaling $25 million in limits collectively, towards AmTrust's settlement of the Consolidated Stockholder Litigation. AmTrust provided these settling insurers with full policy releases.

40. The loss payments by these insurers under the 2017-2018 Policies combined with contributions by AmTrust exhausted those Policies, and thereby exhausted the corresponding Run-Off Policies, by operation of the linked limit provisions in the Run-Off Policies.

41. Insurers on two of the excess layers in the 2017-2018 Tower (the $15 million xs $25 million and $10 million xs $40 million) also paid a total of $1.2 million toward the Consolidated Stockholder Litigation settlement, and as a result the corresponding Run-Off Policies were eroded by that amount. Of the $1.2 million, Forge contributed $271,322.56 toward the settlement of the Consolidated Stockholder Litigation, and so Forge's portion of the Excess Run-Off Policy has been eroded by that amount. Forge subscribed to the $15M xs $25M layer of the Run-Off Tower, and thus its portion of that layer's limit of liability is $3,208,500.00. Accordingly, $2,937,177.04 in limits remain in the Forge Excess Run-Off Policy. The settlement agreement with these two insurers, including Forge, did not release the Policies.

### C. The Take-Private Transaction

42. Between 2013 and 2016, AmTrust issued six different series of preferred stock and depositary shares. The preferred stock was publicly listed and issued pursuant to prospectuses, registration statements, and prospectus supplements, all filed by AmTrust with the United States Securities and Exchange Commission.

43. On January 9, 2018, Trident Pine Acquisition LP, an affiliate of Stone Point Capital LLC, together with AmTrust executives (Barry D. Zyskind, George Karfunkel, and Leah Karfunkel; together the "Karfunkel-Zyskind Family") and certain entities controlled by them (collectively, the "Acquisition Group"), sent a letter to the Board of Directors of AmTrust

proposing the potential acquisition of all of AmTrust's outstanding shares of publicly-traded common stock not already owned or controlled by the Karfunkel-Zyskind Family.

44. The proposal contemplated only the acquisition of the company's common stock, and not any of AmTrust's preferred stock. To that end, the proposal letter stated: "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms."

45. On January 10, 2018, AmTrust issued a press release announcing the formation of a special committee of AmTrust directors (the "Special Committee") to review the proposal.

46. Following several weeks of negotiations between and among the Board of Directors, the Special Committee, and others, AmTrust announced on March 1, 2018 that it had entered into a definitive merger agreement with Evergreen Parent, L.P., an entity formed by the Acquisition Group, whereby the Karfunkel-Zyskind Family, the Company's majority controlling stockholder, and Stone Point would acquire the company's minority common shares—the Take-Private Transaction.  The Take-Private Transaction closed on November 29, 2018, and the Acquisition Group acquired the remaining unaffiliated shares of AmTrust's common stock. Through this process, AmTrust ceased to be a public company.  The preferred stock remained outstanding and continued to be listed on the New York Stock Exchange following the consummation of the Take-Private Transaction.

47. Approximately two months after the Take-Private Transaction, on January 18, 2019, AmTrust issued a press release announcing that it would be delisting all six series of preferred stock (as well as two series of subordinated notes), the last remaining publicly traded AmTrust securities.

### D.    The Martinek Action and Forge's Response

48. On August 30, 2019, Jan Martinek, individually and on behalf of a purported plaintiff class consisting of other persons who purchased AmTrust's six series of preferred stock filed the Martinek Action in the U.S. District Court for the Southern District of New York.

49. On January 11, 2022, AmTrust held a conference call with its insurers, including Forge, to discuss the Martinek Action. AmTrust walked the insurers through the prior settlements, releases, and payments by insurers in the 2017-2018 Tower and how those payments, combined with AmTrust's contribution, had exhausted the corresponding Run-Off Policies.

50. AmTrust also notified the insurers that the parties in the Martinek Action were in the process of negotiating a potential settlement that would be funded by the remaining coverage limits under the Run-Off Policies.

51. AmTrust asked all relevant insurers, including Forge, to accept their coverage obligations and provide mediation and settlement authority for the Martinek Action.

52. On February 10, 2022, Forge—through its counsel—improperly denied coverage for the Martinek Action under the Forge Excess Run-Off Policy.[2]

53. On March 11, 2022, AmTrust sent a response to the February 10 Letter, providing detailed reasons why the Forge Excess Run-Off Policy covers the Martinek Action.[3]

54. AmTrust paid all premiums due and otherwise satisfied all obligations under the Forge Excess Run-Off Policy.

---

[2] Because the Martinek Action had not been settled at that time, AmTrust also sought coverage under the policy Forge issued in the next layer of the 2018-2024 Run-Off Tower. However, the Martinek Action settled for an amount within the $15M x $25M layer.

[3] In its letter, Forge reserved its right regarding exhaustion of the underlying limits. Forge subsequently agreed that the underlying limits were exhausted.

## COUNT I – BREACH OF CONTRACT

55. AmTrust repeats and re-alleges the allegations contained in the paragraphs set forth in the foregoing paragraphs.

56. The Forge Excess Run-Off Policy is a valid and enforceable contract between AmTrust and Forge.

57. The Forge Excess Run-Off Policy "follows form" to the XL Primary Policy, stating that it provides coverage "upon the terms, conditions and limitations of the **Primary Policy** except insofar as express provision for any matter is set out in this excess policy, and only insofar as necessary, the terms[,] conditions and limitations set out in this excess policy will prevail over the corresponding terms, conditions and limitations of the **Primary Policy**." Ex. 1, Section 1.1.

58. AmTrust complied with all terms, conditions and prerequisites to coverage under the Forge Excess Run-Off Policy to the extent required by law, or was excused from doing so.

59. Forge has not accepted coverage for this claim under the Forge Excess Run-Off Policy.

60. AmTrust has incurred significant losses in connection with the Martinek Action, including Defense Expenses and settlement costs, in excess of the limit of the XL Primary Policy and the underlying excess layers.

61. As a direct and proximate result of Forge's breach of the Forge Excess Run-Off Policy, AmTrust has suffered and will suffer monetary damages in an amount of at least $2,366,198.41.

## COUNT II – DECLARATORY RELIEF

62. AmTrust repeats and re-alleges the allegations set forth in the foregoing paragraphs.

63. Forge agreed to indemnify AmTrust for losses in excess of the XL Primary Policy and the underlying excess layers, as provided under the Forge Excess Run-Off Policy.

64. AmTrust suffered covered losses under the Forge Excess Run-Off Policy in connection with the Martinek Action.

65. AmTrust has complied with all terms, conditions, and prerequisites to coverage under the Forge Excess Run-Off Policy or is excused from doing so based on coverage declination and other conduct by Forge.

66. Forge improperly refused to provide coverage to AmTrust.

67. An actual controversy of a justiciable nature presently exists between AmTrust and Forge concerning their respective rights and obligations under the Forge Excess Run-Off Policy, including Forge's obligation and refusal to provide coverage to AmTrust for its losses in connection with the Martinek Action.

68. The controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment. The issuance of declaratory relief and subsequent compliance by Forge should be sufficient to resolve the existing controversy between AmTrust and Forge in this cause of action.

69. Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, AmTrust seeks a declaratory judgment that the Forge Excess Run-Off Policy covers AmTrust's losses in connection with the Martinek Action.

## PRAYER FOR RELIEF

AmTrust respectfully requests judgment in its favor as follows:

a. For declaratory judgment that AmTrust suffered covered losses that Forge is obligated to pay under the Forge Excess Run-Off Policy;

b. For all actual damages arising from Forge's breach of contract, in amounts to be shown at trial;

c. For attorney's fees, costs and disbursements of this action; and

d. For such other and further relief as the Court deems just and proper.

## JURY DEMAND

AmTrust requests a trial by jury for all issues so triable.

Dated: December 8, 2025                    Respectfully submitted,

                                                   PILLSBURY WINTHROP SHAW PITTMAN LLP

*/s/ Robert L. Sills*
Robert L. Sills
Tamara D. Bruno
Peter M. Gillon (*pro hac vice* to be requested)
31 West 52nd St
New York, NY 100019
Tel.: (212) 858.1000
Fax: (212) 858.1000
tamara.bruno@pillsburylaw.com
robert.sills@pillsburylaw.com
peter.gillon@pillsburylaw.com

*Attorneys for Plaintiff AmTrust Financial Services, Inc.*