# Exhibit 1

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **1** of **24** |

---

**RISK DETAILS**

---

**UNIQUE MARKET REFERENCE:**   B0509FINFW1800560


**TYPE:**   EXCESS DIRECTORS & OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE

**INSURED:**   AMTRUST FINANCIAL SERVICES, INC.


**PRINCIPAL ADDRESS:**
59 Maiden Lane
43rd Floor
New York 10038
United States of America


**PERIOD:**   From: 29th November 2018
To:    29th November 2024
Both days at 12.01 am Local Standard Time at the Principal Address.


**INTEREST:**   Excess Directors and Officers Liability and Company Reimbursement Insurance as more fully defined in the wording referenced herein.


**LIMIT OF LIABILITY:**   USD 15,000,000 in the aggregate

In excess of:

USD 25,000,000 in the aggregate, which in turn in excess of underlying primary retention(s)

**TERRITORIAL LIMITS:**   Worldwide.


**CONDITIONS:**
1. Excess Wording, as attached.
2. Schedule of underlying Insurance:

**Primary Contract**
Policy No: ELU152497-17
Insurer: Indian Harbor Insurance Company
Limit: USD 5,000,000

---

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **2** of **24** |

**First Excess Contract**
Policy No: DOC1074701
Insurer: Zurich American Insurance Company
Limit: USD 5,000,000

**Second Excess Contract**
Policy No: MNN626501/01/01/2017
Insurer: Axis Insurance Company
Limit: USD 5,000,000

**Third Excess Contract**
Policy No: USF00255018
Insurer: Allianz Global Corporate Specialty
Limit: USD 5,000,000

**Fourth Excess Contract**
Policy No: FINFW1800559
Insurer: Lloyds Syndicate 033
Limit: USD 5,000,000

3. Small AP/RP Clause NMA 1168, as attached.
4. Nuclear Incident Exclusion NMA 1256, as attached.
5. Radioactive Contamination Exclusion Clause NMA 1477, as attached.
6. War and Terrorism Exclusion NMA 2918, as attached.
7. Sanction Limitation and Exclusion Clause LMA3100, as attached.
8. Tie in of limits clause, Prior Policy Endorsement, as attached
9. Premium Payment Clause LSW3000, as attached.
10. LMA 9105 (amended) – Policyholder Disclosure Notice of Terrorism Insurance Coverage, as attached.

Special Cancellation/Insurer Downgrade Clause as attached.

IUA 09-054 Foreign Account Tax Compliance Act ('FATCA') - only to apply in respect of FATCA in scope contracts, as attached.

Where the terms '(Re)Insurer' and/or 'contract period' and/or '(Re)Insured' do not appear in the Risk Details or attached Policy wording the functional equivalents of these terms shall be deemed incorporated herein.

**CHOICE OF LAW & JURISDICTION:**     Unless stated herein to the contrary, this (Re)Insurance shall be governed by and construed in accordance with the laws of US New York and the exclusive jurisdiction of the US New York courts.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
| --- | --- | --- |
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **3** of **24** |

**PREMIUM:**  USD 2,000,000.00 (100%)

**PREMIUM PAYMENT TERMS:**  Premium Payment Clause LSW 3000

**TAXES PAYABLE BY THE INSURED AND ADMINISTERED BY INSURERS:**  None

**TAXES PAYABLE BY THE INSURERS AND ADMINISTERED BY INSURED OR THEIR AGENT:**  None

**RECORDING, TRANSMITTING AND STORING INFORMATION:**  Where Marsh Ltd maintains risk and claim data, information or documents, Marsh Ltd may hold such data, information or documents electronically.

**INSURER CONTRACT DOCUMENTATION:**  This document details the contract terms entered into by the (Re)Insurers and constitutes the contract document.

This contract is subject to US state Surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the Insured. In the event that the surplus lines notice is not affixed to the contract document the Insured should contact the surplus lines broker.

| If placed via PPL this box will not be signed |
| --- |
| Contract Leader |

| **MARSH LTD** | | |
| --- | --- | --- |
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **4** of **24** |

## MARSH EXCESS LAYER POLICY

In consideration of the **Insured** having paid or having promised to pay the premium, and subject to all of the terms, conditions and limitations of this excess policy, the insurers described in the SECURITY DETAILS of this policy ('**Insurer**') and the **Insured** agree as follows:

1.  **Insuring agreement**

1.1     The **Insurer** will provide the **Insured** with insurance coverage upon the terms, conditions and limitations of the **Primary Policy** except insofar as express provision for any matter is set out in this excess policy, and only insofar as necessary, the terms conditions and limitations set out in this excess policy will prevail over the corresponding terms, conditions and limitations of the **Primary Policy**.

1.2     Subject to the **Limit of Liability** the **Insurer** will pay to or on behalf of the **Insured** that proportion of the loss which exceeds the **Underlying Insurance**.

1.3     Subject to the provisions of sub-clause 1.4, unless and to the extent that clause 4 of this excess policy applies, the **Insurer** will have no liability under this excess policy unless and until all of the **Underlying Insurance** has been exhausted by the payment of losses under the **Underlying Insurance**.

1.4     For the purposes of this excess policy, losses shall be deemed to have been paid under an **Underlying Insurance** if all or any of the insurers subscribing thereto have paid, or have agreed to pay such losses, or have had their liability to pay such losses established by judgment, arbitration award or other final binding adjudication.  Such payment will, for the purposes of this excess policy, be deemed to have been made on the date of payment, agreement or adjudication, whichever occurs first.

Furthermore:

(a)     If a payment in respect of a loss is made under an **Underlying Insurance** of an amount which is less than the applicable limit of liability under that **Underlying Insurance** (but the relevant covered loss of the **Insured** exceeds the applicable limit of liability under that **Underlying Insurance**), then such payment will, for the purposes of determining the application of this excess policy to such covered loss, be deemed to exhaust the applicable limit of liability of that **Underlying Insurance** provided the **Insurer** will be liable to pay only that part of the covered loss which exceeds the **Underlying Insurance**.

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **5** of **24** |

(b)   If any insurer participating on an **Underlying Insurance** is or becomes **Insolvent** then, for the purposes of this excess policy, such **Insolvent** insurer will be deemed to have paid in full the amount of its liability for losses under such **Underlying Insurance**, but only in the event that either:

    (i)   any other insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication, whichever occurs first; or

    (ii)   an **Insured** establishes that the **Insurer** would be liable hereunder but for the **Insolvency**.

(c)   The **Insurer** will recognise the erosion of **Underlying Insurance** whether or not cover provided in such **Underlying Insurance** is also provided by this excess policy.

## 2.   Definitions

2.1   **Insolvent** or **Insolvency** means that any step, application, order, proceeding or appointment has been taken or made in respect of an entity for composition or arrangement with creditors, winding-up, dissolution, administration, receivership (administrative or otherwise) or bankruptcy, or that the entity is unable to pay its debts.

2.2   **Insured** means all persons, organisations and entities as are insured under the **Primary Policy** for their own separate insurable interests.

2.3   **Insurer** means those entities and/or syndicates who are identified as underwriters or insurers by affixing of their seal or stamp in the SECURITY DETAILS section of this contract.

2.4   **Limit of Liability** means the amount set forth in the RISK DETAILS of this policy, which will be the maximum sum the **Insurer** is liable to pay under this excess policy.

2.5   **Primary Policy** means the primary contract identified in the RISK DETAILS of this policy.

2.6   **Policy Period** means the period specified in the RISK DETAILS of this policy.

2.7   **Underlying Insurance** means the **Primary Policy** together with any and all excess policies providing together the amount of cover specified at item (b) of the limit of liability in the RISK DETAILS of this policy, and any policies replacing any of them.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **6** of **24** |

3.      **Maintenance of Underlying Insurance**

3.1     Subject to sub-clauses 3.2 to 3.4 below, all of the **Underlying Insurance** will be maintained during the **Policy Period** in full effect, except for any depletion of underlying limits.

3.2     The **Insured's** failure to maintain **Underlying Insurance** by reason of an action by an insurer subscribing to the **Underlying Insurance** (other than in relation to cancellation for the non-payment of premium by the **Insured**) will not invalidate this excess policy but, and subject to the application of clause 4, the **Insurer** will not be liable to a greater extent or at an earlier point in time than if sub-clause 3.1 had been complied with.  Nothing in this clause will negate clause 6 of this excess policy.

3.3     In the event of a failure by the **Insured** to give notice or to exercise any extension under any **Underlying Insurance** the **Insurer** will not be liable under this excess policy to a greater extent or at an earlier point in time than they would have been in the absence of such failure.

3.4     In the event of the **Insolvency** of any insurer participating on any **Underlying Insurance** the **Insured** shall not be in breach of the obligations under sub-clause 3.1 above if the **Underlying Insurance** is no longer in full force and effect as a result of that **Insolvency**.

4.      **Depletion of Underlying Limits**

4.1     In the event and to the extent of the depletion or exhaustion of any limit of liability of the **Underlying Insurance** other than as provided for in sub-clause 4.2 below, and as a result of payment of a loss or losses under the **Underlying Insurance**, this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue and operate for subsequent losses as excess insurance over the amount of the relevant limit of liability remaining under such **Underlying Insurance**.

4.2     In the event of the exhaustion of any aggregate limit of liability applicable under the **Underlying Insurance** as a result of the payment of loss or losses under the **Underlying Insurance** this excess policy will (subject to the **Limit of Liability** and terms, conditions and limitations of this excess policy) continue for subsequent losses as primary insurance in respect of any subsequent loss or losses that would otherwise have been covered by such **Underlying Insurance** but for the exhaustion of that aggregate limit of liability.

4.3     In the event that this excess policy is required to operate as primary insurance by virtue of sub-clause 4.2 above:

(a)     any excess or retention specified in the **Primary Policy** shall apply to this excess policy, otherwise no excess or retention shall apply to this excess policy;

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **7** of **24** |

(b)   in respect of any loss or losses for which the **Primary Policy** imposed a sub-limit of liability, this excess policy will provide cover for such loss or losses, including any unpaid portion of that sub-limit.

4.4   For the purposes of this clause 4, the determination of whether there has been any payment of losses under and/or exhaustion of any **Underlying Insurance** will be made in accordance with sub-clause 1.4.  However, and for the purposes of this clause 4 only:

(a)   if and to the extent that paragraph 1.4(a) above applies, any and all amounts representing the difference between:

(i)   any applicable limit of liability of any **Underlying Insurance** and

(ii)   the amount paid by that **Underlying Insurance**

will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above

and

(b)   if and to the extent that sub-paragraph 1.4(b)(i) above applies, any and all amounts representing the difference between:

(i)   any applicable limit of liability of any **Underlying Insurance** and

(ii)   the amount that any insurer participating on the relevant **Underlying Insurance** pays, or agrees to pay or has its liability to pay established by judgment, arbitration award or other final binding adjudication

will be included in the calculation of the amount excess of which this excess policy shall then operate in accordance with sub-clause 4.1 or sub-clause 4.2 above.

4.5   An **Underlying Insurance** will not be deemed exhausted solely by reason of the **Insolvency** of an insurer participating thereon.

5.   **Claims**

5.1   Any first notice of a claim or circumstance (or equivalent term by which the **Primary Policy** identifies matters potentially giving rise to notifications thereunder in respect of a loss or losses) required to be given under the terms of the **Primary Policy**, will also be given to the **Insurer** under this excess policy.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **8** of **24** |

5.2    In respect of any matter notified pursuant to sub-clause 5.1 above:

(a)    the **Insured** will inform the **Insurer** of any material developments in relation to such matter;

(b)    without prejudice to paragraph 5.2(a) above the rights and obligations set out in any claims investigation, claims co-operation, claims handling, claims defence, claims assessment and/or claims settlement provisions of the **Primary Policy** will be incorporated into this excess policy, but will not be enforceable for the purpose of this excess policy unless and until the loss or losses (including any defence costs or other fees incurred by the **Insured** for which indemnity is available under the **Primary Policy**) likely to arise from such matter have the potential to deplete the **Underlying Insurance** such that the policy immediately underlying this excess policy will be eroded to the extent of 50% or more of the limit of liability of such immediately underlying policy.

6.    **Alteration**

6.1    No amendment to the **Primary Policy** during the **Policy Period** will be effective in extending the scope of this excess policy, until agreed in writing by the **Insurer**.

6.2    No claim payment made as a consequence of an amendment to the **Primary Policy** during the **Policy Period** will operate to deplete or exhaust any limit of liability of the **Underlying Insurance** unless such amendment has been agreed in writing by the **Insurer**.

7.    **Governing Law and Jurisdiction**

7.1    The constructions, interpretation and meaning of the terms, exclusions limitations and conditions of this excess policy shall be determined in accordance with the laws of the state or country specified in the RISK DETAILS of this policy, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the courts of the state or country specified in the RISK DETAILS of this policy.

8.    **Dispute Resolution**

8.1    In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy, the provisions of the **Primary Policy** are incorporated into this excess policy for the purposes of determining the dispute resolution procedures applicable to this excess policy.

8.2    In the event that a dispute arises between the **Insurer** and the **Insured** under this excess policy in relation to matters that are also the subject of a dispute between the **Insured** and the insurers of any **Underlying Insurance** then those disputes shall be heard together in the same court or arbitration proceedings.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **9** of **24** |

## <u>SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)</u>

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.
NMA1168

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **10** of **24** |

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.       Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.      Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.     Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **11** of **24** |

the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.
* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **12** of **24** |

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
| --- | --- | --- |
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **13** of **24** |

## <u>WAR AND TERRORISM EXCLUSION ENDORSEMENT</u>

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

| If placed via PPL this box will not be signed |
| --- |
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **14** of **24** |

## <u>SANCTION LIMITATION AND EXCLUSION CLAUSE</u>

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

If placed via PPL this
box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **15** of **24** |

## <u>TIE-IN OF LIMITS CLAUSE – POLICIES</u>

It is agreed that:

In consideration of the premium charged, it is hereby understood and agreed that the Limit of Liability of the **Insurer** for **Loss** under this Policy, UMR B0509FINFW1800560, and the prior Policy, UMR B0509FINFW1800153 (amended from UMR B0507N17FA23160), shall be combined.

Accordingly, the Limit of Liability for **Loss** under either Policy mentioned above shall be reduced by **Loss** incurred under either Policy.

All other terms, conditions and exclusions remain unchanged.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **16** of **24** |

### <u>PREMIUM PAYMENT CLAUSE</u>

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 60 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 60th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

If placed via PPL this box will not be signed

Contract Leader

| **MARSH LTD** | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **17** of **24** |

## Special Cancellation/Insurer Downgrade Clause

1   The Underwriter shall give notice to the Insured's representative, as identified in this Contract, as soon as practicable and in any event within 14 days, or as soon as permitted by its regulator if later, where the Underwriter:

(i)   a.   ceases underwriting entirely; or

     b.   ceases underwriting the type of insurance provided by this policy in a territory where the Insured is domiciled; or

     c.   formally announces its intention to cease underwriting as per (i)a or (i)b above; or

(ii)   voluntarily or involuntarily elects to wind up, run off its business, enter a scheme of arrangement or enter into any form of bankruptcy protection or related formal or informal termination of its insurance operations; or

(iii)   has its authority to carry on insurance business withdrawn.

2   The Insured or the Insured's representative may terminate an Underwriter's participation on this risk by giving written notice:

(i)   When one of the events identified above at Condition 1 takes place; or

(ii)   In the event that an Underwriter has its financial strength rating downgraded below BBB by Standard & Poor's or A- by AM Best. For Lloyd's syndicates it is the financial strength rating of Lloyd's as a whole which is considered.

The effective date of termination shall not be earlier than the date notice is actually given by the Insured or the Insured's representative.

Upon notice of cancellation having been given by the Insured or the Insured's representative to the Underwriter, the Underwriter shall pay to the Insured a pro rata return premium for the unexpired period of the policy. Such pro rata return premium shall be paid in accordance with the terms of trade previously agreed between the Insured's representative and the Underwriter to whom notice of cancellation has been given.

In the event that there are any notifications under this policy or the Underwriter has made any payments pursuant to any policy term or condition providing coverage under this policy to the Insured, the premium shall be deemed fully earned unless the Insured withdraws such notifications and/or reimburses the Underwriter for any payment(s) made.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **18** of **24** |

**POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE**

Coverage for acts of terrorism is already included in the policy (including any quotation for insurance) to which this notice applies. You should know that, under the policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020; of covered terrorism losses exceeding the statutorily established deductible paid by the insurer providing the coverage. However, your policy may contain certain exclusions which might affect your coverage, such as exclusion for nuclear events. The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year.

YOU ARE HEREBY NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, AS AMENDED, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER YOUR  POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES, SUBJECT TO A $100 BILLION CAP, AND YOU HAVE BEEN NOTIFIED OF THE AMOUNT OF THE  PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

The premium allocated for this coverage is 1% of the overall premium charged for your policy.

**Option to reject terrorism insurance coverage**

*Your policy automatically provides coverage for claims arising out of acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002 at no additional cost to you. If you would prefer not to have such coverage please check the box below, sign where indicated and return this form to your insurance broker or intermediary. **Please note that there will be no reduction in premium if terrorism coverage is removed from your policy.***

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **19** of **24** |

| | I hereby elect not to have TRIA coverage under this policy.  I understand that I will have no coverage for losses arising from certified acts of terrorism. |
|---|---|

_____
___
***Policyholder / Applicants Signature***

_____
___
***Name of Assured***

_____
__
***Print Name***

***Policy Number***

_____/_____/_____
***Date***

LMA9105 (amended)

If placed via PPL this
box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **20** of **24** |

## FOREIGN ACCOUNT TAX COMPLIANCE ACT ('FATCA')

Each (Re)Insurer hereby acknowledges the requirements of Sections 1471-1474 US Internal Revenue Code of 1986, as amended, and the Treasury regulations and other guidance issued from time to time thereunder ('FATCA') and the obligation of each of them to provide to Marsh Ltd a valid Internal Revenue Service ('IRS') Form W8-BEN-E, W-9 or other documentation meeting the requirements of the FATCA regulations to establish they are not subject to any withholding requirement pursuant to FATCA (the 'Required Documentation').

Furthermore:

a)   If a (Re)Insurer becomes non-compliant with FATCA during the contract period or has not provided the Broker with the Required Documentation 14 days prior to any premium due date, the Withholding Agent (as defined in U.S. Treasury Regulation Section 1.1471-1(b)(147)) shall withhold 30% of the premium (to the extent all or a portion of that premium is subject to withholding pursuant to FATCA) due to that (Re)Insurer under this contract on that premium due date and shall promptly notify that (Re)Insurer via the Broker.

b)   The withholding of premium by virtue of (a) above shall not be, and shall not be treated by the (Re)Insurer as a breach of any premium payment condition, warranty or other clause whether or not entitling the (Re)Insurer to cancel, terminate or restrict this contract, refuse, restrict or delay payment of any claim or invoke any interest, penalty or other late payment provision. The (Re)Insurer shall be liable under this contract as if no such withholding had been made.

c)   The (Re)Insurer shall not recoup sums withheld under (a) above by deducting equivalent sums from any payments due to the (Re)Insured or by set off against any other sums owed by the (Re)Insurer and any general or contractual right of set-off enjoyed by the (Re)Insurer is hereby varied and qualified to that extent.

d)   Where premium is withheld in error, has not yet been paid to the IRS and the (Re)Insurer has been paid only the net premium following such withholding, the broker will cooperate with the (Re)insurer to process the requisite refund.

IUA 09-054 (FATCA)

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **21** of **24** |

| INFORMATION |
|---|

None.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **22** of 24 |

| SECURITY DETAILS |
|---|

**(RE)INSURER'S LIABILITY:**

LMA3333
**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning 'signing' below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is 'signing' (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its 'written line'.

Where this contract permits, written lines, or certain written lines, may be adjusted ('signed'). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **23** of 24 |

syndicate taken together) is referred to as a 'signed line'. The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to 'this contract' in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**        58% of 100%

**BASIS OF WRITTEN LINES:**        Percentage of Whole

**SIGNING PROVISIONS:**        In the event that the written lines hereon exceed 100% of the order, any lines written 'To Stand' will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (Re)Insurers.

However:

a)    in the event that the placement of the order is not completed by the commencement date of the period of (Re)Insurance then all lines written by that date will be signed in full;

b)    the (Re)Insured may elect for the disproportionate signing of (Re)Insurers' lines, without further specific agreement of (Re)Insurers, providing that any such variation is made prior to the commencement date of the period of (Re)insurance, and that lines written 'To Stand' may not be varied without the documented agreement of those (Re)Insurers;

c)    the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of (Re)Insurance, by the documented agreement of the (Re)Insured and all (Re)Insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (Re)Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **24** of **24** |

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the leading (re)insurer.

(Re)Insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

(Re)insurers confirm and agree that where NCAD (Notice of Cancellation at Anniversary Date) is embedded in their stamp/line this is deemed to read and mean NCED (Notice of Cancellation at Expiry Date). This does not affect the right of the (re)insurer to issue a Notice of Cancellation in accordance with the contract terms.

**WRITTEN LINES:**

As shown below and, where placed electronically either wholly or in part via Placing Platform Limited (PPL), in the PPL SECURITY DETAILS.

21.39%   Forge Underwriting   1 8 B F 1 0 1 0 7 4 1 0 1 1 7   3/12/18

S:1F

Security: PartnerRe Ireland Insurance dac



| MARSH LTD | | |
| --- | --- | --- |
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **1** of **10** |

# CONTRACT ADMINISTRATION

# AND

# ADVISORY DETAILS

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **2** of **10** |

| SUBSCRIPTION AGREEMENT |
|---|

**CONTRACT LEADER:** Lloyd's Syndicate 4711

In respect of placements completed using PPL, the Contract Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

Wherever the term 'Slip Leader' appears throughout this contract it is amended to read and mean 'Contract Leader'.

**BUREAU LEADER:** The first Lloyd's bureau stamp on this contract.
The first Company bureau stamp on this contract

In respect of placements completed using PPL, the Bureau Leader will be indicated in the relevant field in PPL and on the subsequent Security Details.

**BASIS OF AGREEMENT TO CONTRACT CHANGES:** GUA (February 2014) with Non-Marine Schedule (October 2001).

31 days extension, if required by the (Re)Insured/Policyholder, at terms and conditions to be agreed by the Contract Leader on behalf of all (Re)Insurers hereon.

All Notice of Cancellation at Anniversary Date terms are amended to provide Notice of Cancellation at Expiry Date, including subsequent period extensions.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which (a) is binding upon the following (Re)Insurers with the agreement of the Contract Leader only (and any additional agreement party if present), and (b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader.

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR**

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **3** of **10** |

**PART 2 GUA CHANGES ONLY:**

Unless any other (Re)Insurers are specified below, the Agreement Parties for Part Two changes will be the Contract Leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY:**

None, unless any (Re)Insurers are specified here.

Where a following (Re)Insurer has charged a different contract premium to that required by the Contract Leader and there is a contract change which

a) is binding upon the following (Re)Insurers with the agreement of only the Contract Leader (and any additional agreement party if present), and

b) involves premium adjustment which is not already provided for within the terms of the contract, then the following (Re)Insurers agree to follow the premium adjustment agreed by the Contract Leader in the same ratio as their respective contract premium bears to that of the Contract Leader

**BASIS OF CLAIMS AGREEMENT:**

As specified under the CLAIMS AGREEMENT PARTIES and to be managed in accordance with:

i) The SINGLE CLAIMS AGREEMENT PARTY ARRANGEMENTS - LMA9150 for claims or circumstances assigned as Single Claims Agreement Party Claims (SCAP Claims) or, where it is not applicable, then the following shall apply as appropriate:

ii) The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

iii) International Underwriting Association of London IUA claims agreement practices.

For non-bureau (re)insurers only, the contract leader only and to be binding for non-bureau (re)insurers.

**CLAIMS AGREEMENT PARTIES:**

A. Claims falling within the scope of the LMA9150 to be agreed by

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **4** of **10** |

Contract Leader only on behalf of all (re)insurers subscribing (1) to this Contract on the same contractual terms (other than premium and brokerage) and (2) to these Arrangements.

For the purposes of calculating the Threshold Amount, the sterling rate on the date that a financial value of the claim is first established by the Contract Leader shall be used and the rate of exchange shall be the Bank of England spot rate for the purchase of sterling at the time of the deemed conversion.

B.  For all other claims:

i)  For Lloyd's syndicates

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate.

Where applicable, the second Lloyd's syndicate is deemed to be the first syndicate stamp to appear after the leading Lloyd's syndicate. For PPL the 2nd claims agreement party will be agreed by endorsement.

ii)  Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii below.

The first IUA company and, where required by IUA practices, the second IUA company.

iii)  Those companies that have specifically elected to agree claims in respect of their own participation.

iv)  All other subscribing (re)insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation.

v)  Notwithstanding anything contained in the above to the contrary, any ex gratia payments to be agreed by each (re)insurer for their own participation.

**CLAIMS ADMINISTRATION:**    Marsh Ltd and (re)insurers agree that any claims hereunder (including any claims related costs/fees) that are in scope and supported by Electronic Claims File (ECF) will be notified and administered via ECF with any payment(s) processed via CLASS, unless both parties agree to do otherwise.

Where claims or circumstances are not administered via ECF,

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **5** of **10** |

notification, administration and payment(s) will be email or paper file.

Where a Lloyd's syndicate or IUA company is not an agreement party to the claim or circumstance (per CLAIMS AGREEMENT PARTIES A. above), they agree to accept correct ECF sequences for administrative purposes to ensure information is circulated to all subscribing parties.

Claims, or any element thereof, settled in a currency for which Marsh Ltd do not hold a banking account will be agreed using a notional rate of exchange which is subject to adjustment. Any difference greater than GBP1,000 per payment or in the aggregate, to be paid by or refunded to (re)insurers as appropriate.

Extension of time to file a proof of loss to be agreed

a)      if the contract leader is a non-Lloyd's (re)insurer, by the contract leader and Lloyd's Claims Agreement Parties only;

b)      if the contract leader is a Lloyd's (re)insurer, by the Lloyd's Claims Agreement Parties only.

Notwithstanding any contrary provisions concerning notification contained in applicable contract documentation to which this agreement applies and in the absence of a condition specifically nominating a party to whom notice must be given (other than (re)insurers) and provided that notification otherwise fully satisfies policy conditions then the (re)insured will be regarded as having complied with contract notification provisions when Marsh Ltd or its subsidiary or successor entities receives notification by email, facsimile or post.

**RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY:**
None, unless otherwise specified here by any other claims agreement parties shown above.

**EXPERT(S) FEES COLLECTION:**
Expert fees payable by (Re)Insurers for services performed on their behalf to be collected by the expert or their appointed fee collection service provider.

**SETTLEMENT DUE DATE:**
20th December 2018

If placed via PPL this box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **6** of **10** |

**BUREAU(X) ARRANGEMENTS:** De-linked accounts to be presented by Marsh Ltd to Xchanging Insure Services (XIS).

Bureau re(insurers) agree to allow XIS not to 'group' associated de-linked signings. Each individual de-linked signing may be released for settlement to XIS independently of any other associated items.

Presentation to XIS of a contract with a premium payment warranty (PPW), premium payment condition (PPC) or prompt payment condition for a signing number and date within the timeframe specified within the warranty or condition shall be sufficient evidence of compliance and payment to all (re)insurers participating hereon. Subsequent rejection shall not affect the fact that the warranty/condition and/or the settlement due date (SDD) has been met by the original presentation and therefore no further update of the due date is required.

In respect of the LSW3001 (amended) or any other Premium Payment Clause, the SDD will automatically be amended to the date the premium is paid to (re)insurers.

Where any SDD, PPW or PPC due date falls on a weekend or public holiday, presentation to XIS on the next working day will be deemed to be in compliance with such SDD, PPW or PPC.

(Re)Insurers agree that the second and subsequent premium instalments are taken down as additional premiums, other than annual re-signings.

In respect of additional premium signings the SDD will follow the same payment period allowed under the original premium payment terms. However, the payment period shall commence from the date of the final agreement of the endorsement or the effective date, whichever is the later.

Claims and/or return premiums may be collected and taken down on production of a copy (including a photocopy) and/or duplicate of the applicable contract or policy.

In respect of non –settlement currencies:
XIS to accept settlement of premium in Pounds Sterling (GBP) converted at the rate of exchange at the date of receipt of payment by Marsh Ltd. However, in the event Marsh Ltd are paid in Pounds Sterling (GBP), U.S. Dollars (USD) or EUROS (EUR) then settlement will be made via XIS in GBP, USD or EUR as received by Marsh Ltd.

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER | | |
| B0509FINFW1800560 | | Page **7** of **10** |

Bureau (re)insurers agree to accept an interim For Declaration Only (FDO) signing.

In the event the Settlement Due Date (as detailed in Subscription Agreement) and/or the Allocation of Premium to Coding and/or Year of Account (as detailed in Fiscal and Regulatory) differ from those shown in the PPL SECURITY DETAILS, the information recorded in the PPL SECURITY DETAILS shall take precedence.

**PLACING PLATFORM LIMITED (PPL) ARRANGEMENTS:** (Re)insurers instruct Xchanging to accept any attachments and additional information as detailed in this Market Reform Contract and any subsequent endorsements thereto, without sight of agreement from (re)insurers on the understanding that Marsh Ltd has obtained agreement thereto from the applicable (re)insurers.

**NON–BUREAUX ARRANGEMENTS:** Where any Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, payment of premium by telegraphic transfer or any other relevant electronic settlement method on the next working day will be deemed to be in compliance with such PPW or PPC.

Where (Re)Insurers have agreed to regular (weekly/ monthly/ quarterly) accounting the Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date shall be overridden by the accounting agreement.

| If placed via PPL this box will not be signed |
|---|
| Contract Leader |

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **8** of **10** |

| **FISCAL AND REGULATORY** |
|---|

**TAX PAYABLE BY**
**INSURER(S):**          None


**COUNTRY OF**
**ORIGIN:**          United States of America


**OVERSEAS**
**BROKER:**          Marsh USA Incorporated
1166 Avenue of the Americas
New York 10036-2774
United States of America


**BROKER:**          Marsh Ltd
Tower Place
London
EC3R 5BU


**SURPLUS LINE**
**BROKER:**          **Surplus Line Broker Name and Licence No.**
Thomas Orrico #892706


          **Surplus Line Broker address:**
1166 Avenue of the Americas
New York,
NY 100362708
United States of America


**US**
**CLASSIFICATION:**          US Surplus Lines.


**ALLOCATION OF**
**PREMIUM TO**
**CODING:**          In respect of the premium allocated to the USA:
99% D2
1% 7T

          In respect of the premium allocated to the Rest of the World:
100% D2

If placed via PPL this
box will not be signed

Contract Leader

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br><br>B0509FINFW1800560 | | Page **9** of **10** |

**REGULATORY
CLIENT
CLASSIFICATION:**     Large Risk

| MARSH LTD | | |
|---|---|---|
| CONTRACT NUMBER<br>B0509FINFW1800560 | | Page **10** of **10** |

| BROKER REMUNERATION AND DEDUCTIONS |
|---|

**FEE PAYABLE BY CLIENT:**　　　　No

**TOTAL BROKERAGE:**　　　　21.5%

**OTHER DEDUCTIONS FROM PREMIUM:**　　　　None.

If placed via PPL this box will not be signed

Contract Leader

Policy Number: (UMR) B0509FINFW1800560

## SECURITY DETAILS

### REFERENCES

UMR (Unique Market Reference): B0509FINFW1800560

Date contract printed to PDF: 10:05 04 December 2018

## SIGNED UNDERWRITERS

**Aspen Insurance Ltd (Insurance)**

Simon Inzani

| **Written Line** | 36.61% | **Signed Line** | 36.61% |
|---|---|---|---|
| **Agreed on** | 11:38 30 November 2018 | | |

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Lloyd's Underwriter Syndicate No. 4711, London, England | | 36.61% | 36.61% |

**Bound as Slip Leader, Lloyd's Leader**

| | | |
|---|---|---|
| *Lloyd's Stamp:* | 4711 | |
| *LORS Code:* | L4711 | |
| *Reference:* | FIA982U18A0W | |
| *Description:* | | |
| *Risk Code(s):* | 7T, D2 | |

---

**Aggregated Offline Market - Proportional Signing**

Non PPL Underwriter

| **Written Line** | 21.39% | **Signed Line** | 21.39% |
|---|---|---|---|

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Aggregated Offline Market - Proportional Signing | | 21.39% | 21.39% |

**Bound Offline - Evidence held on file**

| | |
|---|---|
| *Reference:* | as per signed slip |
| *Description:* | 18BF10107410117 |

Policy Number: (UMR) B0509FINFW1800560

## SETTLEMENT INFORMATION

**Allocation of Premium to Coding**

7T at 1.00%

D2 at 99.00%

**Allocation of Premium to Year of Account**

2018

**Terms of Settlement**

Settlement Due Date:                          20 December 2018

Instalment Premium Period of Credit:          0 day(s)

Adjustment Premium Period of Credit:          0 day(s)

Lloyd's Underwriter Syndicate No. 4711, London, England
**Bureau Leader and Lloyd's Leader**
Simon Inzani