# Exhibit 4

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. STOCKHOLDER LITIGATION | Consolidated C.A. No. 2018-0396-AGB<br><br>**CONFIDENTIAL FILING**<br><br>PUBLIC VERSION DUE MAY 15, 2019 |

## <u>AMENDED VERIFIED CONSOLIDATED CLASS ACTION COMPLAINT</u>

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE.**

If you are not authorized by Court Order to view or retrieve this document, read no further than this page. You should immediately contact the following person(s):

**LABATON SUCHAROW LLP**
Ned Weinberger (#5256)
Mark Richardson (#6575)
Thomas Curry (#5877)
300 Delaware Ave., Suite 1340
Wilmington, DE 19801
(302) 573-2540

**PRICKETT, JONES & ELLIOTT, P.A.**
Marcus E. Montejo (# 4890)
John G. Day (#6023)
1310 King Street
Wilmington, Delaware 19801
(302) 888-6500

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (#2864)
Michael J. Barry (#4368)
Kyle J. McGee (#5558)
Joseph L. Christensen (#5146)
123 Justison Street
Wilmington, DE 19801
(302) 622-7000

**WOLF POPPER LLP**
Carl L. Stine
Adam J. Blander
845 3rd Avenue, 12th Floor
New York, New York 10022
(212) 759-4600

*Attorneys for Plaintiffs*

**A PUBLIC VERSION OF THIS DOCUMENT WILL BE FILED ON OR BEFORE MAY 15, 2019**

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE AMTRUST FINANCIAL SERVICES, INC. STOCKHOLDER LITIGATION | Consolidated C.A. No. 2018-0396-AGB<br><br>**CONFIDENTIAL FILING**<br><br>PUBLIC VERSION DUE MAY 15, 2019 |

## AMENDED VERIFIED CONSOLIDATED CLASS ACTION COMPLAINT

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................ 1

    A.   THE TOWER TRANSACTION – USURPING OF A VALUABLE CORPORATE OPPORTUNITY ..................................................8

    B.   THE ACCOUNTING RESTATEMENT ........................................11

    C.   THE UNFAIR TAKE-PRIVATE TRANSACTION .........................12

II.   PARTIES ........................................................................ 18

III.   RELEVANT NON-PARTIES ............................................... 30

    A.   AMTRUST ..........................................................................30

    B.   MICHAEL KARFUNKEL FAMILY 2005 TRUST .........................33

    C.   MAIDEN HOLDINGS, LTD. ....................................................34

    D.   ACP ..................................................................................34

    E.   NGHC ...............................................................................35

    F.   ESTATE OF MICHAEL KARFUNKEL ........................................36

IV.   SUBSTANTIVE ALLEGATIONS ....................................... 38

    A.   BACKGROUND OF AMTRUST AND THE CONTROL GROUP .....................38

    B.   BACKGROUND OF DERIVATIVE LITIGATION PENDING AGAINST MEMBERS OF THE KARFUNKEL-ZYSKIND FAMILY AND AMTRUST BOARD AT THE TIME OF THE TAKE-PRIVATE TRANSACTION ...............40

        1.   The Cambridge Derivative Action ............................................40

            a.   Without Telling the AmTrust Board, The Karfunkel-Zyskind Family Disloyally Decided The Karfunkel-Zyskind Family's Other Businesses Should Profit from the Tower Opportunity. ................. 42

            b.   The AmTrust Board Failed to Protect the Interests of the Company and its Minority Stockholders............. 47

            c.   The Cambridge Derivative Claims Were Worth Hundreds of Millions of Dollars.................................... 62

        2.   Defendants' Financial Restatement Causes the Company's Stock Price to Crater, Setting the Stage for An Unfair Merger.......................................................67

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

3.    Defendants Ignored Red Flags that Led to the 2017 Financial Restatements ............................................78

4.    AmTrust Takes Steps to Strengthen Its Balance Sheet ............82

V.    THE TRANSACTION WAS A PRODUCT OF AN UNFAIR PROCESS .................................................................................. 84

A.    THE CONTROL GROUP TIMES ITS OFFER TO TAKE ADVANTAGE OF ITS OWN MISCONDUCT .....................................................85

B.    THE SPECIAL COMMITTEE FAILS TO PROTECT THE PUBLIC STOCKHOLDERS OF AMTRUST .............................................89

1.    The Special Committee Is Belatedly Formed and Inadequately Empowered...........................................89

2.    Zyskind Finally Informs the Board of a Potential Take-Private Transaction Involving Stone Point; In Response, the Conflicted Board Forms the Conflicted Special Committee ...................................................................93

3.    The Special Committee Was Conflicted................................108

4.    Given Its Capture by The Karfunkel-Zyskind Family, the Special Committee Unsurprisingly Ignores Its Informational Vacuum to Justify the Transaction and Blesses the Unfair Transaction ................................114

5.    Zyskind and AmTrust Management Manipulate the Special Committee's Valuation Through Threats of a Ratings Downgrade.................................................119

6.    The Special Committee and Company Hire Conflicted Advisors .....................................................................137

a.    Deutsche Bank's Conflicts .........................................137

b.    BOA's Conflicts .........................................................139

VI.    THE UNFAIR PROCESS YIELDED AN UNFAIR PRICE.................... 142

A.    AMTRUST'S STOCKHOLDERS AND MARKET COMMENTATORS AGREE THE INITIAL PRICE WAS UNFAIR ...........................154

B.    THE SPECIAL COMMITTEE FAILED TO ADEQUATELY VALUE THE DERIVATIVE CLAIMS .........................................................163

-ii-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

    1.    The Special Committee Made No Good Faith Valuation of the Cambridge Derivative Claims .......................................163

    2.    The Special Committee Did Not Value the Accounting Derivative Claims at All ........................................................168

    3.    Defendants Are Forced to Improve the Terms to Buy Stockholder Support, but Still Fail to Provide an Entirely Fair Price ................................................................................170

VII.   THE STOCKHOLDER VOTE WAS COERCED.................................... 176

VIII.  DEFENDANTS HAVE FAILED TO DISCLOSE ALL MATERIAL INFORMATION ................................................................... 180

    IX.    TROUBLING POST-MERGER DEVELOPMENTS .....................187

X.     CLASS ACTION ALLEGATIONS ........................................... 192

XI.    COUNTS ....................................................................... 194

    COUNT I BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS ........................................................194

    COUNT II BREACH OF FIDUCIARY DUTY AGAINST ZYSKIND AS AN OFFICER ...............................................................196

    COUNT III BREACH OF FIDUCIARY DUTY AGAINST ZYSKIND, G. KARFUNKEL, AND L. KARFUNKEL ..........................197

XII.   RELIEF REQUESTED ........................................................... 201

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Plaintiffs Arca Investments, a.s., Arca Capital Bohemia, a.s., and Krupa Global Investments f/k/a Arca Venture Capital a.s. (together, "Arca"), Pompano Beach Police & Firefighters' Retirement System ("Pompano"), Cambridge Retirement System ("Cambridge" and, together with Arca and Pompano, the "Lead Plaintiffs"), City of Lauderhill Police Officers' Retirement System and West Palm Beach Police Pension Fund ("Plaintiffs"), by and through their undersigned attorneys, submit this Amended Verified Consolidated Class Action Complaint against the defendants named herein, and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, investigations undertaken by Lead Plaintiffs' counsel, including demands for the production of documents pursuant to Section 220 of the Delaware General Corporation Law, discovery taken in related matters, consultation with financial advisors, and retention of private investigators, as to all other allegations herein, as follows:

## I.    INTRODUCTION

1.    Pursuant to an Agreement and Plan of Merger, dated as of March 1, 2018 (the "Initial Merger Agreement") between AmTrust, Evergreen Parent, L.P. ("Parent"), and Evergreen Merger Sub., Inc. ("Merger Sub"), the Karfunkel-Zyskind Family (defined below) and private equity firm Stone Point Capital LLC (collectively, the "Acquiring Group" or "MBO Group") was to acquire AmTrust's

-1-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

minority shares for $13.50 per share (the "Merger").  The Karfunkel-Zyskind Family owned or controlled approximately 55% of the outstanding common shares of AmTrust, and all of AmTrust's directors are either members of the Karfunkel-Zyskind Family, have close affiliations to the Karfunkel-Zyskind Family, or are beholden to the Karfunkel-Zyskind Family.

2.      The Karfunkel-Zyskind Family attempted to structure the Merger to qualify for business judgment review under *M&F Worldwide* by conditioning the proposed going-private transaction on special committee approval and a majority-of-the-minority vote.  Under *M&F Worldwide*

> in controller buyouts, the business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.

88 A.3d at 645 (emphasis in original).

3.      The effort failed spectacularly.

4.      In reality, the Merger was negotiated between the Karfunkel-Zyskind Family —a 55% controlling stockholder—and a brief interloping minority common stockholder with no access to or cooperation with AmTrust management, no due

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

diligence, no authority to seek alternatives, no power to say "no," and no fiduciary duties.

5.      The four-person special committee, established purportedly to negotiate on behalf of minority stockholders (the "Special Committee" or the "Take Private Special Committee") failed to do any such thing.  The Special Committee was comprised of members who, as described below, had conflicting loyalties and plainly lacked independence from the Karfunkel-Zyskind Family.  Moreover, they were each named defendants in pending derivative actions arsing from the Towers Transaction and Accounting Restatement (each defined below), *i.e.*, mismanagement and self-dealing at AmTrust, and thus expected to benefit directly from any going-private transaction by the extinguishment of their derivative liability to AmTrust.  Worse, these directors—all of whom still serve as AmTrust directors and continue to collect directorship fees material to them from AmTrust and other companies affiliated with the Karfunkel-Zyskind Family —further managed to engage a conflicted financial advisor that peddled financial alchemy.

6.      Not surprisingly, this hapless and conflicted Special Committee purportedly charged with advancing the minority stockholders' interest failed to garner majority-minority support to ratify the unfair Initial Merger Agreement. Instead, the Initial Merger Agreement was met with outrage.  Arca, the Company's largest minority stockholder, launched a public opposition compaign, encouraging

-3-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and meeting with market-movers such as Carl Icahn to oppose the Initial Merger Agreement. Recognizing that the Karfunkel-Zyskind Family was, as he described it in his May 17, 2018 press release, "blatantly taking advantage" of minority stockholders, Carl Icahn emphatically expressed his view that the Initial Merger Agreement clearly "undervalue[d]" the Company. So intrigued was Mr. Icahn by the obvious discrepancy between the true value of AmTrust stock and the price being offered pursuant to the Initial Merger Agreement, that between April 26 and May 17, 2018, he quickly deployed resources to acquire a more than 9.3% interest in the Company, and solicited proxies to oppose the deal.

7.    In the face of strong public opposition, the Karfunkel-Zyskind Family and the Company were unable to obtain the *M&F Worldwide* required majority-of-the-minority approval of the Initial Merger Agreement negotiated and agreed to between the Karfunkel-Zyskind Family and the Special Committee.

8.    Instead, the Karfunkel-Zyskind Family negotiated directly with Carl Icahn to reach a new deal. On June 6, 2018, the terms of the Initial Merger Agreement were amended to a price of $14.75 per share (the "Merger Price") and approved by the AmTrust Board (as amended, the "Merger Agreement"). While Mr. Icahn fared better than the interested and conflicted Special Committee, his efforts were no substitute for the arm's-length bargaining contemplated by *M&F Worldwide*. Mr. Icahn, among other things: was armed with nothing but public

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

information; did not have the benefit of due diligence; did not have the cooperation of, or even access to, AmTrust management; had no authority to shop for alternatives; had no ability to say "no"; and, critically, he had no fiduciary duties to other stockholders. To be sure, Mr. Icahn had been a stockholder of the Company for all of four weeks, yet, he still managed to extract a higher price—*albeit, still a grossly unfair price*—from the Karfunkel-Zyskind Family than the interested and conflicted Special Committee.

9. As explained below, the interested and conflicted Special Committee's halfhearted negotiations were plagued by missteps demonstrating a "controlled-mindset," disloyally advancing only the Karfunkel-Zyskind Family's interests. For example, the Special Committee, without prompting from the Acquiring Group, repeatedly sought downward revisions to the projections management provided to it, in essence negotiating against itself. Moreover, despite being aware that AmTrust's CEO Barry Zyskind—the leader of the Acquiring Group—had publicly affirmed in SEC filings that AmTrust's stock price was *not* indicative of AmTrust's fair value, the Special Committee nevertheless accepted the Acquiring Group's anchoring of negotiations at Amtrust's historically low trading prices (which, of course, were driven to such levels by all of the AmTrust directors' disloyal conduct and mismanagement of AmTrust, priming and timing the Karfunkel-Zyskind Family's grossly unfair squeeze-out effort).

-5-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

10.    Nor were the advisors retained by the Special Committee independent. Rather, the team from Deutsche Bank that advised the Special Committee had numerous prior engagements with several of the Special Committee's counterparties, and also anticipated earning a considerable amount of fees from these counterparties in the future.

11.    After Mr. Icahn's brief interloping, the Defendants continued to stack the deck against the minority, obtaining the majority of the minority approval of the Zyskind-Icahn negotiated Merger Price through a materially misleading proxy statement recommending the Merger, filed on Schedule 14A (as amended, the "Proxy") with the Securities and Exchange Commission ("SEC"). For example, the Proxy failed to disclose that the Special Committee's financial advisor did not consider hundreds of millions of dollars in projected stock repurchases as part of its dividend discount analysis, for the so-called "Case 1" projections (the most realistic set of projections provided by management), which would have significantly altered its fairness conclusions. The Proxy also failed to disclose certain significant affiliations between members of the Special Committee. For example, the Proxy did not disclose that AmTrust was one of Defendant Susan Fisch's ("Fisch") clients prior to joining the AmTrust Board. Moreover, the Proxy assured stockholders that, despite the buyout of all minority common stockholders, AmTrust would continue to be subject to regulatory scrutiny from the SEC post-Merger, as the Company's

-6-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

preferred stock would continue to be listed on the New York Stock Exchange. That representation proved to be patently false.

12.    Defendants also purposefully disenfranchised stockholders who purchased over 20 million AmTrust shares in April through their manipulation of the record date of the stockholder vote, rendering the vote coercive.

13.    Indeed, the Merger represents the final and most egregious example over the past several years of the Karfunkel-Zyskind Family exerting its control over AmTrust in order to benefit itself and its affiliates at the expense of minority stockholders.

14.    For example, in addition to taking the Company private at an unfair price, through an unfair process and a coerced vote, the Karfunkel-Zyskind Family: (i) usurped a valuable corporate opportunity for their own benefit, in a transaction this Court has described as "very troubling" in resulting derivative litigation (the "Tower Transaction"); and (ii) caused the Company to file with the United States Securities and Exchange Commission (the "SEC") a series of false and misleading accounting statements that ultimately needed to be restated, leading to a host of regulatory investigations and a derivative lawsuit against the Company's directors and officers (the "Accounting Restatement").

15.    In light of these circumstances, *M&F Worldwide* affords Defendants no protection. Accordingly the Merger is subject to entire fairness review, which

-7-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

requires both the price and process to be entirely fair.  As demonstrated herein, both the consideration provided to AmTrust's minority stockholders and the process that led to the Merger were not entirely fair to Plaintiffs and the Company's other minority stockholders.

### A.    THE TOWER TRANSACTION – USURPING OF A VALUABLE CORPORATE OPPORTUNITY

16.    AmTrust is a property and casualty insurer founded by members of the Karfunkel-Zyskind Family. Members of the Karfunkel-Zyskind Family have controlled AmTrust since its founding and have long occupied multiple seats on the Board and key roles in AmTrust management.

17.    In the fall of 2013, AmTrust identified an opportunity to acquire then-struggling property and casualty insurer, Tower Group International, Ltd. ("Tower"). Unbeknownst to the full Board, however, members of the Karfunkel-Zyskind Family determined that their family's other enterprises should profit from Tower as well. Ultimately, in December 2013, the Karfunkel-Zyskind Family decided that ACP Re, Ltd. ("ACP"), a private, Bermuda-based investment vehicle owned by a Karfunkel-Zyskind Family trust, would buy Tower. Members of the Karfunkel-Zyskind Family also determined that another entity they controlled, National General Holdings Corp. ("NGHC"), would acquire certain valuable Tower assets that AmTrust had been negotiating to purchase from Tower. With NGHC set

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

for an initial public offering ("IPO") in February 2014, the Karfunkel-Zyskind Family knew that the addition of certain of Tower's assets would boost the value of NGHC and thereby increase NGHC's stock price (as well as the value of the Karfunkel-Zyskind Family's majority stake in NGHC).

18.    *After* ACP submitted an offer for Tower, the Board finally learned that AmTrust would no longer be pursuing the Tower opportunity and that AmTrust management now contemplated that Karfunkel-Zyskind Family-owned ACP would acquire Tower in AmTrust's stead. The Board did not react.

19.    Following one 25-minute meeting, and based solely on representations by plainly-conflicted Karfunkel-Zyskind Family member and AmTrust Chief Executive Officer ("CEO"), President and Director Barry Zyskind ("Zyskind"), that an AmTrust acquisition of Tower would purportedly be undesirable for the Company, the Board and its so-called "independent" Audit Committee—charged with reviewing and approving all related-party transactions like the Tower Transaction—acquiesced and allowed the Karfunkel-Zyskind Family to misappropriate the Tower opportunity.

20.    By facilitating ACP's and NGHC's acquisition of highly valuable Tower assets in exchange for no consideration to AmTrust, the Karfunkel-Zyskind Family usurped a valuable corporate opportunity belonging to AmTrust and otherwise breached their duties of loyalty. The AmTrust Board likewise failed to

-9-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

advance or protect the best interests of the Company, and instead undertook a process that this Court has described as "very troubling," "very unusual," not "bona fide," and culminating in "delegation of transaction approval" to a "conflicted audit committee that appeared predestined to approve an already-baked transaction."[1] Indeed, Defendant Donald T. DeCarlo ("DeCarlo"), a member of the Audit Committee, has testified that the Board "didn't take any steps" to manage any conflicts concerning the Tower Transaction, and DeCarlo and his fellow Audit Committee member Abraham Gulkowitz ("Gulkowitz") somehow did not believe there were any conflicts associated with the Tower Transaction despite the Karfunkel-Zyskind Family's interests in ACP, NGHC and AmTrust.

21.    As discovery in the Cambridge Derivative Action has shown, the Tower Transaction was but one example of the Karfunkel-Zyskind Family—who treat AmTrust as their personal fiefdom and a mere component of one giant family enterprise—exploiting AmTrust resources for their personal benefit rather than the exclusive benefit of AmTrust and its minority stockholders.

---

[1] *See Cambridge Ret. Sys. v. DeCarlo*, *et al.*, C.A. No. 10879-CB, at 36:23-24, 46:22-48:7 (Del. Ch. June 16, 2016) (TRANSCRIPT).

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**B.    THE ACCOUNTING RESTATEMENT**

22.     From at least December 2013 through November 2017, AmTrust used accounting techniques that caused the Company to restate nearly three years' worth of revenue, total service and fee income, net income, and other important metrics by double-digit percentages in 2017.  The restatement was not completed until the spring of 2018, on the same day the Take-Private Transaction was announced.  The restatement also led to numerous governmental investigations, including investigations conducted by the New York Department of Financial Services, the Federal Bureau of Investigation (the "FBI"), and the SEC.

23.     As detailed below, the Audit Committee—whose members comprised a majority of the Tower Transaction Special Committee (as defined below) and the Take Private Special Committee—received numerous red flags over a period of years of the Company's improper accounting practices, including: (i) reports by institutional investors; (ii) articles in the highly respected financial publication *Barron's* detailing the accounting issues; (iii) being instructed by regulators to replace the Company's auditor—which the Audit Committee delayed doing for a year; and (iv) when AmTrust sued an investor for writing a report raising the accounting problems, that investor wrote a detailed letter to the Audit Committee substantiating the accounting misconduct, and in response the Company dropped the lawsuit, but the Audit Committee failed to address the accounting misconduct.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

### C.    THE UNFAIR TAKE-PRIVATE TRANSACTION

24.    Like the Tower Transaction, the Board capitulated to the Karfunkel-Zyskind Family desires – this time to take the Company private, allowing the family to impose its will on AmTrust to the detriment of the Company's minority stockholders.  Having driven down the price of AmTrust stock by their own actions, the Karfunkel-Zyskind Family sought to take advantage of the situation they created by taking the Company private at an unfair price.

25.    Once the Board learned of the Karfunkel-Zyskind Family's intention to take the Company private (which the Karfunkel-Zyskind Family had been planning for some time), it formed a special committee to "negotiate" the deal with the Karfunkel-Zyskind Family (the "Take-Private Special Committee" or "Special Committee"). The same three Audit Committee members who "approved" (and breached their fiduciary duties in connection with) the Tower Transaction (*i.e.*, Defendants DeCarlo, Gulkowitz, and  Fisch), and were the members of the Audit Committee that oversaw the accounting issues that casued the restatement, were appointed to the four-member Take-Private Special Committee, with DeCarlo acting as its Chairman.

26.    As discovery in the Cambridge Derivative Action has underscored, there was never any hope of the Take-Private Special Committee protecting minority stockholders' interests because the committee members were not independent of the

-12-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Karfunkel-Zyskind Family, disinterested, or even capable of running a well-functioning committee.

27.    While the Karfunkel-Zyskind Family's own actions caused severe damage to the Company's stock price, which plummeted from more than $27 at the beginning of 2017 to $13.46 at the end of the third quarter of 2017, the Company admitted that the severe downward pressure on the stock price was an overreaction that did not represent the true value of the Company.  AmTrust's third quarter 2017 Form 10-Q, signed by Zyskind and approved by the Audit Committee, filed on November 9, 2017, stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, ***we believe the share price decline in the nine months of 2017 is relatively short-term in nature*** and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, ***and is not indicative of an actual decline in our fair value*** or our reporting units' fair value.[2]

28.    At the end of the third quarter of 2017, AmTrust's share price was $13.46.  This is essentially the same as the unfair $13.50 per share price for the Take-Private Transaction that was initially announced as the result of negotiations between the Karfunkel-Zyskind Family and the Take-Private Special Committee. The statement in the Company's Form 10-Q, filed on November 9, 2017, confirms

---

[2] Unless otherwise stated herein, all emphasis in quoted material is added.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

that the Karfunkel-Zyskind Family and the Audit Committee (i.e., DeCarlo, Gulkowitz and Fisch) believed that the Company's shares were worth far in excess of $13.50. Yet the Take-Private Special Committee recommended that the Company's public stockholders accept the $13.50 per share offer, despite the statement in the 10-Q that the equivalent stock price did ***not*** reflect the value of the Company.

29. Plaintiffs made demands pursuant to Section 220 of the Delaware General Corporation Law (the "220 Demand"), and the productions made by the Company pursuant to these demands reflect that neither the Take-Private Special Committee nor its advisers either discussed or considered the fact that AmTrust's management explicitly stated that the Company's share price decline to $13.46 at the end of the third quarter of 2017 was artificially low and short term. In the face of this statement in the November 9, 2017 10-Q, it was impossible to conclude that the proposed $13.50 deal price was fair to the public stockholders.

30. After a perfunctory process led by the hopelessly conflicted Take-Private Special Committee, on March 1, 2018, the Board announced the first iteration of the Take-Private Transaction, a deal whereby all of the publicly held shares of AmTrust would be acquired by the Karfunkel-Zyskind Family and Stone Point Capital LLC ("Stone Point") for $13.50 per share in cash, less than half of the Company's trading price before the revelation of the accounting issues.

-14-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

31.    The process leading to that $13.50 per share price bore no resemblance to true arms'-length dealing:

32.    *First*, the Board waited nearly two months to form the Take-Private Special Committee to negotiate with the Company's controllers after they began exploring the take-private deal with potential suitors and facilitating due diligence with those interested parties.

33.    *Second*, the Take-Private Special Committee was told by the Control Group (defined below) that they should not bother speaking to any other prospective buyer because the Karfunkel-Zyskind Family would refuse to sell their control block of shares under any circumstances.

34.    *Third*, the resolutions creating the Take-Private Special Committee limited its mandate exclusively to transactions proposed by the Karfunkel-Zyskind Family and did not permit the Take-Private Special Committee to consider whether a merger with a third party or an investment by a third party (or no deal at all) might be in the Company's best interest.

35.    *Fourth*, the Take-Private Special Committee hired a financial advisor that was conflicted.

36.    *Fifth*, instead of seeking the highest possible price for the public stockholders, the Take-Private Special Committee repeatedly asked for **lower** Company projections, to justify a **lower** price for the Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

37.    *Sixth*, the Take-Private Special Committee did not fully inform itself, failing to even address the Company's own statements that $13.46 undervalued the Company, or ask for draft financial statements and other key documents and information until days prior to the Transaction being approved by them.

38.    *Seventh*, the Take-Private Special Committee predictably failed to (i) value in good faith, or obtain fair consideration for, AmTrust's valuable and material litigation assets, *i.e.*, the claims asserted in the Cambridge Derivative Action and the derivative claims arising out of the accounting restatement (the "Accounting Derivative Claims," and together with the Cambridge Derivative Claims, the "Derivative Claims"), or (ii) take any measures to preserve those claims, such as establishing a litigation trust. The documents produced pursuant to the 220 Demand and the Take-Private Transaction proxy purport that the Take-Private Special Committee ascribed an estimated range of value of $15 million to $25 million for an unspecified "contingent litigation asset" of the Company. It is thus unclear what value, if any, the Special Committee assigned to the Derivative Claims. Assuming, *arguendo*, that the "contingent litigation asset" referred to either or both sets of claims, the Special Committee nonetheless fell woefully short of assigning value to them.

39.    The Take-Private Special Committee had a strong motivation for disposing of these material assets for modest value: any valuation of the Cambridge

-16-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Derivative Claims or Accounting Derivative Claims reflected in the Take-Private Transaction price would have implicated their own misconduct (as well as that of the Karfunkel-Zyskind Family) and conceded their liability to AmTrust. Thus, DeCarlo, Fisch and Gulkowitz—three of the four members of the Take-Private Special Committee—were incapable of disinterestedly and independently valuing the Derivative Claims and knew that the Karfunkel-Zyskind Family would not, in the future, prosecute those claims against them or their fellow family members and entities.

40.    *Eighth*, the stockholder vote in favor of the Transaction was manipulated, uninformed and coerced.

41.    After public outcry from certain large AmTrust stockholders, including Plaintiff Arca and Carl Icahn ("Icahn"), the Karfunkel-Zyskind Family and Stone Point agreed to increase the Take-Private Transaction consideration by $1.25 per share, bringing the buyout price to $14.75 per share. While this modest increase helped secure the support of Icahn and, eventually, minority stockholder approval of the Take-Private Transaction, this did not address the unfair process, the coerced vote, or that the merger consideration remains well outside of the range of fairness.

42.    Without relief from this Court, the Karfunkel-Zyskind Family will never have to answer to AmTrust's minority stockholders.

-17-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## II.    PARTIES

43.    Plaintiffs Arca Investments, a.s., Arca Capital Bohemia, a.s., and Krupa Global Investments, which is formerly known as Arca Venture Capital, are related private equity firms with offices in the Czech Republic and the Slovak Republic. Arca Investments, AC Bohemia, and AVC separately and beneficially held AmTrust common stock at all relevant times.    Collectively, these three stockholders (collectively, "Arca") held 4,831,477 shares of AmTrust common stock, which constituted approximately 2.4% of all AmTrust shares outstanding.    Arca held AmTrust common stock through the closing of the Transaction ("Closing").

44.    Plaintiff Pompano held AmTrust common stock through Closing.

45.    Plaintiff Cambridge held AmTrust common stock through Closing.

46.    Plaintiff City of Lauderhill Police Officers' Retirement System held AmTrust common stock through the closing of the Transaction.

47.    Plaintiff West Palm Beach Police Pension Fund held AmTrust common stock through the closing of the Transaction.

48.    **Zyskind**: Defendant Barry D. Zyskind, the son-in-law of the late Michael Karfunkel, who was one of the founders of AmTrust, has served as a director on the Company's Board since 1998 and as the Chairman of the Board since May 2016.  Zyskind has served as Chief Executive Officer ("CEO") and President of AmTrust since 2000.  Zyskind serves as an officer and director of many of

-18-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

AmTrust's wholly-owned subsidiaries. Zyskind is a member of the board of directors of NGHC, a company that is also part of the Karfunkel-Zyskind web of entities. Zyskind is also the non-executive chairman of Maiden Holdings Ltd. ("Maiden Holdings"), a publicly-held Bermuda insurance holding company formed by Michael Karfunkel ("M. Karfunkel"), George Karfunkel ("G. Karfunkel") and Zyskind in 2007 that has several reinsurance and service agreements with AmTrust. Zyskind is M. Karfunkel and Leah Karfunkel's ("L. Karfunkel") son-in-law (together members of the Zyskind and Karfunkel family are referred to herein as the "Zyskind-Karfunkel Family"). As of the Closing, Zyskind beneficially owned 44,864,556 shares of AmTrust common stock, approximately 22.8% of the Company's issued and outstanding shares and his wife owned a further 2,945,113 shares. As acknowledged by the Company, Zyskind was not an independent director under the NASDAQ listing rules.

49. **George Karfunkel**: Defendant George Karfunkel has served as a director on the Company's Board since 1998. G. Karfunkel is, with his brother, Michael Karfunkel, one of the co-founders of the Company. G. Karfunkel is the chairman of Sabr Group, a purported consulting company which has served as the subscription agent for certain of AmTrust's stock offerings. According to the Company's public filings, G. Karfunkel owns various real estate holdings, including "major office buildings in New York, Chicago and several other cities," through

-19-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

entities co-owned by him and L. Karfunkel. Through these entities, G. Karfunkel and L. Karfunkel lease various properties to AmTrust and NGHC, including corporate headquarters. As of the Closing, G. Karfunkel beneficially owned 32,438,408 shares of the Company's common stock, approximately 16.5% of the Company's issued and outstanding shares. G. Karfunkel is M. Karfunkel's younger brother and the brother-in-law of L. Karfunkel. G. Karfunkel was not considered an independent director under the NASDAQ listing rules.

50. **Leah Karfunkel**: Defendant Leah Karfunkel has served as a director on the Company's Board since May 2016. As of the Closing, L. Karfunkel beneficially owned 22,101,025 shares of AmTrust common stock, approximately 11.3% of the Company's issued and outstanding shares. L. Karfunkel is the sister-in-law of G. Karfunkel and the mother-in-law of Zyskind. She is also the widow of M. Karfunkel. On a director questionnaire filled out and submitted to the Company's attorneys, L. Karfunkel stated that she is also a co-founder of AmTrust. L. Karfunkel was not considered an independent director under the NASDAQ listing rules.

51. Defendants Zyskind, G. Karfunkel, and L. Karfunkel (together, the "Control Group") act as a controlling group of the Company. As such, Zyskind, G. Karfunkel, and L. Karfunkel have filed Schedule 13Ds and amendments thereto with the SEC indicating that each is a member of a "group" for purposes of reporting

-20-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

beneficial ownership under Section 13 of the Exchange Act. According to a Schedule 13D/A filed on April 30, 2018, the Control Group collectively owned 86,844,540 shares of AmTrust common stock, or approximately 44% of the total outstanding shares and such disclosure was not amended by later Schedule 13D/As filed on July 25 and November 30, 2018. However, they owned 49% of the Company's outstanding shares prior to a May 25, 2017 private placement of $300 million of AmTrust stock, 24,096,384 shares, to previously undisclosed family members of the Control Group. When these shares are added to the Control Group's shares, the Karfunkel-Zyskind Family "and its affiliates and certain related parties currently own or control approximately 55% of the outstanding shares of Common Stock of the Company" as disclosed in connection with the announcement of the Transaction.

52. **Gulkowitz**: Defendant Abraham Gulkowitz has served as a director on the Company's Board since 2006 and is a director of several of AmTrust's subsidiaries. Gulkowitz also has ties to the Karfunkel-Zyskind Family of businesses and social causes and resides within a mile of the Karfunkels and Zyskinds. For example, Gulkowitz is a co-founder and partner of Brookville Advisory ("Brookville"), an investment fund specializing in credit analysis. The Hod Foundation, a private foundation owned and controlled by the Control Group (one of three through which the Control Group held shares), was the beneficial owner of

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

at least 10% of FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint"). FrontPoint is managed by Brookville, which means that Gulkowitz personally benefited from the investment by the Control Group. Gulkowitz also served on the advisory board of Gryphon Investors when its portfolio company, Orchid Underwriters, entered into a partnership with a subsidiary of NGHC, a company that is part of the Karfunkel-Zyskind web of entities. Gulkowitz has sat on the boards of many other AmTrust affiliates (along with members of the Karfunkel-Zyskind Family), including AmTrust Title Insurance Company, Republic Underwriters Insurance Company, Southern County Mutual Insurance Company, Republic Fire & Casualty Insurance Company, Republic-Vanguard Insurance Company, Southern Insurance Company, and Southern Underwriters Insurance Company. Gulkowitz is the chair of the Board's Audit Committee, is a member of its Nominating and Corporate Governance Committee, and served on the Special Committee that approved the Transaction. Gulkowtiz was a named defendant in the Derivative Actions.

53.    Gulkowitz is beholden to the Karfunkel-Zyskind Family. For example, in 2016 alone, Gulkowitz received $217,586.00 in director compensation from AmTrust. According to public information reflected on Bloomberg, it appears that all the boards Gulkowitz sits on are affiliated with AmTrust.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

54.    **Fisch**: Defendant Susan C. Fisch has served as a director on the Company's Board since 2010, as well as a director of several AmTrust subsidiaries. Based on public disclosures by AmTrust, Fisch has not been employed since joining AmTrust's Board, nor has she served on the Board of any other companies (aside from AmTrust's subsidiaries). As such, all of her publicly reported income is from AmTrust.

55.    Fisch testified at her deposition in the Cambridge Derivative Action that her relationsip with the Karfunkel-Zyskind Family dates back to 2003 when Fisch was working at Willis Reinsurance Brokers ("Willis") and "asked for an appointment to meet Mr. Zyskind, and we had a long conversation, and I asked to be given an opportunity to place his reinsurance." Fisch testified that AmTrust was a Willis client from at least 2003 until Fisch's retirement in 2009. Fisch further testified that Willis received from AmTrust approximately $250,000 in "brokerage[s], or commission[s] that w[ere] a percentage of the overall premium that was paid to reinsurers." Fisch also testified that she interacted with Zyskind and numerous AmTrust executives during the course of the Willis-AmTrust relationship.

56.    Fisch further testified that, after her retirement, Zyskind personally invited her to join the Board, and later in 2016, invited her to join the board of directors of several of AmTrust's subsidiaries. Fisch testified that she currently serves on the board of at least 20 AmTrust subsidiaries, including: Sequoia Insurance

-23-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company; CorePoint Insurance Company; Developers Surety and Indemnity Company; Associated Industries Insurance Company; Republic Underwriters Insurance Company; and Rochdale Insurance Company. Fisch further testified that she serves on the board of directors of these companies alongside DeCarlo, Gulkowitz, and "senior level" AmTrust employees. According to an SEC filing, Fisch received $256,845.00 in director compensation from AmTrust in 2016 alone. At her deposition, Fisch estimated that she receives approximately $300,000 in annual compensation for serving on the AmTrust Board, more than triple the $100,000 she received when she joined the AmTrust Board in 2010. Fisch also testified that she has been compensated $100,000 annually for her service on the board of directors of AmTrust's subsidiaries. Further, Fisch testified in the Cambridge Derivative Action that she has voted on approximately 20-30 related-party transactions involving the Karfunkel-Zyskind Family and has never voted against any such transaction. Nor was she aware of any other Board member having ever voted against any such transaction.

57.    The director fees received by Fisch are material to her. Fisch testified that her other sources of income (i.e., non-AmTrust director fees) include (1) Social Security payments payable to she and her husband; (2) pension payments from Willis to Fisch totaling $50,000 per year; and (3) investment income earned by she and her husband averaging approximately $700,000 per year. Utilizing these

-24-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

figures, and excluding Social Security payments, the director fees received by Fisch from AmTrust and its subsidiaries total just under 35% of Fisch's current annual income.

58.    Fisch is a member of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees and also served on the Take-Private Special Committee that approved the Transaction.

59.    **DeCarlo**: Defendant Donald T. DeCarlo has served as a director on the Company's Board since 2006. DeCarlo has also served as a director of NGHC since it was founded by members of the Control Group in 2010.

60.    DeCarlo testified at his deposition in the Cambridge Derivative Action that his relationship with the Karfunkel-Zyskind Family dates back to in or around 2000 when DeCarlo was a partner at the law firm Lord Bisell & Brook and "Barry Zyskind and Michael Karfunkel wanted to get into the insurance business. . . ." DeCarlo advised Zyskind and M. Karfunkel in connection with their acquisition of Rochdale Insurance Company ("Rochdale"), which was their first insurance company acquisition. DeCarlo "helped them decide what [Rochdale] was going to write going forward, what line of business." Following the acquisition Zyskind personally asked DeCarlo to join the Board, which DeCarlo did. DeCarlo testified that following the acquisition of Rochdale, he continued to regularly advise Zyskind

-25-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and M. Karfunkel on legal and insurance matters until they founded AmTrust and AmTrust hired its own general counsel.

61.    DeCarlo further testified that he worked on between 20 to 30 separate matters for AmTrust between 2000 and 2005. When DeCarlo left Lord Bissell & Brook in or around 2004 and started his own law firm, AmTrust and the Karfunkel-Zyskind Family came with him as a client.  DeCarlo testified that he continued to advise M. Karfunkel and Zyskind approximately monthly, until he joined the AmTrust Board in 2006.

62.    DeCarlo also testified that he attended the wedding of Zyskind's daughter and continues to have dinner with Zyskind once or twice a year.  DeCarlo testified that he serves on the boards of at least 17 AmTrust subsidiaries, including: Associated Industries Insurance Company; Milwaukee Casualty Insurance Company; Wesco Insurance Company; Technology Insurance Company; Security National Insurance Company; First Nonprofit Insurance Company; Core Pointe Insurance Company; ARI Insurance Company Inc.; AmTrust Title Insurance Company; ARI Casualty Company; Developers Surety and Indemnity Company; Republic Underwriters Insurance Company; Republic Vanguard Insurance Company; Indemnity Company of California; Southern County Mutual Insurance Company; Southern Insurance Company; and Southern Underwriters Insurance

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company.  DeCarlo testified that Zyskind or a member of his management team personally asked DeCarlo to serve on each board.

63.    DeCarlo was likewise appointed to the NGHC board at the time of its founding in 2010.  DeCarlo testified that M. Karfunkel personally asked him to join the NGHC board.  DeCarlo is or has been a director of at least four NGHC subsidiaries:  National Health Insurance Company, Imperial Fire and Casualty Insurance Company, National Automotive Insurance Company, and Century-National Insurance Company.  AmTrust's 10-K filed on March 16, 2018, acknowledged that DeCarlo's dual representation of AmTrust and NGHC "may present, and make [AmTrust] vulnerable to, difficult conflicts of interest, business opportunity issues and legal challenges."  M. Karfunkel or a member of his management team personally asked DeCarlo to join each of those boards.

64.    DeCarlo is the chairman emeritus and founder of the American Society of Workers' Compensation Professionals, Inc. ("AmComp") where Zyskind serves as a director.[3]  As a director of NGHC, DeCarlo earns annual director fees of approximately $120,000 per year and owes that income to his relationship with the Control Group.  DeCarlo is a member of the Board's Audit Committee, is the Chair

---

[3] In addition to Zyskind, AmComp is staffed by other AmTrust executives and/or individuals affiliated with the Karfunkel-Zyskind Family. For example, AmTrust Senior Vice President Jeffrey Fenster serves as the President of AmComp.

-27-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

of the Board's Compensation and Nominating and Corporate Governance Committees, and served as the Chair of the Take-Private Special Committee.

65.    In 2016 alone, DeCarlo was paid $318,086.00 for being employed as a director of AmTrust and its affiliates.  This is in addition to the amount DeCarlo is paid annually for being employed as a director of NGHC, according to NGHC's proxy statement.  These amounts would have been material to DeCarlo.

66.    **Rivera:** Defendant Raul Rivera ("Rivera") has served as a Company director since August 2016.  Rivera retired in January 2017 after working for several years at National Benefit Life Insurance Company. Rivera is a current director of the Insurance Federation of New York, where he has concurrently served with DeCarlo. Rivera is a member of the Board's Compensation Committee and served on the Take-Private Special Committee. According to public information reflected on Bloomberg, it appears that all the boards Rivera sits on are affiliated with AmTrust. In 2016, Rivera received $61,667.00 in director compensation.  Rivera continues to be employed as a director of AmTrust, now a private company.

67.    Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, DeCarlo, and Rivera are collectively referred to herein as the "Director Defendants." References to the "Board" for actions before M. Karfunkel's passing include him as a director, and references to the "Board" for actions following his passing exclude him.

-28-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

68.    **Stone Point and Trident**: Defendant Stone Point Capital LLC ("Stone Point") is a Delaware limited liability company and private equity firm headquartered in Greenwich, Connecticut.   Stone Point manages Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P. and Trident VII Parallel Fund, L.P (collectively, the "Trident Funds").   The Trident Funds participated in the Transaction with the Control Group through Trident Pine Acquisition LP.

69.    Defendant Trident Pine Acquisition LP ("Trident Pine") is a Delaware limited partnership, affiliate of Stone Point and participant in the Transaction. According to a Definitive Proxy filed by AmTrust with the SEC on May 4, 2018 (the "Proxy"), Trident Pine, along with the Karfunkel-Zyskind Family, proposed the Transaction.

70.    Defendants Trident Funds are private equity funds managed by Stone Point and participated in the Transaction.

71.    **Evergreen**: Defendant Evergreen Parent, L.P. ("Evergreen Parent") is a limited partnership formed under the laws of Delaware and controlled by Stone Point and the Karfunkel-Zyskind Family. It was one of their merger vehicles for the Transaction.

72.    Defendant Evergreen Merger Sub, Inc. ("Merger Sub") is a corporation formed under the laws of Delaware, is a wholly owned subsidiary of Evergreen

-29-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Parent, and is controlled by Stone Point and the Karfunkel-Zyskind Family.  It was one of their merger vehicles for the Transaction.

73.    Defendant K-Z Evergreen, LLC ("K-Z Evergreen") is a limited liability company formed under the laws of Delaware and owned by Zyskind, G. Karfunkel and L. Karfunkel. K-Z Evergreen is a limited partner of Evergreen Parent. It is the Karfunkel-Zyskind Family's investment vehicle for the Transaction.

74.    Defendants Evergreen Parent, Merger Sub, K-Z Evergreen, Stone Point and Trident Pine may be referred to herein as the "Merger Partner Defendants."

## III.    RELEVANT NON-PARTIES

### A.    AMTRUST

75.    AmTrust is a Delaware corporation with its principal executive offices located at 59 Maiden Lane, 43rd Floor, New York, NY 10038.  AmTrust underwrites and provides, among other things, property and casualty insurance products, including workers' compensation, commercial automobile, general liability and extended service and warranty coverage, in the United States and internationally, to niche customer groups. AmTrust has also expanded its business to include personal lines insurance.  In a 2014 report by the Southern Investigative Reporting Foundation, a not-for-profit focused on corporate accountability issues, AmTrust was described as "literally a family business — apart from Barry Zyskind, several of Michael and George [Karfunkel]'s children hold important positions in its

-30-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

subsidiaries — and their massive stake in the company makes it immune to takeover or raids from activist investors." Prior to the Closing, AmTrust's common shares traded on the NASDAQ Global Select Market under the ticker symbol "AFSI."

76.    AmTrust and its subsidiaries operate through three business segments: Small Commercial Business, Specialty Program, and Specialty Risk and Extended Warranty.

77.    AmTrust has grown significantly over the years and has been highly acquisitive. Since its inception, "AmTrust has grown organically and through more than 40 acquisitions to become one of the largest property and casualty insurers in North America."

78.    While AmTrust touts commercial lines insurance as its specialty, AmTrust has acquired and operated personal lines insurance businesses as well. In recent years, both before and after the Tower Transaction that is the subject of the Cambridge Derivative Action, AmTrust has acquired and operated at least two personal lines businesses.

79.    In April 2013, AmTrust completed the acquisition of Sequoia Insurance Company and its subsidiaries ("Sequoia") for a purchase price of $60 million. In the transaction, AmTrust acquired a wholly-owned subsidiary of Sequoia called Personal Express Insurance Company ("Personal Express"). Personal Express is a

-31-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

California-domiciled property and casualty insurance carrier that offers personal lines insurance products.

80.     Recognizing the opportunity to profit from a sale of Personal Express, AmTrust determined to sell it.  On April 25, 2013, the Board adopted resolutions establishing a special committee comprised of Defendants Gulkowitz and Fisch. The committee was advised by Griffin Financial Group LLC ("Griffin") and Richards, Layton & Finger, P.A. ("RLF").  Audit Committee member and Defendant DeCarlo testified at his deposition that he was not a member of the Personal Express special committee because he harbored an actual conflict as a result of his simultaneously serving on the board of NGHC, which was potentially interested in acquiring Personal Express.

81.     In or around November 2013 (i.e., during the early stages of the Tower Transaction process), AmTrust sold Personal Express to Integon National Insurance Company, a wholly-owned subsidiary of NGHC. The sale closed in April 2015 and the Company recorded a gain of $6.6 million in connection therewith.

82.     AmTrust also acquired a personal lines insurance business from Republic Companies, Inc. ("Republic"). Republic is a commercial and personal lines property and casualty insurance provider based in Texas.  In 2014, Republic recorded total direct premiums of approximately $711 million.  Approximately half of Republic's total direct premiums on an annual basis were attributable to its

-32-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

personal lines business. On September 27, 2015, AmTrust announced that it had agreed to acquire Republic for approximately $233 million, consisting of cash and a promissory note. AmTrust completed its acquisition of Republic on April 18, 2016.

83.    AmTrust continues to own and operate Republic, including its personal lines business, and Republic continues to offer a wide array of personal lines insurance, including automotive, homeowners, condominiums, renters, dwelling fire, umbrella, and identity theft insurance. AmTrust recorded approximately $484.3 million in gross written premiums and $5.9 million in service and fee income for the portion of 2016 that it owned Republic (April 18, 2016 through December 31, 2016). For 2017, AmTrust recorded approximately $537 million in gross written premiums and $8.2 million in service and fee income as a result of the Republic acquisition.

**B.    MICHAEL KARFUNKEL FAMILY 2005 TRUST**

84.    The Michael Karfunkel Family 2005 Trust (the "Karfunkel Trust") held 15,504,562 shares of the Company's common stock as of the Closing, which represented approximately 9.06% of the Company's total outstanding shares of common stock.  The shares held by the Karfunkel Trust were beneficially owned and effectively controlled by L. Karfunkel and Zyskind.  Defendants Zyskind and L. Karfunkel are co-trustees of the Karfunkel Trust, with the ultimate beneficiaries of the Karfunkel Trust being M. Karfunkel's children, one of whom is married to

-33-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Defendant Zyskind.  The Karfunkel Trust is involved in several related-party transactions concerning AmTrust.

### C.  MAIDEN HOLDINGS, LTD.

85.    Maiden Holdings, Ltd. is a publicly-held Bermudian insurance holding company that has various reinsurance and service agreements with AmTrust. Maiden was formed by M. Karfunkel, G. Karfunkel and Zyskind.  As of December 31, 2015, Defendant G. Karfunkel owned or controlled approximately 4.4% of the issued and outstanding capital stock of Maiden.  As of December 31, 2016, Defendants L. Karfunkel and Zyskind owned or controlled approximately 7.9% and 7.5%, respectively, of the issued and outstanding capital stock of Maiden.  Defendant Zyskind serves as chairman of Maiden's board of directors.

### D.  ACP

86.    Relevant non-party ACP is a Bermuda insurer owned by the Karfunkel Trust.  ACP is wholly-owned by ACP Re Holdings, LLC, and the Karfunkel Trust owns 99.9% of the issued and outstanding stock of ACP Re Holdings, LLC.  L. Karfunkel is the sole trustee of the Karfunkel Trust as well as a beneficiary of the trust.  Until his passing in April 2016, M. Karfunkel was the Chairman and a Director of ACP.  Barry Karfunkel, the son of M. Karfunkel and L. Karfunkel, is currently the Chairman and a director of ACP.  ACP was formed and capitalized by M.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

Karfunkel in 2010 to support NGHC.  ACP operates as an investment vehicle for the Karfunkel-Zyskind Family.

87.    ACP has no officers or employees and instead relies upon employees of AmTrust, NGHC, and other Karfunkel-Zyskind Family companies to manage its assets and otherwise provide services on a regular basis.

**E.    NGHC**

88.    NGHC is a publicly-held specialty personal lines insurance holding company that is controlled by the Karfunkel-Zyskind Family and provides a variety of insurance products, including homeowners, umbrella, personal, and commercial automobile.  As of March 28, 2018, L. Karfunkel was the beneficial owner of 41.7% of NGHC.   Until June 2017, AmTrust subsidiaries owned an additional approximately 12% of NGHC.  M. Karfunkel served as NGHC's chairman and CEO until his death in April 2016.  M. Karfunkel's son, NGHC president Barry Karfunkel, replaced him as CEO.   Barry Karfunkel's brother Robert Karfunkel is NGHC's Executive Vice President and Chief Marketing Officer.  Defendants Zyskind and DeCarlo are also members of the board of NGHC along with Barry and Robert Karfunkel.  From their positions on NGHC's compensation committee Zyskind and DeCarlo enriched Barry and Robert Karfunkel with outsized shares and bonuses.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

F.    ESTATE OF MICHAEL KARFUNKEL

89.    The Estate of Michael Karfunkel (the "Karfunkel Estate") is the estate of the deceased M. Karfunkel, who passed away in April 2016 while serving as Chairman of the AmTrust Board.  The Karfunkel Estate was substituted for M. Karfunkel as a defendant in the Cambridge Derivative Action on August 16, 2017. M. Karfunkel was one of the co-founders of AmTrust. According to the Company's public filings immediately prior to his passing, M. Karfunkel beneficially owned 2,192,824 shares, or approximately 1.3%, of the Company's outstanding common stock.   M. Karfunkel was also the founder, Chairman, President, CEO, and controlling stockholder of NGHC. Additionally, the Karfunkel Trust[4] owns 99.9% of the outstanding stock of ACP's parent company.[5]   M. Karfunkel was also the Chairman and a director of ACP. M. Karfunkel was G. Karfunkel's older brother, L. Karfunkel's husband, and Zyskind's father-in-law. The Karfunkel Estate was among the defendants potentially liable for the Cambridge Derivative Claims.

90.    The Control Group has dominated the Company since its inception, and the members of the Board have made clear that they will not act independently from

_____

[4] The Michael Karfunkel 2005 Grantor Retained Annuity Trust owned 99.9% of the outstanding stock of ACP's parent company until July 28, 2015, at which time it was transferred to the Michael Karfunkel Trust.

[5] ACP is 100% owned by ACP Re Holdings, LLC, which is 99.9% owned by the Michael Karfunkel Trust.

-36-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the Control Group. For example, as explained below, the Company is currently a party to a constellation of agreements with parties related to the Control Group, including Maiden and NGHC. The below diagram illustrates the incestuous nature of various Karfunkel-Zyskind affiliated entities, with AmTrust at the center.



(1) AmTrust's quarterly dividend was raised on August 2, 2016, just months before the company was forced to raise cash through low priced equity sales and began selling assets.
(2) AmTrust originally entered into a $250mm loan to ACP Re, Ltd, a company owned by the family. As of December 2017, the loan had a balance of $128 million, a maturity date of 2036 and a fixed interest rate of 3.7% (a portion of which may be paid-in-kind). At AmTrust's discretion the loan may even be repaid in publicly traded stock instead of cash.
(3) 70% of Maiden's business is reliant on AmTrust as a customer.

6

91.    The sheer volume and size of these related party transactions show how the Company's purportedly independent directors simply accede to the demands of the Control Group.

---

6  Proxy Statement, Form 14A (DFAN14A of Icahn Group), available at https://www.sec.gov/Archives/edgar/data/921669/000114420418030400/tv494868 ex-1.htm.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

92.     Based on the repeated acquiescence of Defendants DeCarlo, Gulkowitz, and Fisch to the Control Group, it is clear the Control Group exercises control over them.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND OF AMTRUST AND THE CONTROL GROUP

93.     AmTrust was founded in 1998 by Defendant G. Karfunkel and his late brother M. Karfunkel.   Currently, AmTrust is controlled by Defendants G. Karfunkel, L. Karfunkel (M. Karfunkel's widow), and Zyskind (M. and L. Karfunkel's son-in-law), who together with their affiliates and family members own 55% of AmTrust's common stock.[7]

94.     Karfunkel-Zyskind Family members also occupy a number of the Company's most powerful and influential positions. Zyskind is the Company's CEO, President and Chairman of the Board. M. Karfunkel was Chairman of the Board until his passing in April 2016. G. and L. Karfunkel are both Board members. Until April 2016, M. Karfunkel, G. Karfunkel, and Zyskind formed the Board's executive committee.

---

[7] On May 25, 2017, AmTrust sold 24,096,384 shares at $12.45 per share for a total of $300 million to family members of the Control Group, increasing their ownership percentage from 49% to 55%.

-38-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

95.    As admitted in the Company's Form 10-K for the 2017 fiscal year, the Control Group, "acting together, have the ability to control all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions."  The Form 10-K goes on to concede that "[t]hese stockholders may have interests that are different from our other stockholders."

96.    The Control Group has used its dominance of AmTrust to pursue interests that differed from the Company's other stockholders for its own personal benefit for years.  In addition to the tens of millions of dollars Zyskind has extracted in compensation over recent years, the Company is currently a party to a startling number of agreements with entities related to the Control Group, including Maiden and NGHC.  This includes: (i) a reinsurance agreement with Maiden (despite its subpar rating) that has been in place since 2007 and under which the Company recorded approximately $596 million of "ceding commissions" in 2016 alone;[8] (ii) a loan from Maiden with an outstanding principal balance of $168 million; (iii) a recently terminated master services agreement with NGHC where AmTrust recorded

---

[8] AmTrust failed to disclose the amount of ceding commissions recorded in 2017 in its disclosure of related party transactions in the Form 10-K/A it filed on April 23, 2018.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

$46 million in fee income in 2016; (iv) a September 2017 sale to NGHC of a personal lines policy management system and related intellectual property for $200 million; (v) a loan to ACP that resulted in AmTrust recording $128.5 million in loan and interest receivables in 2017; and (vi) leasing AmTrust's corporate headquarters from the Control Group for $2 million per year. All told, the Company generally discloses more than twenty related party transactions in its annual proxy filings.

### B. BACKGROUND OF DERIVATIVE LITIGATION PENDING AGAINST MEMBERS OF THE KARFUNKEL-ZYSKIND FAMILY AND AMTRUST BOARD AT THE TIME OF THE TAKE-PRIVATE TRANSACTION

#### 1. The Cambridge Derivative Action

97. AmTrust has been beset by scandal and mismanagement in recent years. For example, in April of 2015, Cambridge Retirement System, an AmTrust stockholder, commenced a derivative action in the Delaware Court of Chancery on behalf of AmTrust against (among other defendants) Zyskind, DeCarlo Fisch, Gulkowitz, G. Karfunkel, and L. Karfunkel for breaching their fiduciary duties of loyalty and usurping a corporate opportunity from AmTrust in connection with the Company's and the Karfunkel-Zyskind Family's dealings with insurance company Tower Group International, Ltd. (the "Cambridge Action").[9] The Court noted that

---

[9] Despite being named as a defendant in the Cambridge Derivative Action, L. Karfunkel claimed in her 2016 director questionnaire that she did not believe she was an "adverse" party in that litigation.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the allegations of the Karfunkel-Zyskind Family's self-dealing and the AmTrust Board's acquiescence to the Karfunkel-Zyskind Family's demands at the expense of the Company due to conflicts of interest were "very troubling" and "very unusual," and denied the sole motion to dismiss filed.

98.     The Cambridge Action alleged that in 2013, members of the Karfunkel-Zyskind Family stole AmTrust's opportunity to acquire valuable businesses and assets from distressed insurer Tower.  Their misconduct gave rise to meritorious derivative claims for money damages that this Court sustained in June 2016.  As shown below, discovery taken in the Cambridge Action confirms that: (1) the Company possessed a hugely valuable asset (*i.e.,* the Cambridge Derivative Claims) that Company fiduciaries were duty-bound to value in good faith and secure value for in connection with the Take-Private Transaction in 2018; and (2) the four-member Take-Private Special Committee—which included all three members of the Audit Committee responsible for reviewing and approving the Tower Transaction—was not independent of the Karfunkel-Zyskind Family and was otherwise incapable of protecting minority stockholders' interests in connection with the Take-Private Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

> **a.    Without Telling the AmTrust Board, The Karfunkel-Zyskind Family Disloyally Decided The Karfunkel-Zyskind Family's Other Businesses Should Profit from the Tower Opportunity.**

99.    Tower was a publicly-traded, diversified casualty and property insurance company that was highly regarded within the industry and broader market. In the first three quarters of 2013, however, Tower suffered significant losses and commenced a strategic review.

100.    In response to these developments, AmTrust, led by CEO Zyskind and Chairman M. Karfunkel, became one of a number of companies interested in acquiring some or all of Tower.

101.    On October 21, 2013, AmTrust submitted a formal letter of intent ("LOI") to acquire two Tower insurance subsidiaries for $50 million cash and make a $100 million preferred stock investment in Tower.  While AmTrust was devoting substantial resources to pursuing Tower, including retaining and paying Guggenheim Securities, LLC ("Guggenheim") to advise the Company, members of the Karfunkel-Zyskind Family determined that certain of the Karfunkel-Zyskind Family's other businsses should profit from Tower as well. In particular, NGHC was preparing for an IPO at the time, and profitable, near-term opportunities for NGHC helped ensure a successful IPO.

-42-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

102.   On October 30, 2013, Justin Rubinstein of Guggenheim emailed AmTrust in-house counsel John Titley a draft engagement letter that alluded to the Karfunkel-Zyskind Family's disloyal plan.

103.   The email states:

John,

Given *that National General Holdings will be acquiring one of the subsidiaries [of Tower]* and AmTrust the other we have revised the engagement letter *to include both companies*. Please let us know if you have any comments.

Best,

Justin

104.   The plan—to divert at least a part of the Tower opportunity to NGHC—revealed through Rubinstein's email is corroborated by other communications produced in the Cambridge Derivative Action. For example, an internal November 4, 2013 AmTrust email among Karfunkel-Zyskind Family subordinates explicitly refers to an "understanding with Nat Gen [i.e., NGHC]" regarding Tower. AmTrust also demanded that its non-disclosure agreement ("NDA") with Tower include an express carve out allowing NGHC access to due diligence.

105.   In response to AmTrust's demand, one of Tower's lawyers at Willkie Farr & Gallagher LLP ("Willkie Farr") commented, "Did we anticipate that they would do a joint bid with something called National General Holdings Corp., which seems to have the same CEO as AmTrust?"

-43-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

106.   Of course, throughout October and November 2013, none of this was communicated to either the full AmTrust Board, or the standing Audit Committee, whose charter expressly required the committee to "oversee all related party transactions.…"

107.   To the contrary, Zyskind, Michael Karfunkel, and their subordinates in AmTrust management were actively working to conceal their plan.

108.   For example, as noted above, AmTrust demanded that the Tower NDA include a carve-out for NGHC. Willkie Farr responded by requesting that NGHC execute a joinder to the NDA, which elicited the following response from one of Zyskind's subordinates in management:

> We will have [NGHC] sign a joinder once we get them involved. ***I don't want to get them involved yet so draft language that says when we get them involved it will only be after they sign something.***

109.   Discovery in the Cambridge Derivative Action further suggests a concerted effort to keep Michael Karfunkel's fingerprints off of the Tower Transaction process because of his position as CEO of both ACP and NGHC, which ultimately received the lion's share of Tower's businsses and assets.

110.   For example, on December 3, 2013, Michael Constantino ("Constantino") of Guggenheim emailed Michael Karfunkel directly concerning Tower at his NGHC email address.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

111.   Upon learning of Constantino's email to M. Karfunkel, Zyskind exploded.

112.   A December 4, 2013 email from Peter Van der Meer of Guggenheim to Constantino states, "As I told you Barry [Zyskind] called me and was extremely upset that you send [sic] email to Michael Karfunkel….This is very serious [sic] Barry said that if this happen [sic] again he will not work with Guggenheim going forward."

113.   The email also states, "As I have told you now several times this is a sensitive…transaction" and then "reiterate[s]" the "very delicate nature" of the transaction. The email concludes by demanding that Constantino cease contacting both Zyskind or Michael Karfunkel.

114.   Meanwhile, on December 2, 2013, AmTrust submitted a new LOI proposing to acquire 100% of Tower's outstanding stock for $5.50 per share.

115.   Ten days later, on December 12, 2013, AmTrust abrupty withdrew the bid. AmTrust claimed the reason was Tower's inability to timely make quarterly filings with the SEC. But others, including members of Tower's audit committee, believed that AmTrust's explanation was pretext. One Tower audit committee member emailed internally: "My view is that their withdrawal at this point has less to do with Tower's filing of the 3rd Qtr. 10-Q than it does with the recent news regarding their situation and the significant drop in their stock price."

-45-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

116.   The "situation" referred to in this email was the publication of a short-seller report by GeoInvesting on December 12 (*i.e.*, the same day AmTrust withdrew its bid) alleging various accounting improprieties at AmTrust (the "GeoInvesting Article").[10] Details of the report were published in numerous media outlets and caused a significant drop in AmTrust's share price (*see* § B.2.a, *infra*).

117.   By December 20, 2013, following an announcement that Tower would increase its loss reserves for the third quarter of 2013 and that A.M. Best, an influential insurance rating service, was again downgrading Tower's credit rating, Tower was trading at $2.65 per share—a 35% decrease from its trading price as of when AmTrust submitted its December 2, 2013 LOI to acquire Tower for $5.50 per share.

118.   That same day, representatives of AmTrust, including Zyskind, "expressed [to Tower management] their renewed interest in making a bid to purchase the entire company," but advised that it would be "in partnership with National General Insurance Company and a privately-owned Bermuda reinsurance company [i.e., ACP] owned by Mr. Michael Karfunkel."

---

[10] At 10:22 a.m. on December 12, 2013, an AmTrust employee forwarded the GeoInvesting Article to Zyskind. The short seller report was then published approximately a half hour later on Seeking Alpha under the title "AmTrust Financial Services: A House of Cards?" Karkowsky called Lee about an hour and half after the report was published to inform him that AmTrust was pulling its bid.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

119.    On December 29, 2013, in-house counsel for AmTrust, Stephen Ungar, sent Tower's legal advisors at Willkie Farr an LOI for ACP to acquire Tower for $3.00 per share, or $2.50 per share less than the $5.50 per share that AmTrust had offered in its December 2 LOI.

120.    The December 29, 2013 LOI contemplated that ACP would acquire Tower and retain its legacy business. ACP would then (i) sell certain of Tower's going-forward commercial lines business to AmTrust, as well as enter certain reinsurance agreements with AmTrust relating to the commercial lines business, and (ii) sell Tower's going-forward personal lines business to NGHC as well as enter certain reinsurance agreements with NGHC relating to the personal lines business.

### b.    The AmTrust Board Failed to Protect the Interests of the Company and its Minority Stockholders

121.    The following day, on December 30, 2013 AmTrust's Board convened for its first of only two meetings before approving the Tower Transaction. Each meeting lasted under 30 minutes. The Audit Committee convened only once—on January 3, 2014—the same day the Tower merger agreement was signed, and for only 15 minutes. Despite his conflicts, Zykind was the sole presenter at each meeting. No Board member—including the three members of the Karfunkel-Zyskind Family—recused themselves from any portion of the December 30 or January 3 meetings. Zyskind was also present for the entire January 3 Audit

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Committee meeting. No outside advisors were retained before the merger agreement was signed.

122.   In denying the motion to dismiss in the Cambridge Derivative Action, this Court considered the Board and Audit Committee minutes and materials for the December 30 and January 3 meetings, and described them as reflecting a process that did not appear to be "bona fide" and that included failures to address "obvious conflicts of interest," and "delegation of transaction approval" to a "conflicted audit committee that appeared predestined to approve an already-baked transaction."[11]

123.   Deposition testimony from the Cambridge Derivative Action is even more damning than the documentary record considered by the Court when denying the motion to dismiss. For example, the testimony of Audit Committee member DeCarlo, who purports to be an "independent" Board member and who would later be named Chair of the Take-Private Special Committee, reflects a fundamental unwillingness or inability to recognize, let alone manage, conflicts when dealing with the members of the Karfunkel-Zyskind Family.

124.   For example, DeCarlo testified that he does not believe that members of the Karfunkel-Zyskind Family harbored any conflicts of interest in connection with the Tower Transaction:

---

[11] *See Cambridge Ret. Sys. v. DeCarlo, et al.*, C.A. No. 10879-CB, at 36:23-24, 46:22-48:7 (Del. Ch. June 16, 2016) (TRANSCRIPT).

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Q.   Would you agree that by the time of this [December 30, 2013] meeting when Mr. Zyskind was leading discussion concerning this transaction, that Mr. Zyskind had a conflict of interest?

A.   No.

* * *

Q.   The fact that his family had an ownership interest in ACP Re, you don't think that created a conflict for Mr. Zyskind?

A.   No, not in a negotiation, no.

* * *

Q.   Would you agree that Michael Karfunkel had a conflict at the time of the meeting?

A.   No, the same.  They were negotiating -- until the point in time it got serious, they were going to go forward and they brought it to us, then -- then the potential conflicts come up.

Q.   So while they're negotiating, no conflict, right?

A.   Yes.

* * *

Q.   If -- so in your view, if Barry Zyskind didn't have a conflict, Michael Karfunkel didn't have a conflict, so I take it at this time that it's your view that George Karfunkel did not have a conflict either?

A.   Correct.

125.   DeCarlo likewise believed he was not conflicted in a potential Tower

***deal irrespective of his board position at NGHC***:

Q.   Do you think you had any conflict at this time?

A.   No.

-49-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

126.    Audit Committee member Gulkowitz—who likewise was later appointed to the Take-Private Special Committee—shared DeCarlo's bizarre and problematic views, testifying that he too did not think Zyskind, Michael Karfunkel or George Karfunkel were conflicted with respect to a potential Tower transaction involving ACP, AmTrust, and NGHC.

127.    DeCarlo further testified that the Board chose to remain willfully blind. At his deposition, he stated he could not recall any Board member asking any questions at the December 30 meeting, such as asking when NGHC or ACP became involved in the Tower Transaction. DeCarlo also took no steps to educate himself following the meeting.

128.    DeCarlo testified as follows:

Q.    Following the December 30 board meeting, did you do anything to, I guess, educate yourself on the background or history of the Tower transaction at AmTrust?

[OBJECTION OMITTED]

A.    No, I was not going to get in and do management's job for them. I wanted Barry to do what he said he was going to do, continue to negotiate and expect him to come back to us when he was ready to go forward or not.

Q.    So did you sort of, I guess, sit tight and wait for another -- another board meeting to be called; is that fair?

A.    That's correct.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

129.    Instead, DeCarlo testified that he was content to allow the members of the Karfunkel-Zyskind Family to structure the Tower Transaction among themselves:

> Q.    You mentioned you expected Barry Zyskind would continue to negotiate.  Who did you expect Mr. Zyskind to negotiate with?
>
> A.    Well, Michael, because the way he's describing it is Michael is taking the laboring oar on this deal and then secondly with Tower to make sure they'd go along with it.
>
> Q.    And when you say "Michael", you mean Michael Karfunkel?
>
> A.    Michael Karfunkel.
>
> Q.    You would have expected Barry Zyskind to continue to negotiate with Michael Karfunkel?
>
> A.    Yes.
>
> Q.    And would Michael Karfunkel be representing both ACP and NGHC in those negotiations?
>
> [OBJECTION OMITTED]
>
> A.    I would expect, yes.
>
> Q.    And Barry Zyskind would be the representative for AmTrust?
>
> A.    Correct.

130.    By January 3, 2014, a merger agreement between ACP and Tower was final and ready to be signed.

131.    The members of the Karfunkel-Zyskind Family knew the AmTrust Board and Audit Commmittee would blindly approve it.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

132.   On the morning of January 3, 2014, before the final Board and Audit Committee meetings, Michael Karfunkel sent family members a celebratory email stating, "Guys stay home & play with the kids…Tower is closing today."

133.   Later that morning, AmTrust's Board held a perfunctory 15-minute telephonic meeting at 10:30 a.m., which was immediately followed by a similarly perfunctory 15-minute telephonic Audit Committee meeting at 10:45.

134.   The Board and Audit Committee received a single PowerPoint presentation via email less than two minutes before the 10:30 a.m. meeting. DeCarlo was asked at his deposition whether he saw the presentation materials before the meeting:

Q. Do you know whether you saw this e-mail before the 10:30 meeting?

A. I'm speculating, but probably not.

Q. Do you see that this e-mail attaches a presentation? Did you see this presentation at any time before the meeting?

A. I don't recall seeing it, no.

Q. Is it possible that you didn't see the presentation?

A. Yes.

135.   The 10:30 a.m. AmTrust Board meeting was the first and only time prior to signing that the Board was informed of any of the details of the transaction. As DeCarlo testified at his deposition:

Q.   [] Was the January 3rd meeting the first you learned of any I guess specifics regarding potential transaction terms, things like price.

-52-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.   To the best of my knowledge, yes.

Q.   And so before January 3rd, you were not aware what, for example, AmTrust was anticipating paying in the Tower transaction?

[OBJECTION OMITTED]

A.   Again, to the best of my knowledge, no.

Q.   How about with respect to NGHC, prior to January 3rd?

A.   The same.

Q.   Did you have any understanding, prior to January 3rd, what ACP would be paying in connection with the Tower transaction?

A.   Yeah, to the best of my knowledge, no.

136.   DeCarlo's testimony makes clear that Audit Committee delegation was

a pointless exercise, as the members of the Audit Committee did not recognize any

conflicts of interest and therefore did not consider taking any steps to manage them:

Q.   Fair to say no steps were taken to address any conflict with respect to Barry Zyskind up to that point in time, January 3, 2014?

A.   No, we didn't believe there was a conflict, so we didn't take any steps, no.

Q.   And as for Michael Karfunkel, fair to say the Audit Committee didn't take any steps prior to January 3, 2014 to address any conflicts –

A.   Same.

Q.   -- with respect to Michael Karfunkel?

A.   Same.

Q.   And then with respect to George Karfunkel, no steps were taken prior to the vote on January 3, 2014 to address any conflict with respect to George Karfunkel?

-53-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.   No.

137.   Even now, DeCarlo maintains that neither himself, nor Zyskind, nor M. Karfunkel, had ever had a conflict in connection with any aspect of the Tower Transaction.  Instead, he believes the deal was not conflicted and was negotiated at "arm's-length":

> Q.   You know, I had asked you questions before about conflicts, but -- so at the time of the Audit Committee's approval, January 3, 2014, I guess, in your view, did -- by that point did Mr. Zyskind have a conflict of interest?
>
> [OBJECTION OMITTED]
>
> A.   No, because this helped us sort of conflicts out [SIC], this structure.
>
> Q.   Uh-huh.
>
> A.   If this structure was done differently, he might have had a conflict. And what was happening here was that ACP Re which was neither Nat Gen nor AmTrust, was going to buy Tower. So that fact, Zyskind had no conflict.  Then once ACP bought Tower, we were going to buy commercial lines from ACP Re.  We weren't interested in personal lines. We were going to get -- ACP was going to pick up legacy liability. All of that was a sweetheart deal for AmTrust.  I didn't see any conflict at all.  I thought it was a great deal.  Tower was known to be writing business in our sweet spot, excluding the personal lines, which we didn't write.  They were writing workers' comp in the same -- a lot of the same geographical areas.  This was a great opportunity for us. So I didn't see any conflict. I saw this as an opportunity for AmTrust.
>
> Q.   I think you said Mr. Zyskind actually prevented a conflict; there could have been a conflict?  Did you say that?
>
> A.   There could have been if we didn't structure it like this.
>
> Q.   I guess sitting here -- what structures would -- what potential structures would cause a conflict in your mind?

-54-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.    There -- I -- I don't want to speculate on what they would be. This is the clearest upfront structure that would avoid a conflict.  Anything short of that, if -- say, for example, if we had to buy the whole company, there might be a conflict there, if it wasn't priced right.   And we wouldn't do that because we don't write personal lines. If the legacy liability was still involved where it wasn't being taken over by ACP Re, that would concern me immensely, and I would say that would be a reason not to vote for the deal. So this -- the better way of putting it, Ned, is that the way they presented it made what could be a nasty deal and conflicted deal, a perfectly acceptable deal.

138.    Gulkowitz too, at his deposition, testified that he does not believe the members of the Karfunkel-Zyskind Family—including M. Karfunkel, G. Karfunkel, and Zyskind—possessed any conflict of interest relating to the Tower Transaction as of January 3, 2013.  He viewed NGHC and AmTrust as "sitting on the same side of the table."  Moreover, Gulkowitz testified that he did not even know for sure whether any member of the Karfunkel-Zyskind Family was an executive of NGHC or on the NGHC Board.

139.    Nor, as DeCarlo testified, did the Audit Committee endeavor to determine whether a multitude of other reasonably available transaction alternatives would have been more financially favorable to AmTrust:

Q.    Prior to the Audit Committee vote on January 3, 2014, did the Audit Committee undertake any assessment of alternative transaction structures involving Tower that AmTrust could potentially pursue?

A.    No, we weren't involved.  It was -- management was doing all the work. This is the first time we saw this structure.  We didn't get into it before this.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Q.   So in terms of how to structure a transaction, would you view that as the job of management, I guess rather than the job of the board?

A.   Yes.

Q.   And management would include Barry Zyskind?

A.   Yes.

140.   Similarly, Gulkowitz could not recall any consideration of alternative transaction structures other than the one presented by Zyskind and went so far as to testify that he "can't understand or fathom anything else."

141.   At the end of the Audit Committee's January 3, 2014 meeting, the Audit Committee, based solely on Zyskind's presentation and the facts he communicated, (i) determined that ACP's acquisition of Tower, and NGHC's acquisition of Tower's personal lines segment, were not corporate opportunities for the Company; and (ii) approved the Tower Transaction.

142.   Later that day, ACP executed the merger agreement with Tower to acquire all of Tower's outstanding stock for $3.00 per share.  AmTrust and NGHC executed interrelated agreements providing for, among other things: (1) ACP's sale of Tower's personal lines business to NGHC for approximately $125 million; and (2) ACP's sale of Tower's commercial lines business to AmTrust for approximately $125 million.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

143.   The price per share paid by ACP was well below Tower's estimated tangible book value, which Compass Point analyst Kenneth Billingsley estimated in early January 2014 as $7.50 per share.

144.   Nonetheless, in light of a deterioration in Tower's operations in the first quarter of 2014, however, the Karfunkel-Zyskind Family began negotiating modifications to the Tower Transaction. As with the negotiations with Tower up to that point, the Karfunkel-Zyskind Family concealed from the Board their plan to modify the deal terms. The AmTrust Board convened meetings in February 2014 and March 2014, and the Karfunkel-Zyskind Family chose not to disclose their ongoing negotiations to the Board at these meetings.

145.   Despite the deterioration in Tower's business in the first quarter, the Tower Transaction remained profitable for the Karfunkel-Zyskind Family. Even before revised deal terms had been reached, on February 16, 2014, Zyskind wrote to M. Karfunkel, "I am sure you are making money on [T]ower."

146.   Ultimately, on May 8, 2014, ACP and Tower executed an amendment to their original merger agreement which, among other things, reduced the merger price from $3.00 per share to $2.50 per share.

147.   Despite the fact that ACP had secured a significant price reduction (*i.e.*, a $0.50 (or 16.66%) reduction from $3.00 per AmTrust share to $2.50 per AmTrust share) in what was an acquisition identified, facilitated, and ultimately financed by

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

AmTrust, the Karfunkel-Zyskind Family passed none of those savings onto AmTrust.

148.   Instead, the transaction was simply restructured such that ACP would retain Tower's subsidiaries following its acquisition, with AmTrust and NGHC retaining renewal rights of the commercial lines and personal lines businesses, respectively, and financing ACP's acquisition of Tower through a $250 million loan, with AmTrust and NGHC each providing up to $125 million.

149.   Other modifications to the Tower Transaction shifted additional risks onto AmTrust that had previously been allocated to ACP. In addition to AmTrust's commitment to provide ACP with up to $125 million in financing, upon terms to be negotiated and determined at a later date (the "Credit Agreement"), AmTrust and NGHC also agreed to cover losses of up to $250 million incurred by a former Tower subsidiary, CastlePoint Reinsurance Company, Ltd. (the "Stop-Loss Agreements").

150.   In connection with the transaction restructuring, AmTrust's Audit Committee determined to finally retain legal and financial advisors, but the process was no less abysmal than before. The Audit Committee retained Griffin as its financial advisor, but Griffin *was simultaneously advising the NGHC board of directors in connection with modifications to the Tower Transaction*.   At his deposition in the Cambridge Derivative Action, DeCarlo testified that it was acceptable for Griffin to represent both AmTrust and NGHC because he understood

-58-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Griffin would erect a "Chinese wall" to manage Griffin's potential conflict. In reality, however, the same individual at Griffin, Jeffrey Harenza, led Griffin's work on behalf of both AmTrust and NGHC.

Q.     Was Griffin also retained by NGHC in connection with the term loan?

A.     Yes.

Q.     Did that cause any concern to you?

A.     Well, we talked about it and Griffin assured us -- and I don't know whether they used this term but it was going to be a Chinese wall, but they were negotiating with Nat Gen and we were negotiating with AmTrust and ACP Re but they were totally independent negotiations; the Audit Committee on behalf of AmTrust, and if I remember correctly, a special committee of Nat Gen on behalf of Nat Gen.

\*     \*     \*

Q.     When you say "Chinese wall", what do you mean by "Chinese wall"?

A.     Griffin was supposed to keep their documents, their negotiations, the developments in connection with the negotiation on behalf of each party separate and apart and not share.

Q.     Did the Audit Committee take any steps to ensure that that occurred?

A.     No, but -- you know from -- no, we didn't, no.

Q.     Who at Griffin advised AmTrust audit committee?

A.     I think his last name is Harenza or Farenza.  I don't know exactly, yeah.

Q.     Who at Griffin advised NGHC's Audit Committee?

A.     Same individual.

-59-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Q.    Same individual, Mr. Harenza?

A.    Yeah.

Q.    Was it Jeff Harenza?

A.    Sounds right.

151.    The Audit Committee's chosen legal advisor, Stevens & Lee, was also conflicted. Stevens & Lee and Griffin are affiliates of the same parent company, Stevens & Lee/Griffin, which touts itself as a "multidisciplinary professional services platform with approximately 150 attorneys and 50 non-lawyer business and consulting professionals." Internal communications show that Griffin recommended that the Audit Committee hire Stevens & Lee. DeCarlo testified he was wholly unaware of the relationship between Stevens & Lee and Griffin:

Q.    Do you know whether Stevens & Lee has any affiliation with Griffin?

A.    I don't.

152.    Yet, DeCarlo testified that the Audit Committee relied on Stevens & Lee to advise the committee members concerning Griffin's conflicts:

Q.    So Stevens & Lee advised with respect to potential conflicts with Griffin; fair to say?

A.    I believe that's the case.

* * *

Q.    [] If Stevens & Lee and Griffin were affiliated with one another, do you think that would make it difficult for Stevens & Lee to really independently assess whether Griffin has any conflicts of interest?

-60-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

[OBJECTION OMITTED]

Yeah, I don't know. I'd leave it up to them to decide. It's not the best of arrangements, but I'd leave it up to them to sort that out.

Q.  When you say "leave it up to them," you mean Stevens & Lee?

A.  I mean Stevens & Lee and Griffen, if there was an arrangement to tell us about it, and then give us an opportunity to opine on it.

The Audit Committee also failed to manage DeCarlo's conflict.  As noted above, DeCarlo was also a director of NGHC, which was interested in the Tower Tranaction. Not until May 29, 2014, did DeCarlo finally suggest to his fellow Audit Committee members that he recuse himself from further deliberations regarding the Tower Transaction given his affiliation with NGHC. At his deposition in the Cambridge Derivative Action, DeCarlo testified that Stevens & Lee had pointed out the "appearance of a conflict" created by his dual role in April 2014.  He testified that he waited the additional month to recuse himself because "he didn't think there was an urgency" because "it wasn't a real conflict":

Q.    Just so I understand your testimony clearly, in your view -- or is it your view that at no point in the transaction process did you have -- in fact have a conflict at AmTrust?

[OBJECTION OMITTED]

A.    Okay.  I -- from beginning to end, I thought this was a home run deal for AmTrust, and independently, a home run deal for Nat Gen, the way it was structured with ACP Re. So I never thought I had a conflict.

153.  The Audit Committee then formed a subcommittee consisting of the Audit Committee's two remaining members, Gulkowitz and Fisch (the

-61-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"Subcommittee"), but it had no ameliorative effect.  The Subcommittee ultimately authorized the Company to agree to pay ACP contingent consideration in the form of a three year earn-out (the "Earn-Out"), payable semi-annually on the last day of January and July, of 3% of gross written premiums of the Tower commercial lines business written or assumed by the Company following the merger.[12]

154.  On September 15, 2014, ACP and Tower consummated the Tower Transaction.

### c.    The Cambridge Derivative Claims Were Worth Hundreds of Millions of Dollars

155.  The Karfunkel-Zyskind Family prevented the AmTrust Board from implementing procedural devices to protect the interests of the Company and its minority stockholders. Had such devices—such as a fully empowered and informed independent committee that could hire advisors, say "no" to the Karfunkel-Zyskind Family and/or consider alternative transactions—been in place when the conflict with NGHC arose in October 2013, AmTrust could have negotiated for an alternative transaction that would have provided the Company with substantially more value than it ultimately received through the Tower Transaction. Instead, the Karfunkel-Zyskind Family orchestrated a transaction among their various entities in

---

[12] Through the Earn-Out, AmTrust and NGHC each agreed to pay ACP up to $30 million in contingent payments to ACP over a three-year period.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the manner that best enriched them, a pattern that repeated itself in the Take-Private Transaction.

156.  Each of Tower's component parts—the personal lines business, commercial lines business and legacy business—were perceived to be highly valuable up through the September 2014 closing of the Tower Transaction.

157.  According to Griffin's July 22, 2014 fairness opinion presentation to NGHC, Tower's personal lines business was valued between approximately $340.7 million to $662.6 million.

158.  According to Griffin's July 22, 2014 fairness opinion presentation to the AmTrust [Sub-Committee], Tower's commercial lines business was valued between approximately $294.59 million and $629.4 million.

159.  According to a September 2014 presentation delivered to A.M. Best, ACP valued Tower's legacy business (which ACP retained after the Tower Transaction) at approximately $136 million.[13, 14]

---

[13] Unless ACP was knowingly lying to the ratings agencies, this September 2014 presentation dispels any notion that the Karfunkel-Zyskind Family was playing the role of "white-knight" in the Tower Transaction. To the contrary, M. Karfunkel/ACP saw significant profit potential in Tower's legacy business and wanted to secure those profits for himself and his family.

[14] Further, a draft ACP presentation from May 2014, states that "[p]rojected [Tower] loss reserves on June 30, 2014 are $1.38bn with a surplus position of $431mm" and concludes that "ACP Re is therefore well protected," and that the Tower "Acquisition results in surplus increase for ACP Re group of companies." In its

-63-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

160.   The perceived value of Tower's component parts dwarfed the $307.8 million paid by ACP at closing to acquire Tower in its entirety, and that excess value was not fairly allocated among AmTrust, NGHC and ACP because of an abuse of power by the Karfunkel-Zyskind Family. AmTrust's Board and Audit Committee should have tried to—and but-for the Karfunkel-Zyskind Family's misconduct likely could have—negotiated an alternative transaction structure vastly more favorable to the Company.

161.   For example, AmTrust could have proceeded with an acquisition of Tower in its entirety and, as ACP did, sold off parts of Tower to NGHC and ACP, resulting in the distribution of Tower's assets and liabilities just as they ultimately were through the Tower Transaction: (1) AmTrust would receive Tower's commercial lines business, (2) NGHC would receive Tower's personal lines business, and (3) ACP would receive Tower's legacy business. Having acquired Tower in its entirety, however, AmTrust could have sold the personal lines and legacy businesses to NGHC and ACP, respectively, each at a substantial profit.[15]

---

September 2014 presentation to A.M. Best, ACP stated that it planned to "Earn investment income on $1.7 billion of Tower reserves and surplus."

[15] Given that NGHC and ACP bought Tower's personal lines and legacy businesses, respectively, through the Tower Transaction, there can be no dispute that they were willing buyers of those assets.

-64-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

162.   Another potential alternative transaction available to AmTrust was for the Company to acquire Tower in its entirety, and then sell Tower's personal lines and legacy businesses to third parties rather than NGHC and ACP. Discovery plainly shows significant third-party interest in Tower's assets, which continued after entry into the Tower Transaction on January 3, 2014. Among other things, (a) 22 third parties executed NDAs in connection with a potential acquisition of Tower, (b) Tower received three "Whole company proposals" (including AmTrust's), and (c) Tower received four "Other proposals" (including AmTrust's).

163.   A representative of one of these interested parties, Catalina Holdings, emailed Zyskind on January 21, 2014:

> [W]e had a good look at the [Tower] business and were interested in acquiring parts of it. If you/ACP Re are interested in selling any of the companies or reserves post acquisition please let me know. We would be happy to work with you.

164.   Thus, AmTrust could have acquired Tower in its entirety, and then sold certain Tower subsidiaries and/or assets—including the personal lines and legacy businesses—to third parties. Those third parties would have likely valued Tower's personal lines and legacy businesses similarly to Griffin and been willing to pay prices commensurate with those valuations. Like NGHC and ACP, third parties would therefore likely have been willing to purchase those assets from AmTrust for

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

between $340.63 million to $798.6 million, allowing AmTrust to turn a quick but substantial profit on the Tower Transaction.

165.   A third potential alternative transaction could have been structured so that AmTrust acquired and operated Tower's personal lines business—whether just long enough for AmTrust to sell the personal lines at a profit, or indefinitely—in addition to the commercial lines business. AmTrust had previously owned and operated personal lines businesses before selling them for a profit, so this structure was known by the AmTrust Board to be feasible at the time.[16] ACP agreed to effectively sell Tower's personal lines business to NGHC for $125 million, suggesting ACP would have been willing to sell the personal lines to AmTrust on similar terms. As noted above, Griffin valued Tower's personal lines business at between $340.7 million to $662.6 million. By acquiring a business valued at $340.7 million to $662.6 million for only $125 million, AmTrust could have received an additional multi-hundred-million-dollar benefit.

166.   Finally, in addition to the specific examples set forth above, there are a nearly infinite number of alternative transactions more favorable to AmTrust than the Tower Transaction that could have been structured and agreed-upon through independent, informed, arms-length negotiations. The opportunity to acquire Tower

---

[16] As noted above, AmTrust has acquired Sequoia and Republic.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

belonged to AmTrust, which had conducted the due diligence on Tower and was a necessary party to any transaction involving the Karfunkel-Zyskind Family (including NGHC, ACP and/or any of its related entities) on the one hand, and Tower on the other. Neither NGHC nor ACP could acquire any portion of Tower absent AmTrust's involvement and/or approval, providing AmTrust immense negotiating leverage. As such, any transaction involving Tower on the one hand and NGHC and/or ACP on the other hand reached through arms'-length negotiations in which AmTrust was represented by independent and informed representatives could and would have resulted in terms more favorable to AmTrust than the transaction ultimately entered into.

### 2. Defendants' Financial Restatement Causes the Company's Stock Price to Crater, Setting the Stage for An Unfair Merger

167. During the year prior to the announcement of the Transaction, AmTrust's stock price dove from $27 to $13 at the end of the 3Q 2017 because of a series of negative disclosures stemming from the Company's accounting. These disclosures included restatements of multiple years of the Company's financials stemming from issues with its financial reporting, increases in the Company's loss reserves, and the public revelation of a long-running SEC investigation.

168. In April 2013, the financial publication *Off Wall Street* ("OWS") questioned the Company's accounting for acquisition costs and life settlement

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

contracts ("LSCs").  Then, on December 12, 2013, GeoInvesting published its article alleging that the Company was hiding losses in offshore entities and improperly accounting for its LSCs.

169.   In February 2014,  *Barron's* issued an article titled "An Insurer's Feat: Turning Losses Into Gains" (the "February 2014 Barron's Article") noting that "[a]fter long interviews with AmTrust executives"—including Zyskind and Pipoly—"[*Barron's*] still ha[s] questions about some cost deferrals and reinsurance maneuvers that critics [such as OWS and GeoInvesting] highlighted," and that "[e]ven staunch defenders like its investment bankers FBR Capital Markets acknowledge confusion in their recent attempts to rebut AmTrust's critics."

170.   In May 2014, *Barron's* published an article titled "Balance-Sheet Risk Makes AmTrust Shares Vulnerable" (the "May 2014 Barron's Article") questioning the Company's loss reserves and estimates and noting that "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings…."  The article noted numerous accounting discrepancies between AmTrust and its reinsurance partner, Karfunkel-Zyskind Family-controlled Maiden Holdings, one of which *Barron's* described as "impossible."

171.  A key agency involved in the regulatory approval of the Tower Transaction was the New York State Department of Financial Services ("NYDFS"). By letter dated September 12, 2014 (the "Approval Letter"), the NYDFS expressly

-68-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

conditioned its approval of the Tower Transaction on representations from a predecessor to the M. Karfunkel Trust that it would cause the Company to enhance its actuarial processes and replace the Company's auditor, BDO USA LLP ("BDO"), for the 2015 financial reporting period. Nonetheless, the Company ignored the NYDFS's directive and retained BDO as the Company's external auditor for the fiscal year 2015 reporting period.

172. In December 2014, AmTrust commenced a defamation lawsuit against Alistair Capital Management, LLC ("Alistair Capital"), a sophisticated institutional investor, for alleging accounting issues at AmTrust. In response, on December 18, 2014, Alistair Capital sent a 16-page letter (the "Alistair Capital Letter") directly to the Audit Committee of the Board, alerting them to a panoply of accounting issues. The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts reported by AmTrust and the amounts reported by a related-party for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions. Five pages of this letter were devoted to signs that the Company's overall internal controls over financial reporting were weak. These signs were

-69-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"indicative of an environment in which an accounting fraud could be perpetuated if members of the Audit Committee fail to fulfill their duty of care in diligently monitoring the Company's control environment." After receiving the Alistair Capital Letter, AmTrust quietly dismissed its defamation suit.

173.    In early April 2016—almost a year and a half after receiving the Approval Letter from the NYDFS—the Audit Committee dismissed BDO and retained KPMG US LLP ("KPMG") as the Company's new external auditor.

174.    In April 2016, *Barron's* published an article titled "Is AmTrust Stock Worth the Premium?" (the "April 2016 Barron's Article"), again questioning the Company's accounting and underwriting practices. The article asserted that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside." The article noted that "the analysts at AmTrust's investment banker, Keefe, Bruyette & Woods, wondered in recent notes whether the insurer's underwriting margins were overstated."

175.    On February 27, 2017, AmTrust issued a press release announcing its fourth quarter 2016 results, which disclosed that the Company (1) anticipated a delay in the filing of its annual report on Form 10-K for fiscal year 2016 (the "2016 10-K") and (2) expected to make "immaterial corrections" to errors in its financial statements for fiscal years 2015 and 2014 and "certain financial information" for

-70-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

fiscal years 2013 and 2012. The Company further disclosed that it "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization" and warned that "additional adjustments and/or material weaknesses could be identified."

176.   The February 27, 2017 press release also disclosed a $65 million reserve charge in the fourth quarter of 2016 relating to the Company's Specialty Risk and Extended Warranty business segment. The reserve charge confirmed *Barron's* (and others') suspicions about the inadequacy of the Company's loss reserves. *Barron's*, in a March 4, 2017 article titled "Our Skepticism on AmTrust Reserves Borne Out," stated that the reserve charge announced on February 27, 2017 "shouldn't have surprised anyone familiar with questions Barron's raised about [AmTrust's] accounting and reserve levels[.]"

177.   After closing at $27.66 per share on the last trading day prior to this announcement, AmTrust's common stock price dropped nearly 20% on this news, closing at $22.34 per share on February 27, 2017.

178.   Two weeks later, on March 16, 2017, AmTrust announced that its Audit Committee had concluded that its consolidated financial statements for the years

-71-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

ended December 31, 2014 and 2015 and the first three quarters of 2016 "should be restated and should no longer be relied upon." AmTrust also stated that audit reports concerning the effectiveness of its internal control over financial reporting for the years ended December 31, 2014 and 2015 "likewise should also no longer be relied upon." On this news, AmTrust stock fell from $21.61 per share on March 16, 2017 to close at $17.58 per share on March 17, 2017, a decrease of $4.03 per share, or 18.6%.

179.    Zyskind described the restatement as a momentary blip in the Company's path towards long-term growth:

> *. . . We believe that AmTrust remains financially strong, and we continue to see opportunities for organic growth within our existing operations, as demonstrated by the gross written and net earned premiums that we recently reported….We are confident in our ability to successfully move through this period and remain focused on leveraging our proprietary technology and efficient operating structure to enhance shareholder returns, best serve our customers and create exciting career growth and development opportunities for AmTrust employees.*

180.    On April 4, 2017, AmTrust filed the 2016 10-K with the SEC revealing that the restatement resulted in a decrease in net income in fiscal years 2014 and 2015 of 7.2% and 11.2%, respectively. The 10-K also disclosed updated reserve charges of $257.9 million for fiscal year 2016 as a result of "unfavorable loss development due to higher actuarial estimates based on actual losses in the Company's Small Commercial Business and Specialty Program segments."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

181.    On April 4, 2017, following AmTrust's filing of its 2016 10-K, which contained the Company's restated financials, AmTrust stock rebounded, closing at $21.95 per share.

182.    Also on April 4, 2017, Plaintiff Arca began purchasing AmTrust common stock, believing that the fundamentals of the Company were sound, despite the recent revelations of impropriety and mismanagement.    Arca believed that AmTrust's fair value was not reflected in its trading price. As discussed herein, AmTrust management shared this belief.

183.    However, the stock rebound AmTrust experienced in connection with the release of its 2016 10-K would be short-lived.  On April 11, 2017, the *Wall Street Journal* reported that the SEC, the FBI and the New York Department of Financial Services were each investigating AmTrust, and that a former auditor of AmTrust had been assisting the FBI through secretly recording conversations about AmTrust.  The former auditor stated that he witnessed "seemingly unsupported adjustments to financial schedules by a senior AmTrust executive."  The *Wall Street Journal* also reported that Harry Markopolos (the forensic accountant who had over a decade earlier alerted the SEC to Bernard Madoff's fraud) had been investigating AmTrust's finances for years.   On this news, AmTrust's shares fell from $18.87 per share the previous day, to close at $15.30 per share on April 11, 2017, down approximately $3.57 per share, or 18.9%.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

184.  AmTrust's downward movement in February, March, and April of 2017, which, as discussed in the preceding paragraphs, was primarily due to delays of management's own making, is reflected in the following image produced by the *Wall Street Journal*:



185.  The revelations of financial irregularities precipitated a number of lawsuits against AmTrust and its leadership.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

186.   For example, in March and April of 2017, investors filed three putative securities class actions in the U.S. District Court for the Southern District of New York against AmTrust and certain of its officers and directors.  The actions, which are pending, were ultimately consolidated under the case name *In re AmTrust Financial Services, Inc. Securities Litigation*.  The stockholders seek damages under Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act"), and Rule 10b-5 promulgated thereunder and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.

187.   Additionally, on April 27, 2017, an AmTrust stockholder filed a derivative action in the Supreme Court of the State of New York for the County of New York seeking damages on behalf of the Company (*Shaev v. DeCarlo et al.*).

188.   Also, on May 11, 2017, and on June 28, 2017, two derivative actions were filed by AmTrust stockholders in the U.S. District Court for the District of Delaware.  The District Court consolidated these two actions (collectively, the "Accounting Derivative Action," discussed herein) under the case name *In re AmTrust Financial Services, Inc. Derivative Litigation*.

189.   Despite this tumult, analysts shared Arca's and management's belief that the Company was still poised for growth.  For example, JMP Securities LLC ("JMP"), in a report dated October 4, 2017 (when AmTrust stock was trading at $14.12) acknowledged that "there are still steps that need to take place for the stock

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to work from here – mainly improved financial disclosures (including better fee income and reserving disclosures) and remediation of the material weaknesses cited by its auditor at year-end."  JMP Securities LLC, *Update Following Meetings with Management* (Oct. 4, 2017).  JMP also acknowledged that AmTrust had entered "into several related-party transactions, mostly with members of or entities controlled by the Karfunkel-Zyskind Family," which it identified as investment risks.  Nevertheless, JMP gave AmTrust a "Market Outperform" rating and a price target of $18.00 per share of common stock, stating that the "$300 [million] in capital raised earlier this year and the recently purchased $400 [million] adverse development cover" led it to believe that "management is committed to making progress on the remaining outstanding items in coming quarters."

190.   The $300 million referenced by JMP was from a May 25, 2017 private placement in which AmTrust issued 24,096,384 shares of common stock, solely to members of the Karfunkel-Zyskind Family, at $12.45 per share (reflecting AmTrust's May 25, 2017 closing price of $12.45 per share) (the "Private Placement").   As the trading price of AmTrust common stock experienced a significant drop earlier that month, the timing of the Private Placement benefitted the Karfunkel-Zyskind Family.

191.   The Karfunkel-Zyskind Family's orchestration specifically of the Private Placement, rather than another form of financing (such as a public offering)

-76-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

in which unaffiliated investors could benefit from AmTrust's temporary stock drop, is symptomatic of the Karfunkel-Zyskind Family taking advantage of dips in the market for their own selfish ends. Moreover, the Private Placement had the effect of further consolidating the Karfunkel-Zyskind Family's control over AmTrust, which, in the event of a going-private proposal, would provide it additional leverage when compared to the minority stockholders, as well as a larger rollover stake in any future private company, all at a cost considerably lower than the $14.75 per share Merger Price. Specifically, as a result of the Private Placement, the Karfunkel-Zyskind Family substantially increased its control of AmTrust, which, of course, could be of considerable utility in a future buyout. The Karfunkel-Zyskind Family, however, in a subsequent Section 13 filing dated June 7, 2017, denied this was its intention, stating that it did "not have any present plans or proposals that relate to, or that would result in, any of the events described in paragraphs (a) to (j) of the instructions to Item 4 of Schedule 13D," which included "[a]n extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries."

192. On November 6, 2017, AmTrust announced that it was forced to increase its reserves for Q3 2017 by an additional $327 million. This confirmed that the Company had materially understated its reserves in prior years.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

### 3.    Defendants Ignored Red Flags that Led to the 2017 Financial Restatements

193.    The AmTrust Board faced a substantial likelihood of liability to AmTrust for the damage their inaction caused to the Company.

194.    Not only was the Company taken private at an unfair price due to the Defendants' misconduct, but all of the Defendants were incentivized to see AmTrust taken private so that they could escape liability from their breaches of fiduciary duty as pursued in the Derivative Actions.

195.    The Defendants, including the Audit Committee and Take Private Special Committee, were on notice of the red flags of the improper accounting practices.  As a result, the Defendants knew of the unfairness of the Take Private price and also were not independent.

### a.    Red Flags Concerning AmTrust's Auditor

196.    As noted above, on September 12, 2014, AmTrust disclosed that the NYDFS recommended, among other things, that AmTrust replace BDO as its auditor.  In spite of not only receiving this red flag from NYDFS, but agreeing to replace its auditor, AmTrust maintained BDO as its external auditor for the year ended December 31, 2015, and did not replace them until April 2016.  A year later, the *Wall Street Journal* reported that a whistleblower at BDO had collected evidence of AmTrust's accounting manipulation regarding its reserves and had divulged the

-78-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

evidence to the FBI.  And in 2018, the SEC charged certain BDO auditors with signing off on AmTrust's 2013 audit prior to actually completing the audit, in violation of applicable SEC rules and regulations.

### b.    Red Flags Regarding Internal Controls

197.    The December 18, 2014 Alistair Capital Letter addressed red flags about the overall inadequacy of AmTrust's internal accounting controls over financial reporting:

> First, we are concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K, filed with the SEC in conjunction with quarterly earnings reports, and amounts reported to the SEC in the Company's Forms 10-K and 10-Q.  We believe these frequent and often material discrepancies indicate the Company is reporting inaccurate information in one or both of the filings for a given period.

> Second, we believe AmTrust's loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative remaining reserves) or, more likely, AmTrust's disclosures reflect flawed data that validate our skepticism of the Company's reported financial statements.

> Third, we have noticed that amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations for "Accrued Expenses and Other Liabilities" appear to be irreconcilable, as discussed further below.  In addition, the amount AmTrust reports for Accrued Expenses and Other Liabilities in the footnotes to the Company's financial statements does not even correspond to the amount reported in the balance sheet.

> Fourth, we note that Ronald Pipoly, Jr., AmTrust's Chief Financial Officer ("CFO"), served as the CFO of Maiden Holdings, Ltd. ("Maiden") during the period that PricewaterhouseCoopers determined

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Maiden had "deficiencies which aggregate to a material weakness in internal control over financial reporting."

198.   As noted above, as part of AmTrust's February 27, 2017 press release, the Company admitted that it had identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016.

### c.    Red Flags Regarding Reserves

199.   The Defendants were also made aware of red flags regarding improper accounting regarding reserves.

> A May 31, 2014 *Barron's* article questioned the Company's reserves, stating, "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital." The article noted that:Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

200.   The April 23, 2016 *Barron's* article specifically addressed the inadequacy of AmTrust's reserves, stating that AmTrust's statutory filings on behalf of its insurance units "show it has consistently underestimated the cost of settling claims."   The Defendants were not only aware of this red flag, but specifically responded by falsely denying it, stating that the Company's "reserving is

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

conservative and rigorous."  Yet, a mere ten months later, on February 27, 2017, AmTrust announced that it was taking a reserve charge of $65.0 million, or approximately $0.24 per diluted share.  As *Barron's* pointed out in a subsequent March 4, 2017 article, titled "Our Skepticism on AmTrust Reserves Borne Out," this meant that their prior warnings about AmTrust's reserves had proven correct.

201.   Moreover, despite the $65 million charge in Q4 2016, resulting in total reserve charges of $258 million for 2016, and the restatements of its previously filed financial statements, the Board continued to under-reserve.  A May 9, 2017 *Barron's* article highlighted the issue of under-reserving:

> [A]nalysts asked a lot of questions about the adequacy of the insurer's loss reserves.  That's because the March quarter showed a continuation of AmTrust's practice of setting aside seemingly-low reserves against future claims, despite a decade of state insurance filings that show "adverse development" in its reserves – meaning that insurance losses have exceeded the company's earlier estimates.

202.   That AmTrust had materially understated its reserves for years was further confirmed on November 6, 2017, when AmTrust announced prior year adverse loss and allocated loss adjustment expenses ("loss") reserve development of $327 million for the third quarter ended September 30, 2017. Significantly, the increase in loss reserves was based on cases the Company had known about for years – namely its program business for the 2013 through 2016 accident years. The $327

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

million reserve increase was so large, and so material that it effectively wiped out 68% of the Company's 2016 net income attributable to common stockholders.

### 4.    AmTrust Takes Steps to Strengthen Its Balance Sheet

203.    In late spring 2017, rumors arose that the Karfunkel-Zyskind Family was positioning itself to take AmTrust private.  Specifically, in a May 10, 2017 article titled "Amtrust, private company," *The Insurance Insider* reported that the Karfunkel-Zyskind Family would likely seek to take the Company private with private equity assistance.

204.    The Karfunkel-Zyskind Family took advantage of the Company's historically low stock prices to further increase their stake in AmTrust.  On May 25, 2017, AmTrust issued a press release announcing its entry into the $300 million Private Placement, discussed above.  In the May 25, 2017 press release announcing the Private Placement, Zyskind praised the transaction and the Company's future:

> The capital contribution gives AmTrust a higher capital base to support our business platform and organic growth opportunities. In addition to enhancing our balance sheet and capital base, this sizeable investment of $300 million should also provide confidence to all of our stakeholders that we are well capitalized to grow and write business.

205. On June 5, 2017, the Karfunkel-Zyskind Family also moved Karkowsky, Zyskind's long-time right-hand associate (who was also a key AmTust employee involved in the Tower Transaction) to the position of Executive Vice President and CFO. By appointing Karkowsky to this important position as the

-82-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company's principal financial officer and principal accounting officer, the Karfunkel-Zyskind Family ensured that he would be directly involved in any going-private transaction. This move was surprising to investors, given Karkowsky's dearth of accounting and financial reporting experience. Indeed, Karkowsky is a lawyer with a history of mergers and acquisitions work in the insurance industry.

206.    Throughout 2017, AmTrust took several steps to strengthen its balance sheet and position itself for long-term growth, while also simplifying its balance sheet in advance of a going-private transaction.  For example, during a May 8, 2017 earnings call, Zyskind revealed that the Company was "exploring several ways to monetize the value of [AmTrust's] fee business" and that the Company had been in discussions with "several interested parties" and was seeking to sell a 51% stake to a "private equity-like partner" (the "Fee Business Sale").  Zyskind further indicated during the May 8, 2017 earnings call that the Company's fee business was potentially worth more than $2 billion.[17]  Thereafter, on June 9, 2017, AmTrust announced that it had agreed to sell over 10 million shares of NGHC in a third-party transaction valued at almost $212 million.  According to Karkowsky, AmTrust undertook the sale "in order to simplify [its] balance sheet and investment portfolio composition."  Then, on July 6, 2017, AmTrust disclosed that it had entered into an

---

[17] Two days later, *The Insurance Insider* reported that the Company retained BOA to advise it in connection with the Fee Business Sale.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

agreement for a loss development cover with Premia Reinsurance Ltd. providing for up to $400 million of reinsurance for adverse net loss reserve development in excess of AmTrust's stated net loss reserves (the "Cover Agreement").

207.   Zyskind continued to assure the market that AmTrust was financially strong and had great long-term potential. For example, in a July 6, 2017 press release, Zyskind touted the benefits of the Cover Agreement and stated that

> By entering into [this transaction], we are providing confidence to all of our stakeholders that we are well insulated from any potential reserve volatility in the future….***We are committed to acting in the long-term interests of the Company and our shareholders, supporting opportunities for growth and success across our global operations and continuing to be a strong, stable partner for our brokers, agents, and policyholders***.

208.   Nonetheless, just as the stock hit a 52-week low in November 2017 on an announcement of the enormous loss reserve increases, the Karfunkel-Zyskind Family immediately pounced on the opportunity to take the Company private on the cheap.  In fact, the ***same week*** he filed with the SEC his ***signed admission*** (approved by the Audit Committee) in the Company's Form 10-Q that AmTrust's $13.46 stock price at the end of 3Q 2017 was well below its fair value, Zyskind went before the Board to propose taking the Company private.

## V.    THE TRANSACTION WAS A PRODUCT OF AN UNFAIR PROCESS

209.   In their public filings, the Defendants have attempted to create the impression that an independent special committee was zealously advocating for

-84-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

stockholders' rights in negotiating the Transaction and that the Transaction was otherwise negotiated according to the dictates of *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). Contrary to this impression, the process leading to the Transaction must be viewed against the ugly backdrop of the Defendants' long record of misconduct. The committee that was formed for the stated purpose of negotiating on behalf of the Company's stockholders was not independent, lacked necessary information, and was not empowered to seriously negotiate. It allowed itself to be pushed around by the Control Group to approve the transaction under timing constraints that were coercive, exhibiting the very "controlled mindset" of a fatally-conflicted and deficient special committee of the kind critiqued by the Court of Chancery and the Delaware Supreme Court in the Southern Peru litigation. *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). Like the committee there, the Take-Private Special Committee viewed its mandate narrowly and seriously considered only one option: endorsing the Control Group's going-private transaction.

### A. THE CONTROL GROUP TIMES ITS OFFER TO TAKE ADVANTAGE OF ITS OWN MISCONDUCT

210. The Proxy discloses that Zyskind and Stone Point initiated discussions regarding a going-private transaction in September 2017, but that Zyskind unilaterally suspended such discussions until after the Company announced its

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

disappointing third quarter 2017 financial results in early November 2017, which caused the stock price to plummet and created the opportunity for the Control Group to pursue privatization at a lower price.

211.  Defendants' delays and manipulation of the Company's accounting afforded the Control Group an opportunity to acquire the Company at a lower price when it finally came to light.  Knowing that the market was not properly judging the value of the Company given the uncertainty caused by the revelation of the improper accounting practices they had overseen, the Control Group pounced.

212.  Specifically, on November 6, 2017, the Company announced a $327 million loss reserve charge that resulted in a 25% stock price drop (nearly $3 per share on heavy trading).  Only two days later, on November 8, 2017, Zyskind suggested to the Board that the Company should explore strategic alternatives, including a potential going-private transaction, and resumed communications with Stone Point the very next day.  The Proxy does not indicate that Zyskind informed the Board at its November 8, 2017 meeting that he had been approached by Stone Point about a potential take-private transaction in September 2017.[18]

213.  On November 8, 2017, during an earnings call to discuss the Company's third quarter financial results, both Karkowsky and Zyskind touted the

---

[18] Despite Lead Plaintiffs' specific request, the Company did not produce meeting minutes for a November 8, 2017 Board meeting as part of the 220 Documents.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Company's prospects for fiscal year 2018. Indeed, Karkowsky noted that various

actions taken by the Company in 2017 to strengthen its balance sheet "have allowed

us to set AmTrust up for a strong and successful 2018," and that the Company's

improved reserve practices "position[ed] AmTrust for much greater profitability and

predictability in 2018." Karkowsky noted:

> Now turning to our outlook…the takeaway is that we are carrying our 2017 accident year loss ratio above the average loss ratios of the affected accident years 2012 to 2016, excluding Specialty Program. ***This gives us a high degree of confidence in our current reserve position, and we expect that we won't need to provide much in the way of earnings adjustments going forward.*** We believe that the year-to-date adjusted underlying combined ratio of 95.5% is a better proxy for the likely go-forward profile of our business, allowing for a degree of positive or negative variance driven by marketing conditions in our core lines, particularly workers' compensation, business picks by quarter and some seasonality. ***This combined ratio profile, combined with continued solid investment income results, will allow us to generate our targeted 12% to 15% operating return on equity on our adjusted book value and generate the consistently profitable results our shareholders can rely on.***

214.    In slides presented during the same call, AmTrust management touted

the Fee Business Sale (which would close at the end of February 2018, just before

the Merger Agreement was signed), stating that the transaction "unlocks significant

shareholder value," and "enhances AmTrust's balance sheet strength and financial

flexibility."  The slides stated that the "~$950 million of gross cash proceeds" from

the Fee Business Sale would "enhance [AmTrust's] ability to pursue attractive

underwriting opportunities," enabling the Company to generate "operating ROE of

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

12-15%."   Further, the deal would be "accretive to book value and tangible book value by approximately $3.50 and $6.00 respectively through the gain on the transaction and reduction in goodwill and intangibles."

215.   On November 9, 2017, A.M. Best announced that AmTrust was "under review with negative implications."  Almost four months later, just two days before the deal was signed, AmTrust's management used the prospect of a downgrade by A.M. Best (known of since early November) to justify a dramatically depressed set of projections, even though, as explained further below, management knew it was fully within their power to cure the defects leading to A.M. Best's concerns, and that a ratings downgrade was thus highly unlikely.

216.   A.M. Best indicated that the Fee Business Sale would positively affect its review of AmTrust.  While A.M. Best was wary of the Company's reserve charge, the ratings agency observed that the Fee Business Sale was "expected to significantly improve the equity position and balance sheet strength of [AmTrust] upon completion of the transaction." A.M. Best also noted that: (1) "[t]he improvement in financial leverage on a total and tangible basis is projected to be significant once the transaction closes;" (2) "risk-adjusted capitalization…also is expected to strengthen materially"; and (3) "[t]he overall improvement in the holding company's position upon closure of the sale will be a net positive to [AmTrust's] ratings and those of its

-88-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

subsidiaries." A.M. Best further positively observed the many actions taken by the Company in 2017 to improve its balance sheet.

217.   A.M. Best concluded its analysis by stating that AmTrust would remain under review with negative implications until: (1) the Fee Business Sale closed, and A.M. Best assessed the transaction's impact on risk-adjusted capital; and (2) the Company's annual report on Form 10-K for fiscal year 2017 (the "2017 10-K") was filed, and A.M. Best assessed the full-year reserve information contained therein.

**B.    THE SPECIAL COMMITTEE FAILS TO PROTECT THE PUBLIC STOCKHOLDERS OF AMTRUST**

**1.    The Special Committee Is Belatedly Formed and Inadequately Empowered**

218.   According to the Proxy, on November 16, 2017, Zyskind discussed with the Board the potential association of Stone Point and the Control Group. *See* Proxy at 22. The next day, Stone Point signed a non-disclosure agreement to obtain access to the Company's non-public information. *Id.* The Board did not form a special committee or delegate the approval of matters relating to the Control Group's plans to take the Company private to the purportedly independent directors. While the Proxy claims that "Mr. Zyskind advised the Board of Stone Point's interest in a potential transaction at a meeting of the Board on November 16, 2017" and that "the Board determined to permit Stone Point to conduct due diligence," the November 16, 2017 Board minutes make no reference at all to Stone Point or the Board's

-89-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

purported determination; rather, the November 16, 2017 Board minutes state that Zyskind informed the Board that "the Company had begun to receive unsolicited calls from potential investors," and that "senior management was in the process of negotiating non-disclosure agreements with certain parties so they could commence due diligence and have discussions with Company management."

219.    During the November 16, 2017 Board meeting, various alternative transactions were discussed, including not only a going-private transaction, but also "a significant investment from an unrelated third party or possibly a combination of a third party investor with the Karfunkel and Zyskind families participating." (AFSI-220FDP_0694).  Ultimately, the Special Committee was not authorized to consider any of these other alternative transactions.  Instead, it was limited to considering a going-private transaction with the Control Group and their partners at Stone Point (with the Control Group, the "MBO Group" or "Acquiring Group").

220.    Furthermore, the November 16, 2017 Board minutes do not identify the "potential investors" who had approached the Company, nor the parties with whom "senior management" was negotiating non-disclosure agreements.  Accordingly, it is unclear whether the Board was ever apprised of these critical details in the first instance.

-90-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

221.   Nonetheless, the Proxy claims that the following day, November 17, 2017, Stone Point entered into a confidentiality agreement with the Company and thereafter began conducting due diligence.  Proxy at 22.[19]

222.   According to a research note issued by investment bank SunTrust Humphrey Robinson ("SunTrust") on November 27, 2017, "[t]he [C]ompany has not seen any material change in the flow of new business submissions or its binding ratio, either of which might signal some change in appetite among brokers to work with AmTrust (a possibility in light of recent events)."  The note also observed that AmTrust's workers' compensation lines possessed "less sensitivity around financial strength ratings, especially at the smaller end of the market that is AFSI's specialty (where brokers have low incentive to move accounts because of the low commission dollars involved)."

223.   The SunTrust note also stated that AmTrust's new capital provided it with profit-enhancing opportunities.  Among these opportunities was the expiration of the Company's reinsurance agreement with Maiden Holdings, which could "provid[e] the option for AmTrust to use its own capital to support premium and thereby drop more profit to the bottom line."

---

[19] Lead Plaintiffs specifically requested, but did not receive, this confidentiality agreement as part of one of the Section 220 document productions.

-91-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

224.   SunTrust observed that "[w]ith the stock trading at a meaningful discount to post-fee deal tangible book value, AFSI is a noteworthy value idea." Indeed, SunTrust observed that "[o]n price-to-earnings, the company trades at 7.2X, well below its P&C industry peers . . . ."  SunTrust assigned AmTrust a price target of $16 per share.

225.   The notion that a robust market existed for potential fundamental corporate transactions involving the Company is further corroborated by minutes from the Board's December 21, 2017 meeting.  The minutes state that Karkowsky noted that unidentified members of "senior management had been approached by a handful of interested parties considering investment in the Company or financing alternatives," and that "[s]enior management had entered into non-disclosure agreements with several parties."

226.   At this meeting, the Board was presented with financial projections prepared by the Company with the assistance of the Company's financial advisor on the Fee Business Sale, Bank of America ("BOA"), which "had assisted the Company in preparing the financial projections." Further, the December 21, 2017 Board minutes indicate that Karkowsky offered to discuss the projections at a future meeting.

227.   The December 21, 2017 Board minutes do not identify the "handful of interested parties" or describe the "investments" or "financing alternatives" these

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

parties were interested in pursuing. The December 21, 2017 Board minutes also do not identify the members of "senior management" who entered into the aforementioned non-disclosure agreements, nor the circumstances under which these agreements were entered. In fact, the Proxy does not reference the December 21, 2017 Board meeting at all. There is no record that the Board was ever apprised of any material details regarding these alternative transactions.

228. The Proxy claims that, on December 22, 2017, Stone Point spoke to unnamed "representatives of the Karfunkel-Zyskind Family" to discuss Stone Point's "interest in pursuing a take-private transaction" with the Karfunkel-Zyskind Family and "to provide more information about Stone Point." Proxy at 22.

### 2. Zyskind Finally Informs the Board of a Potential Take-Private Transaction Involving Stone Point; In Response, the Conflicted Board Forms the Conflicted Special Committee

229. The Board met on December 27, 2017 to discuss a request from the MBO Group to waive Section 203 of the DGCL with respect to discussions between the Control Group and Stone Point regarding their designs to take the Company private. The December 27, 2017 Board meeting minutes mark the first time in the 220 Documents that Stone Point was identified to the Board as one of the "potential investors" pursuing a potential transaction with the Company and/or the Karfunkel-Zyskind Family.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

230.   The December 27, 2017 Board minutes further state that Zyskind told the Board that he had been contacted by other unidentified parties who "inquired about the Company's or the Karfunkel Family's interest in a potential transaction." However, the Board minutes reflect that Zyskind only discussed Stone Point as "he and the Karfunkel Family have known Stone Point for many years." The meeting minutes do not reflect discussion about the other potential investors or the identities of such investors.

231.   At the December 27, 2017 meeting, the Board was asked to consider granting Stone Point a waiver under 8 *Del. C.* § 203 to permit Stone Point to discuss a joint proposal with the Karfunkel-Zyskind Family (the "Waiver"). Oddly, the Karfunkel-Zyskind Family's counsel at Paul, Weiss, Rifkind, Wharton and Garrison LLP ("Paul Weiss") counseled the Board on "the requirements for the Waiver."

232.   The December 27, 2017 Board minutes further state that the Audit Committee—*i.e.*, DeCarlo, Fisch and Gulkowitz—would meet later that day or the following morning with its counsel at Simpson, Thacher & Bartlett LLP to discuss the Waiver.

233.   The Board met again the next day and formed a limited special committee with effectively no powers other than to consider whether to grant the Waiver requested by the MBO Group.  This committee was comprised of DeCarlo, Fisch, Gulkowitz and Rivera "subject to a final determination that each of them is

-94-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

independent and disinterested." With the exception of Rivera, these were the same Audit Committee members who approved the Tower Transaction. The resolutions also appointed DeCarlo as Chairman of the committee. As discussed further herein, DeCarlo, Fisch, and Gulkowitz could not act independently of the Karfunkel-Zyskind Family and/or one another in considering matters connected with a potential going-private transaction.

234. Stone Point and the Control Group's need for the Waiver created leverage for the committee. The committee could have obtained, but failed to obtain, concessions from Stone Point or the Control Group for the Waiver. As Institutional Shareholder Services, Inc. ("ISS") would note, the "special committee would have been in a much stronger negotiating position had it obtained a binding commitment from the Karfunkel-Zyskind Family to vote in favor of a 'superior proposal' as a condition for granting the family a waiver." Such a condition "could have led to a much more open process and prevented the family from potentially blocking a better outcome for unaffiliated shareholders." Instead, on January 8, 2018, this limited special committee gifted the MBO Group the Waiver for no consideration, failing to use the MBO Group's request as negotiating leverage, and gratuitously agreeing to waive the obligations of the non-disclosure agreement the Company had entered into with Stone Point. (AFSI_220FDP_0861).

-95-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

235.   The Proxy indicates that on January 8, 2018, Paul Weiss contacted Willkie Farr, who had been selected as the committee's counsel on January 2, to request that the committee permit the Karfunkel-Zyskind Family to make a joint proposal with Stone Point to take AmTrust private.

236.   At a January 8, 2018 meeting of this limited special committee, it passed a resolution granting Stone Point and the Karfunkel-Zyskind Family the requests above.

237.   Minutes from the Special Committee's January 8, 2018 meeting reflect that the "selection of an appropriate independent financial advisor for the Special Committee" was discussed.  During the course of this discussion, it was noted that "Bank of America Corporation had … declined the potential engagement when previously approached."  This statement is remarkable as it demonstrates that the Special Committee was considering retaining a financial advisor that it knew was already serving as a financial advisor for AmTrust management, and that had existing loyalties that *conflicted* with the Special Committee's interest.  While Bank of America declined this representation, the mere fact that the Special Committee "approached" it demonstrates the Committee's lack of independence from the Karfunkel-Zyskind Family, and also demonstrates its failure to act in the furtherance of the interests of minority stockholders.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

238.  The following day, on January 9, 2017, representatives of Stone Point and the Karfunkel-Zyskind Family met with a "ratings agency" (presumably, A.M. Best) and made a "confidential presentation" disclosing that the group intended to make an offer to take AmTrust private.  The Proxy does not explain why such a meeting was held without the involvement or supervision of the Board or Special Committee and whether it was appropriate or necessary.  Nor does the Proxy describe the nature of the confidential presentation.

239.  Also, on January 9, 2017—approximately two months after Zyskind notified the Board of his intent to take AmTrust private—the Karfunkel-Zyskind Family-dominated Board adopted resolutions formally appointing the Special Committee to negotiate and evaluate the imminent offer from the Acquiring Group. While the December 28, 2017 resolution referenced (at least perfunctorily) the Special Committee's authority to explore "other strategic alternatives," the January 9, 2017 resolution, as described herein, made clear that the Special Committee would only be authorized to consider a "proposal from the Karfunkel Family or any other bidder affiliated or working with the Karfunkel Family."

240.  The Special Committee's limited authority would also come as a surprise to the financial advisor it would soon retain (Deutsche Bank), which anticipated pursuing "strategic alternatives," including a "sale to [a] third party." Pursuing such strategic alternatives would, at a minimum, have had the benefit of

-97-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"facilitat[ing] price discovery." Moreover, according to Deutsche Bank, "[s]trategic buyers may identify potential synergies through consideration of [AmTrust]'s platform." Deutsche Bank also observed that AmTrust could benefit from a strategy of maintaining the status quo and foregoing a transaction altogether, as the Company could "[b]enefit from remedial actions that are already underway."[20]

241. Moreover, the December 9, 2017, resolution made clear that it was "understood" that any definitive agreement it would negotiate was nonetheless "subject to the approval of the [Karfunkel-Zyskind Family-dominated] Board." In other words, the Special Committee, from its inception, recognized that its authority was severely limited.

242. The Special Committee thereafter "determined to retain Deutsche Bank as its financial advisor." Remarkably, the Proxy notes that the Special Committee made this decision based on the perceived "absence of potential conflicts of interest that would prevent Deutsche Bank from acting as [an] independent financial advisor" even though it had not yet received a conflict disclosure letter from Deutsche Bank. In fact, it would be *another week* until Deutsche Bank would deliver

---

[20] In this same presentation, Deutsche Bank identified as "considerations" weighing against the Merger 1) the fact that AmTrust had already "communicated to regulators and rating agencies that it has no near-term plans for M&A" and 2) that a merger process would "distract from ongoing initiatives to right-size the business and restore profitability."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to the Special Committee a letter disclosing its relationships to the Special Committee's counterparties (i.e., the Karfunkel-Zyskind Family and Stone Point). As discussed herein, Deutsche Bank was not independent.

243.    In the late afternoon of January 9, 2018, Stone Point and the Karfunkel-Zyskind Family submitted to the Board a letter proposing to acquire all of the outstanding shares of AmTrust common stock that the Karfunkel-Zyskind Family did not already own or control for $12.25 per share in cash (the "Proposal").

244.    Stone Point and the Karfunkel-Zyskind Family attempted to design their Proposal to comport with *M&F Worldwide*, nominally conditioning the proposal on approval by an independent special committee and a fully informed majority of AmTrust's minority stockholders.  The Proposal also ominously stated:

> [T]he Family Stockholders have no interest in selling any of the shares of common stock of AmTrust owned or controlled by them. As such, the Family Stockholders would not expect, in their capacity as stockholders of AmTrust, to vote in favor of any alternative sale, merger or similar transaction involving AmTrust. If the special committee does not recommend, or the stockholders of AmTrust do not approve, the proposed transaction, the Family Stockholders currently intend to continue as long-term stockholders of AmTrust.

245.    The proposal made clear that the Karfunkel-Zyskind Family, as the controlling stockholder of AmTrust, would veto any transaction not to its liking, even if that alternative transaction was in the interest of AmTrust stockholders.  Such a coercive dynamic is the ultimate "deal protection."  All parties—the Special

-99-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Committee, minority stockholders, the controlling stockholder, and potential acquirers—discern this dynamic, which would prevent any superior proposals from even arising.

246. As the following slide from one of Deutsche Bank's presentations makes clear, the Karfunkel-Zyskind Family and Stone Point deliberately timed their Proposal to coincide with the time period in which AmTrust was trading at its lowest price in five years:[21]

---

[21] In the very next slide from Deutsche Bank's presentation, displayed below, the false impression is given that the Special Committee succeeded in obtaining a revised merger price at the unique time (i.e., the "sweet spot") in which AmTrust was trading above its peers. In fact, the slide, which reflects only a three month window that started only after the Company's substantial stock drop, does not account for the several immediate preceding years in which AmTrust substantially *outperformed* its peers. This brief three-month snapshot is troubling in that it appears to intentionally mask the fact that AmTrust's low stock price was historically uncharacteristic:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



247.  The chart also reflects that (at least compared to AmTrust) there had been minimal stock movement by AmTrust's peer companies over the past several years (in fact, the industry peers had slightly outperformed the S&P 500).  This fact calls into question the Special Committee's repeated decisions (as described more fully *infra*) to request downward projections to reflect "adverse industry trends."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

248.    The viewer of this slide should also bear in mind that only two months earlier—on November 9, 2017 (when Zyskind was already engaging in discussions to take the Company private), Zyskind assured public investors that AmTrust's stock price was not indicative of the Company's fair value.

249.    Only then, on January 9, 2018—following receipt of the proposal, two months after Zyskind first disclosed his interest in taking AmTrust private, and after squandering the opportunity to leverage the Waiver—did the Board take action to officially form a special committee consisting of DeCarlo, Fisch, Gulkowitz and Rivera (the "Special Committee"), as described above.  Despite the fact that the Board's resolution at its December 28, 2017 meeting expressly authorized the limited special committee to consider "other strategic alternatives available to the Company" in addition to a potential transaction with Stone Point and the Karfunkel-Zyskind Family, the resolution provided by the actual Special Committee and approved by the Board the following day on January 9, 2018 severely restricted the Special Committee's authority, authorizing it only to "consider any proposal from the [Control Group] or any other bidder affiliated or working with the [Control Group] to acquire all or a material portion of the outstanding common stock of the Company or enter into any business combination transaction with the Company." (AFSI_220FDP_1224).  Neither the January 8, 2018 committee meeting minutes nor the Proxy identify the reasons for the Special Committee's decision to severely

-102-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

restrict its authority.  The resolution appointed DeCarlo as chair of the Special Committee.  On November 9, 2017, AmTrust stock opened at $11.78 and closed at $10.90.

250.  The four directors appointed to the Special Committee were not independent for purposes of satisfying the requirement that a controller's takeout offer be conditioned on approval by a fully independent committee to shift the applicable standard of review, as alleged in detail below.

251.  The Special Committee's mandate was extremely limited.  Despite its original authorization to consider other strategic alternatives available to the Company, the Special Committee, seemingly of its own accord, was now only authorized to consider offers if they were made by or with the Control Group.  The Special Committee was not authorized to consider, for example, other business combinations with, or investments by, third parties, despite that the Board had previously been informed that there existed third parties interested in pursuing a strategic transaction with the Company.

252.  In connection with these discussions, on January 9, 2018, Stone Point and the Karfunkel-Zyskind Family—*i.e.*, Zyskind, G. Karfunkel and L. Karfunkel— entered into a joint bidding agreement (the "JBA"). Notably, the exclusivity provisions of the JBA precluded the parties from working with any other person or entity, which like the Special Committee's choked mandate, served to effectively

-103-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

foreclose the Company from pursuing alternative transactions.  Indeed, Section 5 of

the JBA provides that:

> No Party shall negotiate or initiate or continue discussions with (a) any
> other person or entity or otherwise solicit, encourage (including by
> providing any information to), or enter into any agreement (written or
> oral) with, any other person or entity relating to the acquisition of all or
> any material part of AmTrust, its subsidiaries or any material portion of
> the AmTrust and its subsidiaries' assets[.]

253.  On January 9, 2018, the Special Committee determined to engage

Deutsche Bank as its financial advisor.  According to the Proxy, the Special

Committee approved the retention of Deutsche Bank "approximately one week"

before purportedly receiving a disclosure letter from Deutsche Bank describing the

relationships between Deutsche Bank, on the one hand, and the Company, Stone

Point, and the Karfunkel-Zyskind Family, on the other.  Proxy at 24.[22]

254.  The Proxy states that "[i]n the late afternoon of January 9, 2018," *id.*,

the MBO Group submitted a letter to the Board containing the Initial Proposal to

take AmTrust private at $12.25 per share (the "Proposal Letter"). The Proposal

Letter contemplated a merger of AmTrust with a wholly-owned subsidiary of an

acquisition vehicle formed by the MBO Group.  The Proposal Letter also assumed

that the proposed transaction would include the roll-over of shares held by the

---

[22] The Proxy does not disclose the contents of the Disclosure Letter, and the
Company did not produce the Disclosure Letter as part of the 220 Documents despite
Plaintiffs' specific request.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

Karfunkel-Zyskind Family, including those shares acquired in the Private Placement, as well as an additional cash contribution by the Karfunkel-Zyskind Family into the acquisition vehicle.

255.   Later that evening of January 9, 2018, the Board met to discuss proposed Special Committee resolutions setting forth the Special Committee's powers and mandate.  Despite the Proxy's assertion that the Proposal Letter was submitted to the Board earlier that day, the minutes from this meeting make no reference to the Initial Proposal or the Proposal Letter.  Instead, the minutes merely state that the purpose of the meeting was to adopt the proposed Special Committee resolutions.  At the conclusion of the meeting, the full Board approved the proposed Special Committee resolutions.

256.   The following day, on January 10, 2017, the Board's receipt of the Proposal was disclosed to the public.  Stone Point and the Karfunkel-Zyskind Family announced that their going private Proposal would allow "Amtrust to focus on the long term without the emphasis on short-term results," which was consistent with management's statement that the fair value of AmTrust common stock was not reflected in its trading price.

257.  In the wake of this news, an analyst from SunTrust Robinson Humphrey Inc. ("SunTrust") identified a price target of $16.00 for AmTrust.  The analyst also included the following Industry Valuation Comparison, which

-105-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

demonstrates that AmTrust's price/earning ratio ("P/E Ratio") and price-to-book ratio ("P/B Ratio") were *far* below the P/E Ratio and P/B Ratio for comparable companies, and  absent some compelling reason why AmTrust's fundamentals were significantly inferior to the comparable companies,[23] suggests that the market was significantly undervaluing AmTrust's stock:

Figure 1: P&C Industry Valuation Comparison

| Ticker | Company Name | 2016 P/E | 2017E P/E | 2018E P/E | P/B |
|--------|--------------|----------|-----------|-----------|-----|
| *Specialty P&C:* | | | | | |
| AFSI | AmTrust Financial Services Inc.* | 5.2x | 13.0x | 9.4x | 0.8x |
| HIG | Hartford Financial Services Group, Inc. | 16.3x | 17.7x | 12.9x | 1.1x |
| TRV | Travelers Companies, Inc. | 13.1x | 19.5x | 13.0x | 1.5x |
| AIZ | Assurant, Inc. | 22.2x | 28.4x | 14.1x | 1.3x |
| AFG | American Financial Group, Inc. | 17.9x | 17.8x | 14.6x | 1.8x |
| JRVR | James River Group Holdings Ltd | 14.9x | 16.1x | 12.5x | 1.5x |
| EIG | Employers Holdings, Inc | 16.8x | 17.7x | 17.6x | 1.5x |
| AMSF | AMERISAFE, Inc. | 14.7x | 19.0x | 19.9x | 2.3x |
| WRB | W. R. Berkley Corporation | 20.2x | 28.6x | 19.3x | 1.5x |
| NAVG | Navigators Group, Inc. | 20.6x | 54.0x | 18.6x | 1.2x |
| KNSL | Kinsale Capital Group, Inc. | 35.5x | 38.4x | 26.0x | 4.2x |
| PRA | ProAssurance Corporation | 22.5x | 26.9x | 24.8x | 1.6x |
| RLI | RLI Corp. | 28.4x | 39.2x | 28.2x | 3.0x |
| MKL | Markel Corporation | 35.8x | 201.9x | 35.4x | 1.7x |
| **Average:** | | **20.3x** | **38.4x** | **19.0x** | **1.8x** |
| **Median:** | | **19.0x** | **23.2x** | **18.1x** | **1.5x** |

*Valued at $12.25 proposed takeout price
Source: FactSet, SunTrust Robinson Humphrey Estimates

SunTrust Robinson Humphrey Inc., *Management-Led Takeout Proposed* (Jan. 9, 2018).

258.   As described herein, Deutsche Bank, the Special Committee's financial advisor, made similar findings with respect to AmTrust and its peers.

---

[23] Deutsche Bank's benchmarking analysis indicates that, if anything, AmTrust's fundamentals were in line, or better, than the comparable companies.

-106-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

259.   Similarly, on January 12, 2018, when AmTrust stock was trading at $12.55, Compass Point Research & Trading, LLC ("Compass Point") identified a price target of $15.00, noting that "the decision to take AFSI private leads us to the assumption that short-term headlines may create more headaches for management, but long-term, the upside is obviously higher.  Otherwise it is unlikely private equity firm Stone Point Capital (with many investments in the insurance space) would have teamed up with AFSI family insiders to take the company private." Compass Point Research & Trading, LLC, *Market Assumes Offer Could Rise…But By How Much?* (Jan. 12, 2018).

260.   In fact, the *modus operandi* of most private equity firms—and Stone Point is no exception—is to identify companies they perceive to be undervalued, and acquire them through taking advantage of market timing, which Stone Point and the Karfunkel-Zyskind Family were able to do here, but without the inconvenient possibility of having to compete with other potential bidders.

261.   Compass Point noted that a higher offer of $13.50 (the consideration ultimately reflected in the initial Merger Price) "still represents more than 40% upside to Stone Point and the investor group," observing that several large transactions by AmTrust in 2017 had "strengthened [the Company's] capital position" and that AmTrust "maintains a competitive advantage on the expense side of their operations within the small commercial Workers Comp business through

-107-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

their IT platform, as well as being a leader in the Warranty business," which Compass Point identified as "long term upsides," given its belief that the market for both Workers Comp and warranty products would be expanding.

### 3. The Special Committee Was Conflicted

262. The four directors appointed to the Special Committee were not independent. Thus, for that reason alone, the Defendants must bear the burden to prove that the Transaction was entirely fair to AmTrust's public stockholders.

263. *First*, DeCarlo appears to make his livelihood serving companies affiliated with the Control Group. DeCarlo has served as a close associate and trusted advisor of M. Karfunkel and Zyskind for nearly 20 years—dating back to before they had even entered the insurance industry. DeCarlo recently testified that Zyskind and M. Karfunkel had personally appointed him to upwards of 20 boards of directors and that he has *never* voted against a related-party transaction involving the Karfunkel-Zyskind Family.

264. Further, discovery in the Cambridge Derivative Action has established that DeCarlo, Gulkowitz, and Fisch—a majority of the Special Committee—are fundamentally incapable of exercising appropriate independent judgement in the context of conflicted transactions involving members of the Karfunkel-Zyskind Family. As described at length above, the Tower Transaction was riddled with conflicts, and yet DeCarlo and Gulkowitz to this day insist that neither M. Karfunkel,

-108-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

nor G. Karfunkel, nor Zyskind *ever* harbored any conflict of interest in connection with the Tower Transaction. DeCarlo, moreover, voiced a fundamentally distorted view of the nature of conflicts of interest. He testified that, essentially, there can be no conflict in a transaction if the transaction appears to be a good deal for the Company—even if the only person telling you it is a good deal is conflicted.

265. In addition to his role in facilitating misconduct by the Control Group at AmTrust, he has served as a director of NGHC, which is another Karfunkel creation and continues to be operated as another branch of the Karfunkel Family of companies, currently by its CEO, Barry Karfunkel. DeCarlo has served as a director of NGHC since its founding and he serves on the boards of three other NGHC subsidiaries by virtue of his relationship with the Karfunkels: National Health Insurance Company, Imperial Fire and Casualty Insurance Company and Century-National Insurance Company. DeCarlo is also a director of "several of [AmTrust's] subsidiaries." In 2017, DeCarlo earned a total of $318,086 from his service on the AmTrust Board and another $118,395 from his NGHC board service. As acknowledged by the Court, the transactions at issue in the Cambridge Derivative Action involved DeCarlo taking part in transactions involving "obvious conflicts of interest." DeCarlo is not independent of the Control Group.

266. Moreover, DeCarlo is named as a Defendant and faces a substantial likelihood of liability in both the Cambridge Derivative Action and Accounting

-109-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Derivative Action. Therefore, he sought to personally benefit from the Transaction by attempting to deprive the Plaintiffs in those derivative actions of standing to continue prosecuting those actions. This conflict was partially recognized by AmTrust and DeCarlo as he "recused himself from all discussions and decisions made by the Special Committee in respect of the Cambridge Derivative Action." Proxy at 31. However, this was woefully insufficient as he participated in all deliberations that did not directly reference the Cambridge Derivative Action, despite the fact that those deliberations, and ultimately his approval of the Transaction, resulted in his receipt of unique benefits through the dismissal of those derivative actions.

267. *Second*, Gulkowitz served as a director on the Company's Board since 2006 and was also a director of several AmTrust subsidiaries. The Karfunkel-Zyskind Family, through the Hod Foundation (which they control), owns a 10% interest in a fund managed by Brookville, the firm founded by Gulkowtiz and of which he remains a partner. Gulkowitz also served on the advisory board of Gryphon Investors when its portfolio company, Orchid Underwriters, entered into a partnership with a subsidiary of NGHC.

268. Gulkowitz has significant ties to Deutsche Bank and its affiliates. Gulkowitz previously served as a Senior Managing Director and member of the partners' management group at Bankers Trust, an investment bank, before it was

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

acquired by Deutsche Bank in 1999. Following the acquisition, Gulkowitz remained at Deutsche Bank, where he served as Chief Global Strategist for Corporate Finance. Gulkowitz's prior affiliations with Deutsche Bank AG raise serious questions as to whether he could act impartially and independently when selecting the Special Committee's financial advisor. Neither the Proxy nor the 220 Documents indicate that Gulkowitz's affiliations with Deutsche Bank were disclosed to the Special Committee.

269. Moreover, Gulkowitz is named as a Defendant and faces a substantial likelihood of liability in both the Derivative Actions. Therefore, he sought to personally benefit from the Transaction by attempting to deprive the Plaintiffs in those derivative actions of standing to continue prosecuting those actions.

270. *Third*, Fisch served as a director on the Company's Board since 2010, as well as a director of at least 20 of AmTrust's subsidiaries. Based on public disclosures by AmTrust and her deposition testimony in the Cambridge Derivative Action, a material portion of Fisch's annual income is derived from these director fees. In addition, Fisch has long-standing ties to Zyskind during her time at Willis, and owes her current directorships at AmTrust and its subsidiaries to Zyskind. Fisch was not independent of the Control Group. Further, Fisch testified in the Cambridge Derivative Action that she has voted on approximately 20-30 related-party transactions involving the Karfunkel-Zyskind Family and has never voted against

-111-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

any such transaction. Nor was she aware of any other Board member having ever voted against any such transaction.

271. Furthermore, neither DeCarlo nor Gulkowitz testified that Fisch ever raised concerns regarding any conflict of interest despite the web of such conflicts. Before approving the Tower Transaction, Fisch, like DeCarlo and Gulkowitz, never identified any conflict of interest, never considered alternatives, never considered hiring outside advisors, did not ask for more time, and was content to rely solely on a presentation by the conflicted Zyskind. Moreover, Fisch is named as a Defendant and faces a substantial likelihood of liability in both the Derivative Actions. Therefore, she sought to personally benefit from the Transaction by attempting to deprive Plaintiffs in those derivative actions of standing to continue prosecuting those actions.

272. Moreover, Fisch is named as a Defendant and faces a substantial likelihood of liability in both of the Derivative Actions. Therefore, she personally benefits from the consummation of the Transaction if the Plaintiffs in those derivative actions lose standing to continue prosecuting those actions.[24]

---

[24] The final member of the Special Committee, Defendant Rivera, is also named as a Defendant and faces a substantial likelihood of liability in the Accounting Derivative Action. Therefore, he too personally benefits from the consummation of the Transaction if the Plaintiffs in that action lose standing to prosecute the same.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

273.  *Further*, each of DeCarlo, Fisch, and Gulkowitz were incapable of independently and disinterestedly valuing the Derivative Claims. Each was a defendant in the Derivative Actions and each faces a substantial likelihood of liability for breaches of fiduciary duty in their own right. Indeed, DeCarlo—the Chairman of the Special Committee—effectively admitted as much when he belatedly recused himself from "all discussions and decisions made by the Special Committee in respect of the Cambridge Litigation." While the January 8, 2018 Special Committee meeting minutes indicate that the Special Committee determined that each individual was independent with respect to a potential transaction proposal submitted by the Karfunkel-Zyskind Family and Stone Point, the Special Committee failed to consider the obvious and disabling conflicts of DeCarlo, Fisch, Gulkowitz as defendants in the Cambridge Derivative Action.  In its resolutions forming the Special Committee, the Board resolved to compensate the members of the Special Committee (a) $20,000 per month up to the time a definitive proxy or offer to purchase was mailed, (b) thereafter, $10,000 per month until closing, and (c) $1,000 per hour in connection with time spent "in connection with any dispute, litigation, claim, proceeding or obligation" arising out of a transaction.  Knowing that this transaction, which was the result of an improper process and was riddled with conflicts, would be the subject of litigation, the Board ensured that the Special Committee would be further enriched to the tune of $1,000 per hour in connection

-113-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with the litigation and would actually have an incentive to approve a transaction that resulted in litigation.

274.   The result of these conflicts was an unfair process (and unfair price) where the Special Committee acted like a controlled board and did everything it could to justify bowing to the Control Group's wishes, including repeated downward revisions to the Company's projections.

### 4.   Given Its Capture by The Karfunkel-Zyskind Family, the Special Committee Unsurprisingly Ignores Its Informational Vacuum to Justify the Transaction and Blesses the Unfair Transaction

275.   According to the 220 Documents, the projections provided to the Board at its December 21, 2017 meeting represented Company's management's best estimates as to the Company's future performance and which were a product of the Company's ordinary course planning and were provided to potential suitors, including Stone Point, interested in pursuing a potential transaction with the Control Group (the "Ordinary Course Projections").   Once the Control Group obtained a strategic partner in Stone Point, these projections would be repeatedly pushed downward over the course of the "negotiations" that followed the Initial Proposal to help justify the preordained endorsement of the MBO Group's proposal.

276.   According to the Proxy and 220 Documents, the Company's management, together with BOA, created the Ordinary Course Projections during

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the Company's annual budgeting process.  In fact, the financial planning process had been redesigned to be even more robust after the current CFO took office in mid-2017.  The individual business units provided their expertise on the budgets and projections pertaining to their units, which were then rolled up into a consolidated set of projections.  This process was subject to several layers of review and approvals, culminating in a meeting of business executives in November and specific approval by Karkowsky and Defendant Zyskind.  These projections were then "accelerated and finalized" on December 20, 2017 with the help of BOA, the Company's financial advisor on the Fee Business Sale, "in light of the discussions with potentially interested parties," and were subsequently shared with Stone Point and others.  Despite this rigorous process of constructing and validating the Ordinary Course Projections, once the process of selling the Company to the Control Group began in earnest, the Special Committee and management determined to set aside the Ordinary Course Projections and instead rely on newly created projections that were crafted to justify the Transaction.

277.   The Proxy claims that the Special Committee met on January 16, 2018 to discuss, among other things, the Initial Proposal and the Ordinary Course Projections.  Proxy at 27-28. With regard to the Ordinary Course Projections, the Proxy states that:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

> After discussion, the Special Committee determined that the Budget Projections were no longer current, and that updated projections from Company management would be necessary because, among other things, the Budget Projections were prepared before the enactment of the Tax Cuts and Jobs Act of 2017 and did not take into account subsequent transactions involving the Company or the Company's latest expectations regarding operating results for the fourth quarter of 2017 and the full year 2017.

*Id.* The minutes from the January 16, 2018 telephonic Special Committee meeting, however, do not evidence any such discussions or determinations.

278.    The Proxy indicates that Deutsche Bank and BOA met with Zyskind's right-hand associate, Karkowsky, on January 23, 2018 to conduct a due diligence overview of AmTrust. Proxy at 28. In connection with the Special Committee's purported determination that the Ordinary Course Projections were outdated, the Proxy states that:

> Mr. Karkowsky orally provided representatives of Deutsche Bank and representatives of [BOA] with Company management's current estimates of the future operating and financial performance of the Company, and advised that management's assumptions upon which the Budget Projections were based, had changed as a result of developments in the fourth quarter of 2017 that were not contemplated in the preparation of the Budget Projections.

*Id.* Thereafter, the Proxy indicates that Karkowsky agreed that AmTrust management would provide updated projections "to reflect those items not contemplated in preparation of the Budget Projections." *Id.*

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

279.   According to the Proxy, the following day, January 24, 2018, AmTrust management provided the Special Committee and Deutsche Bank with Company management's updated financial projections, which were downwardly adjusted from the Ordinary Course Projections (the "Case 1 Projections").  Proxy at 28.

280.   On January 29, 2018, the Special Committee met telephonically with Deutsche Bank and Willkie Farr to request yet another set of downwardly-adjusted projections. Specifically, the Proxy states that the Special Committee and Deutsche Bank "noted that the Case 1 Projections were inconsistent with financial analysts' consensus estimates for the Company and the Company's peer group," and "did not appear to reflect certain adverse industry trends and Company issues discussed with the Company management at a January 23, 2018 Audit Committee meeting."[25]

281.   The Proxy further claims that DeCarlo and representatives of Deutsche Bank spoke again with Karkowsky the following day, January 30, 2018, about the Case 1 Projections.    Proxy at 29.  Apparently after realizing the Case 1 Projections would still not justify the unfairly low price sought by the MBO Group, Defendant DeCarlo specifically requested revised financial performance projections reflecting

---

[25] Curiously, the January 29, 2018 Special Committee meeting minutes do not evidence any such discussions or conclusions. And, despite Plaintiffs' specific request, the Company did not produce the January 23, 2018 Audit Committee meeting minutes as part of the 220 Documents.  The Proxy does not disclose any further information about this meeting.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

both negative industry trends and negative operational and reputational issues specific to the Company. Purportedly, DeCarlo "noted the Special Committee's discussions regarding whether the Case 1 Projections were inconsistent with adverse industry trends and recent issues at the Company discussed during the January 23, 2018 Audit Committee meeting,"[26] and "requested, on behalf of the Special Committee, that Company management prepare an alternate case of financial projections to reflect such trends and issues." *Id.* DeCarlo's request—which is not referenced in Special Committee meeting minutes—marked the second time in two weeks that the Special Committee sought downwardly-adjusted projections from the Company. The Special Committee was purportedly formed to advance the interests of AmTrust's public stockholders. Accordingly, it should have been focused on securing the highest possible take-out price. Instead, it appears that the Special Committee acted to *drive down* the take-out price by proactively rejecting management's projections as too high and seeking downwardly revised projections. Simply put, the Special Committee was effectively negotiating *against* the interests of the stockholders it was supposed to be representing—something that would be inexplicable but for the Special Committee members' conflicts of interest.

---

[26] Plaintiff specifically asked that the Company provide the meeting minutes from the January 23, 2018 Audit Committee meeting; however, the Company did not produce the minutes as part of the 220 Documents.

-118-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

282.    The following day, January 31, 2018, AmTrust management responded to the Special Committee's request for downwardly-revised projections by providing the Special Committee and Deutsche Bank with a new set of projections (the "Case 2 Projections"). The Proxy claims that the Case 2 Projections "reflect[ed] a more challenging operating environment[,] reputational and business pressures faced by the Company, slower growth, more conservative projected underwriting assumptions reflecting recent loss reserve activity and a more conservative balance sheet in light of the rating agency placing the Company under review with negative implications." Proxy at 29.

### 5. Zyskind and AmTrust Management Manipulate the Special Committee's Valuation Through Threats of a Ratings Downgrade

283.    On February 1, 2018, the Special Committee and Deutsche Bank held a telephonic meeting and were joined by "Company management"—namely, Zyskind, Karkowsky and Deputy CFO Zachary Wolf (Karkowsky's right-hand associate in connection with the negotiation of the Tower Transaction)—to discuss the Case 1 Projections and Case 2 Projections.  According to the meeting minutes, the discussion concerned, among other things, the background of the preparation of the Case 1 Projections and Case 2 Projections, bases, models and assumptions used in these projections, the status of the Company's reserves, and the status of the Company's relationship with reinsurers, regulators and rating agencies.

-119-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

284.   The Special Committee met in person on February 5, 2018.  At this meeting, Deutsche Bank presented its preliminary financial analyses utilizing the Case 1 Projections and Case 2 Projections, the latter of which contained significant downward adjustments purportedly predicated on "the rating agency placing the Company under review with negative implications." At the February 5, 2018 meeting, Deutsche Bank also discussed the status of the Company's fourth quarter 2017 financial results, as well as the anticipated timing of the audit by KPMG, AmTrust's auditor.

285.   The Special Committee met telephonically on February 7, 2018. According to the Proxy, after noting a purported lack of "'in-bound' inquiries from third parties related to a potential alternative acquisition or other strategic transaction proposals" (which the Special Committee was not authorized to consider anyway) and, previously, the Karfunkel-Zyskind Family's unwillingness to sell its shares in connection with a third-party transaction, the Special Committee directed Deutsche Bank to provide Stone Point and the Karfunkel-Zyskind Family with a counterproposal of $17.50 per share.  Proxy at 30.

286.   The Proxy states that, on February 8, 2018, Deutsche Bank communicated the $17.50 per share counterproposal and "reviewed certain valuation analyses" supporting this proposal.  Proxy at 30. Notably, the $17.50 per share counterproposal was predicated on a discount dividend model contained in the Case

-120-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

1 Projections that was actually upwardly adjusted from the relevant figures

contained in Deutsche Bank's February 5, 2018 preliminary presentation.

287.   The Special Committee met telephonically later that day on February

8, 2018. While the Proxy states that the Special Committee "directed" Deutsche

Bank to meet with representatives of Stone Point and the Karfunkel-Zyskind Family

to further discuss the counterproposal, Proxy at 30, the minutes from the Special

Committee's meeting indicate that Deutsche Bank informed the Special Committee

that it was already "in the process of scheduling a follow-up meeting" with Stone

Point and the Karfunkel-Zyskind Family.

288.   The Proxy states that, on February 11, 2018, Deutsche Bank met with

representatives of Stone Point, the Karfunkel-Zyskind Family, and BOA.  The Proxy

further indicates that Karkowsky also attended this meeting and provided an

"update…on the Company's anticipated 2017 fourth quarter and full year 2017

financial results."  Proxy at 30.  The Proxy does not disclose the substance of what

Karkowsky conveyed at this meeting.  Although not disclosed in the Proxy, the

minutes from a Special Committee meeting held later that day indicate that Deutsche

Bank's discussion with Karkowksy also included "recent correspondence between

the [SEC] and the Company," and "preliminary reports on the 2018 Q1 financial

results."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

289.   Three days later, on February 14, 2018, the Special Committee held a meeting with "certain representatives of Stone Point and the Karfunkel-Zyskind Family," as well as Karkowsky and representatives of BOA, to discuss the Special Committee's counterproposal. The meeting minutes indicate that the meeting was called at the request of the Karfunkel-Zyskind Family and Stone Point.  According to the minutes, James Carey ("Carey") of Stone Point explained "Stone Point's position in respect of the [potential going-private transaction], including Stone Point's views on the Company's financial position and the effect that the [going private transaction] could have on the Company's rating by A.M. Best Company." Meanwhile, Zyskind "explained the Karfunkel-Zyskind Family's view on the [potential going-private transaction]," and Karkowsky provided an update on "the status of the 2017 Q4 financial statements and when they would be available."  While not reflected in the meeting minutes, the Proxy nevertheless indicates that Stone Point and the Karfunkel-Zyskind Family expressed their intent to submit a revised proposal within the range of $12.85 to $12.90 per share.  Proxy at 31.[27]

290.   According to the Proxy, sometime prior to February 16, 2018, the Special Committee requested that "Company management provide a determination

_____

[27] A Deutsche Bank presentation dated February 26, 2018 indicates that the "Buyer Group increase[d] offer to $12.90" on February 15, 2018, but neither the Proxy nor 220 Documents evidence that the Special Committee was apprised of this offer or discussed it during its meetings.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

as to which financial projections represented management's best current estimates of the future financial performance of the Company"—that is, the Case 1 Projections or the Case 2 Projections.  Proxy at 31. The Proxy states that, in response to this inquiry, "management" informed the Special Committee on February 16, 2018 that "in light of developments that had become apparent since the Case 1 Projections were prepared," the more extreme Case 2 Projections were a better estimate of the Company's expected financial performance.  *Id.*

291.    The only relevant "development" that occurred between the preparation of the Case 1 and Case 2  Projections was that, on February 14, 2018, the MBO Group indicated that they would reject the Special Committee's counterproposal and revert with an offer of $12.85–12.90 per share.

292.    The Proxy indicates that on February 18, 2018, the Special Committee met with "Company management" to further discuss the latter's view on the Case 2 Projections.  The Special Committee specifically inquired as to "what the impact would be on the Case 2 Projections if the Company's insurance company subsidiaries' ratings were downgraded to below an 'A' and/or the Company's 2017 year-end results when finalized were worse than Company's management's current expectations regarding such results[.]"  Proxy at 31.   According to the Proxy, Karkowsky stated that the Company's projections would be revised lower from the

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Case 2 Projections.[28]  *Id.*  At the direction of the Special Committee, AmTrust's management then prepared yet another set of financial projections (the "Special Committee Case Projections") with still more aggressive negative assumptions concerning loss ratios, net investment yield, capital return, and anticipated premium growth.  Proxy at 32.

293.   The same day it was provided with the Special Committee Case Projections, the Special Committee delivered a revised counteroffer of $15.10 per share to the MBO Group, despite receiving no formal rejection of the $17.50 per share counteroffer, *see* Proxy at 32, but rather a shakedown from the Karfunkel-Zyskind Family, Stone Point, and Karkowsky at the February 14, 2018 Special Committee meeting.  *See* Proxy at 30-32.  The MBO Group rejected the $15.10 per share counteroffer on February 23, by countering at $13 per share.  Proxy at 32.  The MBO Group also rejected the inclusion of a "go shop" period, during which the Company would have been permitted to solicit potential acquirers, and of a voting agreement requiring the Control Group to vote in favor of any superior proposal from a third party.  Proxy at 33.

294.   After discussing the events of February 21, 2018, the Proxy indicates that, "over the next several days," the Special Committee, Deutsche Bank and

---

[28] The Company did not produce any minutes from a February 18, 2018 Special Committee meeting in the 220 Productions.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Willkie Farr met with the "Company's management" to discuss the delay in the filing of the 2017 10-K and "the Company's discussions with the rating agency"—presumably, A.M. Best. Proxy at 31. During these discussions, the Proxy states that "***Company management*** indicated that, given the status of the year-end audit process," it was possible that the Company would not meet the March 1, 2018 deadline by which to timely file its 2017 10-K, but that it expected to make said filing by March 16, 2018, the new deadline if AmTrust sought an extension under Rule 12b-25 of the Exchange Act ("Rule 12b-25"). *Id.*

295. The February 25, 2018 Special Committee meeting minutes further state that the Special Committee discussed outstanding issues in the draft merger agreement and that the Special Committee directed Deutsche Bank to request that the Company provide it with 1) the current draft of the 2017 10-K; 2) a draft of the Company's Q4 2017 financial statements; and 3) yet another set of downwardly-adjusted financial projections based on the scenario that the Company's rating was downgraded by A.M. Best (the "Downside Projections"). The real design of the Downside Projections was to make the Special Committee Case Projections look more reasonable than they actually were.

296. According to a Deutsche Bank presentation dated February 26, 2018, the Downside Projections specifically "reflect[ed] consequences of a delayed 10-[K] filing and a potential ratings downgrade by A.M. Best[.]" This was a farce. The

-125-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Special Committee knew that A.M. Best had only put the Company's rating under review until it filed its full year 2017 results and completed the Fee Business Sale. Moreover, the Special Committee knew that the Fee Business Sale would be consummated by the end of February 2018 and the Company would file its 2017 10-K after a brief fifteen-day extension. If it had simply waited for these events to happen, the market would have likely rewarded AmTrust with a higher stock price. Thus, it appears the Special Committee manufactured illusory negative factors to, once again, drive down the Company's projections so that it could reach a deal with the Control Group before the market could begin rewarding AmTrust for its turnaround.

297. While not mentioned in the Proxy, the February 25, 2018 Special Committee meeting minutes indicate that the Special Committee contemplated Deutsche Bank's placement of outbound calls to third parties for purposes of gauging market interest in a transaction with the Company. The Proxy and 220 Documents, however, do not evidence that Deutsche Bank ever took any such action.

298. According to the Proxy, on February 26, 2018, the Special Committee participated in a teleconference with "the Company's management" in order "to receive an update on Company management's anticipated timing of the filing of the 2017 10-K and the Company's discussions with the ratings agency." Proxy at 33.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

The minutes from a 5:00 p.m. meeting of the Special Committee[29] that day indicate that the teleconference participants included, among others, (1) Zyskind; (2) Karkowsky; (3) Robert Giammarco ("Giammarco") of BOA; and (4) the Karfunkel-Zyskind Family's counsel at Paul Weiss.

299.   The Proxy states that "[o]n the call, Mr. Karkowsky indicated that the Company would not be filing the 2017 Form 10-K by March 1, 2018, but that Company management currently expected to file the 2017 10-K within the 15-day grace period available under the SEC's rules but there was no certainty that the Company would be able to do so."  Proxy at 33. The minutes from the 5:00 p.m. meeting, do not, however, reflect that Karkowsky communicated such information to the Special Committee at this meeting.

300.   Moreover, while the Proxy states that "Mr. Karkowsky also advised the Special Committee that management had informed the ratings agency about the delay in the filing of the 2017 10-K," Proxy at 33, the minutes from the 5:00 p.m. Special Committee meeting reveal that Karkowsky *and* Carey of Stone Point participated in this meeting with A.M. Best.  The minutes from the meeting also do not reflect that Karkowsky advised the Special Committee of his discussions with

---

[29] While not referenced in the Proxy, the 220 Documents indicate that the Special Committee actually met at 11:00 a.m. The minutes from the 11:00 a.m. meeting merely state that its purpose was to discuss the Transaction and provide no information regarding the substance of this meeting.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.M. Best about the delay in the filing of the 2017 10-K.  Indeed, the minutes vaguely state that Karkowsky "summarized" the call with A.M. Best, "during which the representatives of AM Best informed the Company that AM Best was 'going to committee to consider ratings action' on the Company."  Neither the Proxy nor the 220 Documents evidence that the Special Committee or any of its advisors contacted A.M. Best to verify such information.

301.   Furthermore, according to the Proxy, this marked the second time that the Karfunkel-Zyskind Family and Stone Point met with a ratings agency.  The Proxy indicates that on January 9, 2018, certain unidentified "representatives of Stone Point and the Karfunkel-Zyskind Family" attended a meeting with a "ratings agency"—again, presumably A.M. Best—at which time they made a "confidential presentation" advising the agency that they were considering a potential going-private transaction with the Company.  Proxy at 24.  Neither the Proxy nor the 220 Documents provide any additional information regarding this meeting. By all measures, Stone Point and the Karfunkel-Zyskind Family were heavily involved in and influenced the Company's interaction with A.M. Best.

302.   The meeting minutes further indicate that Zyskind, Karkowsky, Giammarco and Givertz left the call and the Special Committee then proceeded to discuss the Special Committee Projections with Deutsche Bank.  The presentation prepared by Deutsche Bank for that meeting reflect that, in addition to the draft of

-128-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the 2017 10-K, fourth quarter financial statements, and Downside Projections, the Special Committee and/or its advisors purportedly requested a "back-up plan" and the "presentation/ talking points in the A.M. Best discussion on Feb 26th, 2018[.]" The Special Committee then determined to make a counter-offer of $14.00 per share.

303.  The Proxy suggests that, sometime after the 5:00 p.m. Special Committee meeting but before its next meeting at 9:45 p.m. that night, Deutsche Bank communicated the $14.00 per share offer to Zyskind.  *See* Proxy at 33.

304.  The Proxy further indicates that, "in order to induce Stone Point [] to support a transaction at a higher price," the Karfunkel-Zyskind Family agreed to a deal modification, including an agreement to cause the Company to pay Stone Point a transaction fee of $15.0 million if the Transaction was consummated.  Proxy at 33. The Proxy indicates that Stone Point and the Karfunkel-Zyskind Family agreed to a "best and final" offer of $13.50 per share. *See id.*  As later events revealed, this was merely bluster that the Special Committee accepted.

305.  While the Proxy claims that Zyskind relayed the $13.50 offer to the Special Committee and that the committee met on the "evening" of February 26, 2018 to discuss the offer, the minutes from the 9:45 p.m.  February 26, 2018 Special Committee meeting merely indicate that "Mr. Stynes [of Deutsche Bank] provided the Special Committee with an overview of the call with Barry Zyskind and his feedback to the Special Committee's counteroffer proposal" of ***$14.00*** per share.

-129-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

306.    The Proxy also states that at a February 26, 2018 Special Committee meeting, the committee "resolved to approve and adopt the Special Committee Case Projections," and directed Deutsche Bank to use these projections in its financial analysis. Proxy at 34.   The meeting minutes, however, do not reflect any such resolution.  Rather, the minutes indicate that the Special Committee was still without several critical pieces of information at this time including, among other things, an updated draft of the 2017 10-K and a draft of the Company's financial statements for the fourth quarter of 2017.

307.    The 220 Documents evidence that the Special Committee met twice telephonically on the following day, February 27, 2018.   According to the 220 Documents, the Special Committee met first at 11 a.m. and "discussed their ongoing review of the financial projections modeled by the Company and the potential need for additional information from the Company."  Neither the Proxy nor the meeting minutes identify the potential "additional information" that was needed from the Company at this time, nor whether it was received.

308.    The 220 Documents further evidence that the Special Committee met telephonically later that day on February 27, 2018 at 9:15 p.m. to discuss the "Revised Merger Agreement" including with respect to the "termination rights, termination fee and expense reimbursements" sought by Stone Point and the Karfunkel-Zyskind Family.

-130-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

309.   The Proxy claims that, on February 27 and 28, 2018, Willkie Farr and Skadden negotiated the terms of the merger.  One of the remaining terms subject to negotiation was a provision relating to termination rights proposed by Stone Point and the Karfunkel-Zyskind Family that would be triggered in the event that: (1) any of the Company's insurance subsidiaries is downgraded below "A"; and (2) the Company failed to file the 2017 10-K by a specified date following the 15-day grace period offered under Rule 12b-25.  Thus, while Zyskind was pressuring the Special Committee to strike a deal to stave off a purported looming ratings downgrade, he was simultaneously negotiating a way to get out of the deal in the event a ratings downgrade occurred and would not be required to pay any termination fee in such event.

310.   Throughout the entire process of negotiating the Transaction, the Special Committee lacked current financial information about AmTrust, which makes its decision to revise the projections all the more inexplicable.  It was not until February 25—just days before completing negotiations—that the Special Committee finally resolved to ask the Company's management for the current draft of the Company's Form 10-K.  The Special Committee apparently did not receive a draft of the Form 10-K until February 27, one day before it approved the Transaction.  According to a presentation provided by Deutsche Bank in connection with a February 28, 2018 Special Committee meeting, while February 28, 2018 marked the

-131-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"target transaction signing date," the Special Committee was still awaiting the receipt of "updated consolidated financials."

311. Without accurate current financial information, the Special Committee lacked the most fundamental information necessary to engage in negotiations to sell the Company. This is all the more true given that the counterparty with which the Special Committee was supposed to be negotiating consisted of insiders who would have superior knowledge even if the Special Committee had accurate financial statements.

312. Again, the Special Committee could have waited for this information before agreeing to sell the Company. But the members of the Special Committee had an interest in finalizing a sale of the Company and operated under the influence of members of the Control Group. Accordingly, they willingly acceded to the artificial time constraints imposed by the Control Group.

313. Further, even if the Special Committee were independent—and it was not—the Special Committee's informational vaccum rendered it fundamentally incapable of carrying out its duties to effectively represent AmTrust's minority stockholders. The Special Committee acted in bad faith by failing to act in the face of its known duty to apprise itself of all relevant financial information and allowing the Control Group to rush it into a transaction before the Company's financial statements were current.

-132-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

314.    At 3:30 p.m. on February 28, 2018, the Special Committee met with Willkie Farr and Deutsche Bank. At the meeting, Deutsche Bank provided its views on the potential transaction. While Deutsche Bank's fairness presentation claims that the Special Committee received "the latest draft of the 10-K" on February 27, 2017, the presentation and 220 Documents do not evidence that the Company provided to the Special Committee the "updated consolidated financials" or any of the other information requested by the Special Committee such as the talking points from the February 26, 2018 A.M. Best presentation or the "back-up plan." According to the 220 Documents, this presentation also marked the first time that the Special Committee was apprised of the $13.50 per share offer.

315.    At 5:00 p.m., AmTrust issued a press release announcing the consummation of the Fee Business Sale. In the press release, Zyskind stated that the close of the Fee Business Sale "mark[ed] a significant milestone in our efforts to unlock value and build a stronger capital base for AmTrust, while positioning both AmTrust and the U.S. fee companies for continued, profitable growth[.]"

316.    At 9:00 p.m. that day, the Special Committee met again telephonically with Deutsche Bank and Willkie Farr. The Proxy claims that the Special Committee discussed the "risks and consequences of rejecting" the proposed transaction. The Proxy further indicates that Deutsche Bank approved the $13.50 per share counteroffer provided by Stone Point and the Karfunkel-Zyskind Family.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

317.   At the conclusion of the meeting, the Special Committee purportedly approved resolutions recommending that the Board adopt draft resolutions approving the Transaction at a price of $13.50 per share. The 220 Documents, however, do not evidence an executed version of these resolutions.

318.   Sometime after the 9:00 p.m. Special Committee meeting, the Board executed resolutions approving the Transaction.

319.   The Proxy claims that shortly after midnight on the morning of March 1, 2018, the parties executed and delivered the merger agreement governing the Transaction (the "Take-Private Merger Agreement" or "Merger Agreement"). Proxy at 35.

320.   The $13.50 per share consideration represented an increase of only $1.25 from the price offered in the Acquiring Group's $12.25 proposal.  As  the below chart from Deutsche Bank's analysis demonstrates, the Special Committee obtained only 3 price "bumps" from the Acquiring Group during its short tenure:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



321.   Later on March 1, 2018, AmTrust issued a press release announcing it had entered into the Take-Private Merger Agreement.  In the press release, Zyskind was quoted as saying: "I believe that this transaction represents an exciting step forward for AmTrust, our employees, and the agents, brokers, partners, and customers we serve. ***As a private enterprise, we will be able to focus on long-term decisions, without the emphasis on short-term results.***"

322.   Also on March 1, 2018, the Company filed a Form NT 10-K with the SEC disclosing that AmTrust was seeking relief under Rule 12b-25. The Form NT

-135-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

10-K discloses that "additional time is needed for the [Company] to complete its consolidated financial statements for the fiscal year ended December 31, 2017, and as a consequence, for [KPMG] to complete its audit procedures and audit of the consolidated financial statements included in the Form 10-K."[30]

323.    Two weeks later, on March 16, 2018, AmTrust filed the 2017 10-K within the extension period provided by Rule 12b-25, which was signed by Zyskind, Karkowsky, and each of the Special Committee members, among others.  The 2017 10-K reiterated AmTrust's "overall financial objective" of "produc[ing] a return on equity of 12.0% - 15.0% over the long term."

324.    The 2017 10-K also reemphasized the notion that 2017 was an outlier in terms of the Company's financial performance.  Indeed, the 2017 10-K stated that "[a]lthough we did not achieve our key growth and profitability measures for the year ended December 31, 2017, *we do not consider this to be a trend*," and attributed this negative performance to various unique events, such as "catastrophe losses in our Small Commercial Business segment from Hurricanes Harvey, Irma and Maria and the earthquake in Mexico, prior period adverse reserve development in all of our segments and higher professional service fees."  The 10-K assured investors that

---

[30] Shortly after the Company's announcement that it had entered into the Take-Private Merger Agreement, on March 5, 2018, Lead Plaintiffs separately issued 220 demands to inspect certain books and records of the Company in connection with the Private Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"[m]anagement believes that significant progress has been made in enhancing internal control over financial reporting through the period ended December 31, 2017."  In other words, management was representing that it was addressing the risks that gave rise to the shareholder litigation commenced in 2017.

### 6. The Special Committee and Company Hire Conflicted Advisors

#### a. Deutsche Bank's Conflicts

325.  The Special Committee's financial advisor, which issued a fairness opinion endorsing the Transaction, was conflicted.  The Proxy disclosed that Deutsche Bank and its affiliates provided services to Stone Point and its affiliates and the Company itself (meaning its management led by the Control Group).  In the preceding two years, Deutsche Bank had earned $9.7 million from services provided to Stone Point and its affiliates and $1.4 million from services provided to AmTrust and its affiliates.  Deutsche Bank was incentivized to provide a fairness opinion blessing the Transaction so that it could continue to earn fees from Stone Point and the Control Group in the future.  Furthermore, $6.5 million of its $8.5 million fee was contingent on the consummation of the Transaction, thus giving it a further incentive to provide its blessing to the Transaction regardless of its merits.

326.  While the full extent of Deutsche Bank's conflicts is unknown at this time, several connections between Stone Point and Deutsche Bank raise serious

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

questions as to whether Deutsche Bank was independent from Stone Point. For example, Stone Point's CEO Charles Davis is a member of the Advisory Board of Deutsche Bank and earns $100,000 per year from that service. Prior to Stone Point, Davis was a partner at Goldman, Sachs & Co., where he spent 23 years. One of Deutsche Bank's lead bankers advising on the Transaction, Celeste Guth, is a Managing Director and Co-Head of the Global Financial Institutions Group at Deutsche Bank. From 1986 to 2015, Guth worked at Goldman Sachs. According to a May 23, 2018 Icahn presentation filed with the SEC, during her tenure at Goldman Sachs, Guth worked directly for Charles Davis. Icahn also stated that he believed that "other of [Guth's] colleagues at Goldman during this time period included Stephen Friedman and Nicolas Zerbib, both of whom sit with Chuck Davis on Stone Point's investment committee."

327. Furthermore, Deutsche Bank has a long history of advising AmTrust and NGHC. By way of example, the LinkedIn profile for Meir Lewis, a member of the Deutsche Bank team that advised the Special Committee, lists several notable transactions involving AmTrust and NGHC, including:

- "Acquisition of Direct General by National General (Jun '16)"

- "Sale of U.S. Specialty Homeowners business by QBE to National General (Sep '15)"

- "Follow-on equity offering for National General (Mar '15)"

- "Follow-on equity offering for AmTrust (Jan '15, Nov '15)"

-138-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

328.   Notably, the presentation materials provided by Deutsche Bank in connection with its January 4, 2018 meeting with the Special Committee do not identify Lewis' involvement in the NGHC-Direct General transaction, nor do the Proxy or the 220 Documents evidence that this transaction was otherwise disclosed to the Special Committee.

329.   Given Deutsche Bank's numerous ties to Stone Point and the other members of the Control Group, it is doubtful that Deutsche Bank could have recommended against this Transaction.

### b.      BOA's Conflicts

330.   The Company's retention of BOA also created conflicts. As acknowledged in the Proxy, BOA had a pecuniary interest in the Transaction and the private entity contemplated by the Transaction. Indeed, the Proxy admits that "an affiliate of [BOA]…engaged in preliminary discussions with the Karfunkel-Zyskind Family about providing debt financing in connection with the [Transaction]," and that "the Company and Stone Point have asked [BOA] to participate in a new credit facility that the Company may enter into at the closing of the [Transaction], the proceeds of which [BOA] understands will be used, among other things, to refinance the Company's convertible notes."  Proxy at 57-58.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

331.    Finally, the Company's financial advisor, BOA, has longstanding and strong ties to Stone Point and the Karfunkel-Zyskind Family. For example, the Proxy discloses that:

> The senior member of the [BOA] deal team advising the Company in connection with the [Transaction] (who we refer to in this section of the proxy statement as the "[BOA] Representative") has also participated in coverage activities and the provision of services with respect to [BOA's] relationship with Stone Point and affiliates and investees of the Karfunkel-Zyskind Family. The [BOA] Representative has had an ongoing relationship with Stone Point and its senior principals over many years and has also served as the relationship manager with respect to [BOA's] relationship with Stone Point. In addition to participating on [BOA] deal teams advising Stone Point in connection with transactions by its portfolio companies, he has also advised other parties in connection with their transactions with Stone Point and its portfolio companies. In addition, the spouse of the [BOA] Representative serves as a principal of Stone Point. The [BOA] Representative introduced Stone Point to the Company as a potential transaction counterparty in connection with the Fee Business sale process.[31]

332.    While the Proxy claims that the relationships described in the foregoing paragraph were disclosed to the Board and the Special Committee, there are a number of relationships involving BOA and its affiliates which the Proxy suggests were not disclosed to the Special Committee. Those relationships involving BOA include, but are not limited to:

- With regard to AmTrust, (i) acting as financial advisor to the Company in connection with mergers and acquisitions (including the Fee

---

[31] Proxy at 59.    Upon information and belief, the "[BOA] Representative" is Giammarco and the "spouse of the [BOA] Representative" is Jacqueline M. Giammarco, a Principal and Chief Compliance Officer at Stone Point.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Business Sale), (ii) having acted or acting as a lender to the Company, (iii) having provided or providing certain distressed and mortgage trading services to the Company, and (iv) having provided or providing certain treasury and management services and products to the Company.

- With regard to the Karfunkel-Zyskind Family, (i) having acted as a bookrunner on certain offerings of senior notes and preference shares by Maiden Holdings, (ii) currently acting (including certain senior members of the deal team advising the Company in connection with the [Transaction]) as a financial advisor to the board of directors of Maiden Holdings in evaluating strategic alternatives, (iii) having acted or acting as a lender to Maiden Holdings; and (iv) having provided or providing certain treasury and management services to, another of the Karfunkel-Zyskind Family's affiliates.

- With regard to Stone Point, (i) having acted as financial advisor to Stone Point and certain of its affiliates and portfolio companies in connection with certain mergers and acquisitions, (ii) having acted or acting as administrative agent, collateral gent, arranger, bookrunner and/or lender for Stone Point and certain of its affiliates and portfolio companies, (iii) having acted or acting as underwriter, initial purchaser and placement agent for various equity and debt offerings undertaken by Stone Point and its affiliates, (iv) having provided or providing certain foreign exchange and mortgage trading services to the Stone Point and its affiliates and (v) having provided or providing certain treasury and trade services and products to Stone Point and certain of its affiliates and portfolio companies. [32]

333. The structure of BOA's compensation in connection with the Transaction created a further conflict. The entirety of BOA's aggregate $10 million fee was contingent upon completion of the Transaction. Thus, even putting aside its deep connections to the Karfunkel-Zyskind Family and Stone Point, BOA was

---

[32] *See* Proxy at 58-59.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

financially incentivized to steer negotiations towards consummation of the Transaction.

## VI.    THE UNFAIR PROCESS YIELDED AN UNFAIR PRICE

334.    The MBO Group's initial purchase price of just $13.50 per share was unfair to the Company's minority stockholders and provoked widespread stockholder opposition.  It represented a clear attempt to take AmTrust private at an unfair price.  The Icahn bump to $14.75 per share did not result in a fair price.  It was merely enough to satisfy Icahn and enough other short term holders, many of whom likely entered their investments after the announcement of the initial proposal, to support the deal.[33]  As described herein, the Company's stock price was artificially depressed prior to the Transaction's announcement due to uncertainty created by the Company's disclosures regarding material weaknesses in its financial reporting, its loss reserves, and the restatement of its financials.

335.    The buyout price was announced in the immediate wake of troubling disclosures, locking in a rough price "ceiling" of $13.50 per share for AmTrust stock before the market could adequately evaluate the Company's prospects based on further financial reporting and the closing of the Fee Business Sale, which would

---

[33] Icahn had his own investment and tactical reasons to negotiate a quick settlement in consideration for a $1.25 price bump.  In less than one month, Icahn's investment in 18.4 million AmTrust shares netted him approximately $23 million in profits.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

have removed the overhang caused by the A.M. Best ratings review. Defendants'
own statements belie that the price could have been fair. The ceiling likely would
have held if not for vigorous public outcry against the unfairness of the $13.50 per
share price.

336.   In the November 6, 2017 press release announcing a large reserve
charge, Zyskind continued to emphasize the Company's financial stability and long-
term growth prospects. Specifically, Zyskind observed that "[w]ith this reserving
action and the transactions we have announced earlier this year and today, *we have
transformed the Company's balance sheet and established the strongest capital
profile in AmTrust's history*....With our large capital base and disciplined
underwriting approach, we are well positioned to continue to be a leading provider
of small commercial business insurance and warranty coverage globally."
Meanwhile, Karkowsky noted that "[e]ven after recognizing the prior year
development, primarily in accident years 2013 through 2016, our overall
underwriting business was profitable."

337.   Later on November 6, 2017, the Company issued a second press release
announcing that the Company found a partner for the Fee Business Sale in MDP. In
connection with the Fee Business Sale, AmTrust agreed to transfer a 51% interest in
certain U.S.-based fee businesses to MDP in a transaction valued at $1.15 billion. In
return, AmTrust received gross cash proceeds of $950 million and retained a 49%

-143-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

equity interest in the business. According to the November 6, 2017 press release regarding the Fee Business Sale, the transaction was approved by the Board and expected to close in the first half of 2018. BOA served as AmTrust's financial advisor in connection with the Fee Business Sale.

338.    Zyskind also touted the Fee Business Sale. Among other things, Zyskind stated that "[t]he transaction…aligns with our recent initiatives to further strengthen our balance sheet and simplify our organization, and provides us with capital to support AmTrust's meaningful organic growth opportunities."

339.    Defendant Zyskind himself stated that the decline in AmTrust's share price as of November 2017 was "***relatively short-term in nature***" and "***not indicative of an actual decline in our fair value or our reporting units' fair value***." Specifically, Zyskind signed AmTrust's Form 10-Q for the third quarter of 2017, dated November 9, 2017, which stated as follows:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, ***we believe the share price decline in the nine months of 2017 is relatively short-term in nature and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, and is not indicative of an actual decline in our fair value or our reporting units' fair value***.

340.    Indeed, just one month earlier, on October 6, 2017, AmTrust's common stock had traded as high as $14.35 per share—$0.85 per share above the initial deal

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

price—and just three months earlier, on August 3, 2017, it had traded as high as $16.21 per share—$2.71 per share above the initial deal price. And as recently as February 2017, AmTrust's common stock traded above $27 per share—more than twice the initial buyout price of $13.50 per share. The proposed $13.50 takeout price was 62.0 percent below the company's all-time high closing price and 41.7 percent below the company's highest closing price in the 52 weeks before the deal was announced.

341.   Based on AmTrust's purported December 31, 2017 book value of $16.23—as calculated by the Special Committee's financial advisor, Deutsche Bank—AmTrust's predicted generation of 12-15% operating ROE would imply operating earnings per share of $1.95 to $2.44.

342.   In spite of this, even the most optimistic projections used by the Special Committee—the "Case 1 Projections"—showed the Company's operating earnings per share failing to reach even the low end of this range until 2021. For comparison, the various sets of projections used by the Special Committee are listed below:

### Operating Earnings Per Share

|  | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| **Special Committee Case** | 0.87 | .98 | 1.25 | 1.52 | 1.88 |
| **Case 1** | 1.21 | 1.44 | 1.71 | 1.98 | 2.28 |
| **Case 2** | 0.87 | 0.94 | 1.05 | 1.18 | 1.31 |
| **Downside Case** | 0.21 | -0.13 | 0.23 | 0.48 | 0.69 |

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

343.  As such, it appears that AmTrust management created unrealistically negative projections once it realized that its goal was to take the Company private on the cheap—only to revise those projections downward even further to help justify accepting the meager offer from the MBO Group.

344.  Further, the projections used by the Special Committee and by Deutsche Bank were based on the assumption that AmTrust's best days are over, and that the Company will continue to dramatically lag its peer companies in the coming years.  However, the buyout price does not account even for the possibility of improvement, which was already occurring as exhibited by the Fee Business Sale, thus allowing insiders—who have greater knowledge of the Company's true financial picture and prospects—to capture all of the returns from any improvement in performance after they take the Company private.

345.  The creation of the absurdly pessimistic "Downside Projections" in particular had no purpose other than to make the Special Committee Case Projections appear more reasonable and thus to make the MBO Group's unfair offer look more attractive.  Specifically, the Downside Projections were based on the possibility of a ratings downgrade by A.M. Best.  But by February 27, 2018, when these "downside" projections were first presented to the Special Committee, management already knew that A.M. Best would likely not downgrade AmTrust's

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

ratings further.  Specifically, AmTrust management knew that the reason A.M. Best was considering further ratings action on AmTrust was the late filing of its 10-K. But AmTrust management also knew that the Company *would* soon file its Form 10-K and thus that an A.M. Best ratings downgrade was highly unlikely.  Indeed, the ***same day the Merger Agreement was signed***, March 1, 2018, AmTrust filed a Form NT 10-K stating that AmTrust was merely seeking a fifteen-day extension to file its Form 10-K.  AmTrust then abided by this extension, filing its Form 10-K on March 16, 2018.  Thus, the "Ratings Downgrade Case" has never been a realistic possibility, but rather has been used as a boogeyman to scare the Company's minority stockholders into accepting an unfair price.

346.  Indeed, as ISS—which initially opposed the Transaction—noted, while the Board's interest in pursuing a sale of the Company at such a low price "implies that the company's problems would be long lasting," in reality "the publicly available information paints a less dire picture of the company's prospects." Importantly, ISS noted, "the board did not conclude that the near-term prospects appeared dim and thus the best solution was to sell the company; its decision to begin the sale process was in response to an inquiry from a potential buyer after AmTrust's stock had fallen sharply."  And because the MBO Group includes the CEO, ISS asked: ***"if he is willing to buy at this price, does that not imply that the company's challenges are not so severe?"***

-147-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

347.    ISS further noted that the Company itself stated, in its 2017 Form 10-K, that "[m]anagement believes that significant progress has been made in enhancing internal control over financial reporting." ISS also noted that even the Special Committee's unduly negative projections show the Company's diluted operating earnings per share rising 44% between 2018 and 2020.

348.    Ironically, the Company's downwardly-manipulated projections were not enough on their own to justify a low deal price. Deutsche Bank was also forced to rely on an unrealistically high cost of equity in order to justify their low valuation of AmTrust. Specifically, Deutsche Bank used a Cost of Equity/Discount Rate range of 12-16% to justify the buyout price of $13.50 per share. In order to derive this discount rate, Deutsche Bank created a range of equity risk premiums with AmTrust's company-specific risk premium on one end and a peer-company risk premium on the other. However, Delaware courts have expressed strong preference for the use of supply-side equity risk premiums.[34]  Using a supply-side equity risk premium results in a substantially lower cost of equity range of 10%-12%. Relying on the same Special Committee Case Projections used by Deutsche Bank, and

---

[34]  *See, e.g.*, *In re Orchard Enterprises, Inc.*, No. CIV.A. 5713-CS, 2012 WL 2923305, at *19 (Del. Ch. July 18, 2012), *judgment entered sub nom. In re Appraisal of the Orchard Enterprises, Inc.* (Del. Ch. July 26, 2012), *and aff'd sub nom. Orchard Enterprises, Inc. v. Merlin Partners LP*, No. 470, 2012, 2013 WL 1282001 (Del. Mar. 28, 2013) (recognizing the Chancery Court's "default acceptance of the supply-side equity risk premium.").

-148-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

keeping all other assumptions the same as they were in Deutsche Bank's analysis (including using the same artificially low perpetuity growth rate of 1.5%), this cost of equity range implies a per-share valuation of $15.09–$18.75 (with a midpoint of $16.72), i.e. anywhere from 11.7% to 38.8% higher than the buyout price.

349.  There are further reasons to question Deutsche Bank's analysis. Among other things, Deutsche Bank's analysis is filled with inappropriate adjustments and assumptions that are driven by (1) AmTrust's currently depressed market price (which is more of a reflection of investor mistrust of Company management than it is of the underlying profitability of the Company), and (2) the many events which made 2017 an atypical year for AmTrust, such as its abnormally high reserve charges and the catastrophic losses incurred in the third quarter of 2017.

350.  Deutsche Bank's multiples analysis is also flawed. In conducting this analysis, Deutsche Bank inappropriately "discounts" median P/E multiples by 57% and 36%, and transforms what would be genuine "comps" into essentially "AmTrust" driven estimates (driven primarily by recent AmTrust pricing). Said differently, the two price-to-earnings approaches that Deutsche Bank presents are really just one approach after this non-standard discounting. Deutsche Bank also inappropriately applies these "discounts" to its calculation of price-to-book-value and price-to-tangible-book-value calculations.

-149-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

351.   In addition, Deutsche Bank's analysis incorrectly assumes that AmTrust's anomalous 2017 year is indicative of future performance during the projection period, which results in a gross undervaluation of AmTrust. As AmTrust acknowledged in its 2017 10-K, the conditions driving the Company's 2017 financial performance are not expected to continue going-forward. Deutsche Bank knew or should have known of this information and advised the Special Committee to accord little weight to the anomalous events of 2017 when conducting its valuation. Deutsche Bank, however, appears to have done the opposite and instead advised the Special Committee to consider conditions in 2017 to be typical for AmTrust going forward.

352.   Deutsche Bank also conducted a flawed dividend discount analysis that undervalued AmTrust. For example, Deutsche Bank's assumption that AmTrust will continue with its current market value to debt ratio significantly impacts all the implied valuation ranges. The assumption is entirely inappropriate on several levels, is grossly inflated from AmTrust's capital structure pre-2017, and is grossly inflated relative to AmTrust's peers. Indeed, the abnormally high market value to debt ratio is driven primarily by the current depressed AmTrust pricing.  The use of this inappropriate assumption generates significant upward bias in the cost of equity and, as a result, downward bias in all the calculated valuation ranges.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

353.    Moreoever, as ISS pointed out, Deutsche Bank improperly compared the Merger to 15 buyouts of "stressed" property and casualty insurers, even though "AmTrust's fundamental appear to be improving, which may make comparisons to 'stressed' situations not that relevant."

354.    In addition, Deutsche Bank's treatment of stock repurchases appears to fail to account for the additional value that investors will receive, aside from dividends.

355.    Specifically, in a financial supplement dated January 24, 2018, BOA, AmTrust's financial advisor, provided the Company with updated financial projections.  Those projections were thereafter forwarded to the Special Committee. As described in the Proxy:

> On January 24, 2018, Company management provided the Special Committee and representatives of Deutsche Bank with Company management's updated estimates of the future financial performance of the Company (the "Case 1 Projections"), reflecting certain adjustments to the Budget Projections as a result of the Tax Cuts and Jobs Act of 2017, recent transactions involving the Company, and updated estimates of the Company's operating results for the fourth quarter of 2017 and the full year 2017.

356.   For clarity and for completeness, AmTrust's Summary Financial Projections of the Case 1 projections from the financial supplement are displayed herein:

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| | Historical | | YTD 9/30/17 | Q4 17E | 2017E | Pro Forma 2017E | Adjustments[1] | Pro Forma | Projected | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | | | | **2017E** | | | **2018E** | **2019E** | **2020E** | **2021E** | **2022E** |
| Gross written premium | 56,799.5 | 57,949.3 | 56,456.8 | 51,947.3 | 58,404.1 | 58,404.1 | — | 58,404.1 | 58,907.7 | 59,112.0 | 59,757.1 | 510,244.9 | 510,757.2 |
| % Change | 21.6% | 16.9% | 6.9% | 2.0% | 5.7% | 5.7% | | 5.7% | 6.0% | 4.5% | 4.5% | 5.0% | 5.0% |
| Net retention ratio | 62.7% | 61.0% | 60.3% | 61.5% | 60.6% | 60.6% | | 60.6% | 61.8% | 61.8% | 61.8% | 61.8% | 61.8% |
| Net written premium | 54,261.9 | 54,851.3 | 53,891.2 | 51,197.9 | 55,089.6 | 55,089.6 | | 55,089.6 | 55,504.4 | 55,753.7 | 56,028.4 | 56,329.8 | 56,646.3 |
| % Change | 8.2% | 13.8% | 3.0% | 4.5% | 4.9% | 4.9% | | 4.9% | 4.3% | 4.5% | 4.5% | 5.0% | 5.0% |
| Net earned premium | 54,021.2 | 54,669.0 | 53,796.1 | 51,310.5 | 55,106.6 | 55,106.6 | (5375.5) | 55,106.6 | 55,504.4 | 55,639.9 | 55,879.7 | 56,168.8 | 56,477.2 |
| Service and fee revenue | 345.6 | 439.0 | 389.4 | 115.6 | 505.0 | 505.0 | (537.5) | 123.6 | 140.6 | 147.6 | 155.0 | 162.7 | 170.9 |
| Net investment income | 156.3 | 208.0 | 173.7 | 60.7 | 234.3 | 234.3 | 15.6 | 249.9 | 280.7 | 304.8 | 333.4 | 364.1 | 397.1 |
| Net realized gains (losses) | 8.1 | 36.5 | 56.6 | — | 56.6 | 56.6 | | 56.6 | | | | | |
| Corporate and other revenue [2] | 82.5 | 99.0 | 90.3 | 25.3 | 122.3 | 122.3 | (17.1) | 105.2 | 108.2 | 90.3 | 93.2 | 97.4 | 101.7 |
| Total revenues | 54,613.8 | 55,450.4 | 54,512.8 | 51,512.0 | 56,024.8 | 56,024.8 | (577.0) | 55,447.8 | 55,907.6 | 56,102.6 | 56,461.2 | 56,972.0 | 57,186.5 |
| % Change | 24.8% | 18.1% | 6.5% | 6.3% | 10.5% | 10.5% | NM | 3.6% | 6.2% | 3.1% | 4.5% | 5.1% | 5.2% |
| Interest expense | (55.4) | (79.5) | (70.7) | (24.5) | (95.2) | (95.2) | (4.7%) | (95.2) | (95.2) | (95.2) | (95.2) | (95.2) | (95.2) |
| Income tax (expense) benefit | (38.9) | (85.3) | 61.0 | (63.1)[3] | (2.1) | (2.1) | (50.57) | (45.1) | (74.1) | (87.1) | (102.7) | (115.7) | (130.1) |
| Effective tax rate | 8.2% | 17.1% | 28.5% | NM | NM | NM | 5.9% | 8.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% |
| Net income to common stockholders | 5419.1 | 5361.1 | (5146.2) | (533.6) | (5179.8) | (5179.8) | 5788 | 5490.0 | 5293.1 | 5270.2 | 5343.5 | 5387.6 | 5445.7 |
| % Change | | | | | | | | | | | | | |
| **Net operating income to common stockholders** | 5469.5 | 5408.7 | 5321.1 | 537.9 | 5159.0 | 5159.0 | (5107.3) | 551.6 | 5283.6 | 5289.9 | 5343.3 | 5390.9 | 5445.7 |
| Return on equity (operating) | 24.4% | 17.8% | 6.5% | 6.2% | 6.5% | 6.5% | (4.7%) | 1.8% | 7.3% | 8.5% | 9.7% | 10.6% | 11.5% |
| Diluted EPS (operating) | 52.79 | 52.34 | 50.66 | 50.20 | 50.84 | 50.84 | (50.57) | 50.27 | 51.21 | 51.44 | 51.71 | 51.98 | 52.28 |
| % Change | 3.1% | (16.0%) | (68.7%) | (8.4%) | (63.9%) | (63.9%) | NM | (88.3%) | 340.3% | 19.1% | 19.1% | 15.5% | 15.5% |
| Loss & LAE ratio - calendar year | 66.8% | 67.2% | 82.5% | 69.3% | 79.1% | 79.1% | | 79.1% | 67.2% | 66.8% | 66.6% | 66.6% | 66.6% |
| Favorable (unfavorable) development | (0.8%) | (5.5%) | (11.0%) | | (8.2%) | (8.2%) | | (8.2%) | | | | | |
| Loss & LAE ratio - accident year | 66.0% | 61.8% | 71.4% | 69.3% | 70.9% | 70.9% | | 70.9% | 67.2% | 66.8% | 66.6% | 66.6% | 66.6% |
| Expense ratio | 24.8% | 26.6% | 27.3% | 27.2% | 27.3% | 27.3% | 0.5% | 27.8% | 27.0% | 26.9% | 26.8% | 26.7% | 26.6% |
| Combined ratio - accident year | 90.8% | 88.5% | 98.7% | 96.5% | 98.2% | 98.2% | 0.5% | 98.7% | 94.2% | 93.7% | 93.4% | 93.3% | 93.1% |
| Combined ratio - calendar year | 91.6% | 93.7% | 109.8% | 96.5% | 106.4% | 106.4% | 0.5% | 106.9% | 94.2% | 93.7% | 93.4% | 93.3% | 93.1% |
| NPW / Total stockholders' equity | 1.47x | 1.40x | 1.40x | 1.38x | 1.46x | 1.46x | (0.26x) | 1.20x | 1.28x | 1.30x | 1.33x | 1.35x | 1.36x |
| Share repurchases | — | — | — | — | — | — | | — | — | 543.1 | 570.1 | 5101.1 | 5101.1 |
| Dividends | 85.9 | 108.2 | 95.7 | 33.3 | 129.0 | 129.0 | | 129.0 | 144.7 | 151.9 | 157.6 | 162.5 | 166.3 |
| Total capital management | 589.9 | 5108.2 | 595.7 | 533.3 | 5129.0 | 5129.0 | | 5129.0 | 5144.7 | 5151.9 | 5200.7 | 5232.6 | 5267.4 |
| Payout ratio (net income to common stockholders) | 20.5% | 29.8% | NM | NM | NM | NM | | 25.9% | 66.0% | 96.2% | 60.0% | 60.0% | 60.0% |
| Investment yield | 2.48% | 2.58% | 2.47% | 2.47% | 2.47% | 2.47% | | 2.47% | 2.60% | 2.70% | 2.80% | 2.90% | 3.00% |
| **Balance Sheet** | | | | | | | | | | | | | |
| Total cash and investments | 57,211.6 | 59,235.7 | 59,632.7 | 59,976.8 | 59,976.8 | 59,976.8 | 585.0 | 510,827.8 | 511,213.4 | 511,627.8 | 512,473.7 | 513,155.5 | 513,876.9 |
| Invested assets / Total stockholders' equity | 3.5x | 3.2x | 2.6x | 2.9x | 2.9x | 2.9x | (0.3x) | 2.6x | 2.6x | 2.7x | 2.7x | 2.8x | 2.8x |
| Goodwill and intangibles | 5800.0 | 51,243.1 | 51,329.1 | 51,334.7 | 51,334.7 | 51,334.7 | (5474.6) | 5840.1 | 5790.6 | 5746.3 | 5714.7 | 5689.1 | 5672.2 |
| Loss & LAE reserves | 57,208.4 | 510,140.7 | 512,086.6 | 512,297.2 | 512,297.2 | 512,297.2 | | 512,297.2 | 512,991.0 | 513,697.5 | 514,427.1 | 515,179.5 | 515,950.2 |
| Net paid to incurred ratio | 69.4% | 81.0% | 84.0% | 93.2% | 85.0% | 85.0% | | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| Unearned premiums | 54,014.4 | 54,880.1 | 55,322.2 | 55,139.1 | 55,139.1 | 55,139.1 | (51.6) | 55,137.5 | 55,196.1 | 55,380.2 | 55,620.9 | 55,881.6 | 56,155.2 |
| Total debt | 51,161.0 | 51,402.9 | 51,287.7 | 51,287.7 | 51,287.7 | 51,287.7 | | 51,287.7 | 51,287.7 | 51,287.7 | 51,287.7 | 51,287.7 | 51,287.7 |
| Debt to total capitalization | 27.0% | 27.7% | 27.1% | 27.2% | 27.2% | 27.2% | (3.5%) | 23.7% | 23.4% | 22.9% | 22.4% | 21.8% | 21.2% |
| Common stockholders' equity | 52,241.3 | 52,355.4 | 52,599.4 | 52,532.5 | 52,532.5 | 52,532.5 | 5746.9 | 53,279.4 | 53,353.9 | 53,472.2 | 53,606.0 | 53,761.0 | 53,939.3 |
| Total stockholders' equity | 52,900.2 | 53,465.6 | 53,694.5 | 53,477.6 | 53,477.6 | 53,477.6 | 5746.9 | 54,224.5 | 54,298.5 | 54,416.3 | 54,549.6 | 54,704.1 | 54,881.9 |
| Book value per share (primary) | 512.74 | 513.81 | 513.26 | 512.92 | 512.92 | 512.92 | | 516.73 | 517.11 | 517.72 | 518.61 | 519.77 | 521.24 |
| % Change | 22.9% | 8.4% | (4.0%) | (6.5%) | (6.5%) | (6.5%) | | 22.1% | 2.3% | 3.5% | 5.1% | 6.2% | 7.4% |
| Tangible book value per share (primary) | 58.20 | 56.50 | 56.48 | 56.21 | 56.21 | 56.21 | | 512.44 | 513.07 | 513.90 | 514.92 | 516.15 | 517.62 |
| % Change | (24.1%) | (20.7%) | (33.6%) | (4.5%) | (4.5%) | (4.5%) | | 21.1% | 5.1% | 6.3% | 7.3% | 8.2% | 9.1% |

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

357.   The particular line item at issue is the one marked "share repurchases" which reflects that the Company projected share repurchases in the terminal years of 2020, 2021, and 2022 of $43.1, $70.1, and $101.1 million.

358.   It is remarkable that management could issue projections reflecting future share repurchases, which are invariably dependent on the trading price of the common stock, *without also predicting AmTrust's trading prices during those anticipated future repurchases*.  The basis for these projected share repurchases was not disclosed to stockholders.

359.   Crucially, the Special Committee and Deutsche Bank failed to consider these share repurchases.  Rather, Deutsche Bank's analysis in its Case 1 projections, relied on the "dividends" line item, but did not include the projected share repurchases.  Analytically, the monetary effect on a company's decision to issue dividends is the same as its decision to repurchase stock.  Cash available for share repurchases is the same as cash available for dividends.  Yet the repurchases were not treated the same as dividends.  The failure to account for share buybacks in the terminal years had a significant decreasing impact on AmTrust's implied fair value.

360.   The share repurchases were deliberately placed by management and BOA into a separate line item for the Case 1 projections.   And the Special Committee's and Deutsche Bank's analysis, which minimized the importance of the

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

projected share repurchases, had the effect of manipulating downward the dividend discount model for the Case 1 projections.

361.   Correction of these flaws alone indicates that AmTrust common stock is worth significantly more than the Transaction consideration, even without including the hundreds of millions of dollars of value attributable to the Derivative Claims.

362.   Finally, the Transaction undervalued the Company because it fails to properly account for the value of derivative claims brought on the Company's behalf.  Specifically, while the Special Committee assigned a low value to the Cambridge Derivative Claims, they failed to assign any value to the Accounting Derivative Action.

363.   In sum, the MBO Group used unrealistically negative projections and assumptions to justify their unfairly low buyout price, taking advantage of their insider knowledge of AmTrust's true prospects while relying on excessive pessimism to scare the Company's public stockholders into accepting far less than fair value for their shares.

A.   **AMTRUST'S STOCKHOLDERS AND MARKET COMMENTATORS AGREE THE INITIAL PRICE WAS UNFAIR**

364.   Major AmTrust stockholders including Carl Icahn, who held more than 9.3% of the Company's outstanding shares, came out emphatically against the

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

buyout, and Icahn solicited proxies to oppose the deal. In a press release dated May 17, 2018, Icahn emphasized that the deal was "blatantly taking advantage" of minority stockholders, and that it clearly "undervalues" the Company. Icahn also criticized Defendants for creating a "stealth" record date (discussed further herein), which disenfranchised minority stockholders and which made a "sham" of Delaware law, and which had the effect of depriving Defendants' of any "business judgment treatement" in connection with the Merger. Public stockholders apparently agreed that $13.50 was less than the value of the stock, as on the day that Icahn publicly filed his letter to the Board with the SEC, AmTrust's stock traded above $13.50 throughout the day, rising as high as $14.00 and closing at $13.76.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

365.   On May 23, 2018, Icahn's investment firm, Icahn Capital, L.P. ("Icahn Capital"), filed a Form DFAN14A incorporating a slide presentation that laid out Icahn's case for why the Transaction grossly undervalued AmTrust.  First, Icahn noted that AmTrust's stock was under "heavy pressure" at the time the Transaction was announced, due to a rapid series of negative disclosures:



366.   However, in spite of these "challenges," Icahn Capital pointed out, AmTrust's Combined Ratio[35] was in line with its peers, and was far ahead of its peers in annual growth.  Moreover, AmTrust had maintained a steady level of total reserves to total capital, similar to that of its peers:

---

[35] The combined ratio is equal to loss and loss adjustment expenses plus acquisition costs and other underwriting expenses divided by net earned premiums.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- Despite these recent recent challenges, AmTrust has historically led the industry in Loss Ratio, Combined Ratio and premium growth.



Note: peer group consists of same companies utilized by Deutsche Bank in its Fairness Opinion: AFG, ARGO, AIZ, AMSF, CNA, EIG, IRVR, MKL, NAVG, PRA, SIGI, THG and WRB.

- ..and contrary to the recurring narrative that AmTrust's reserves are inadequate, the Company has actually maintained a steady level of Total Reserves To Total Capital, in line with its peers.



367.   As such, Icahn Capital concluded that the main reason that AmTrust's common stock had traded at a discount compared to its peers was that "investors haven't wanted to own the company believing that a transaction like the proposed

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

going private could occur, particularly given the historical disregard the Karfunkel/Zyskinds have demonstrated toward public shareholders."

368.   Nonetheless, Icahn Capital showed management's ***own claim*** that the Company expected a future return on operating equity of 12–15% implied a valuation significantly higher than $13.50 per share based on the Company's book value per share as of March 31, 2018:

| AmTrust P/E Valuation | Low | High | Average |
|---|---|---|---|
| Management Long-Term Target ROE | 12.0% | 15.0% | 13.5% |
| x Book Value Per Share (3/31/18) | $14.48 | $14.48 | $14.48 |
| **= Earnings Per Share** | **$1.74** | **$2.17** | **$1.95** |
| x AmTrust Historical Earnings Multiple[2] | 8.5x | 11.0x | 9.9x |
| **= Equity Value Per Share** | **$14.77** | **$23.89** | **$19.33** |
| or | | | |
| x Peer Historical Earnings Multiple[2] | 16.0x | 20.0x | 18.2x |
| **= Equity Value Per Share** | **$27.80** | **$43.44** | **$35.62** |

"Our overall financial objective is to produce a return on equity of 12.0%-15.0% over the long-term."

- *Q1 2018 10Q*

(1) Per Deutsche Banks Fairness Opinion Special Committee Case Projections.
(2) AmTrust and Peer earnings multiple ranges based on 3, 5 and 10 year historical multiples. Data from Bloomberg.

369.   Moreover, Icahn Capital showed (building on Deutsche Bank's own analysis of return on equity compared with price/book value per share) that AmTrust should trade at 1.8x-2.2x book value (implying a price of $26.06 to $31.86 per share) based on the March 31, 2018 book value of $14.48 per share.   Icahn Capital illustrated this through a graph based on Deutsche Bank's own graph in its February

-158-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

28, 2018 presentation to the Special Committee, modified to reflect management's

statements about projected return on equity:



370.  Icahn Capital also pointed out certain of the serious errors in the

Deutsche Bank Fairness Opinion relied on by the Special Committee, which in turn

improperly lowered Deutsche Bank's valuation of the Company.  For example,

Deutsche Bank "uses a flawed concept where they look at the *one* and *five year*

discount of AmTrust's Price to Earnings multiple vs. its peer group," which

Deutsche Bank then applies "to the peers['] *current* trading multiple to derive a per

share value for AmTrust."  This method is fatally flawed, however, because (1) "five

years (and certainly one year) is not long enough to cover the entire insurance cycle,"

and (2) 2017 was a disastrous and admittedly transitional year for the company,"

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

meaning that its one-year and five-year P/E multiples are unusually low compared to peers and not representative of the true value and prospects of the Company.

371.   In sum, Icahn Capital emphasized that it was "strongly against the transaction at the rock bottom price of $13.50 per share."

372.   Days after Icahn announced his opposition to the deal, Plaintiff Arca—which owned 2.4% of the Company's outstanding shares—publicly expressed its agreement with Icahn that the initial Transaction dramatically undervalued the Company in a press release, which read, in relevant part:

> PRAGUE, May 21, 2018 /PRNewswire/ -- Arca Capital, one of the largest shareholders of AmTrust Financial Services, Inc., plans to work with Carl Icahn and other minority shareholders in opposing the proposed privatization transaction.
>
> *            *            *
>
> Arca Capital has long held the view that **AmTrust Financial Services is a fundamentally strong business and has questioned the justification for its decline of over 50% since January 2017**. During that 15 month period, the stock has declined from over $27 per share to under $13 per share amidst no significant changes to the business. While ordinary shareholders have lost retirement and college funds, **Barry Zyskind and his in-laws are now trying to privatize the firm at what Arca believes is an absurdly low valuation**.
>
> Arca Capital, which owns approximately 2.4% of outstanding shares of AmTrust Financial, has led an advocacy campaign since March of 2018, when the privatization plan was announced, on behalf of ordinary investors to oppose the transaction. The campaign has involved creating an organization, ProtectAmTrustInvestors.org, meeting with relevant influencers, advertising, and even conducting demonstrations of angry shareholders and allies outside of AmTrust Headquarters. The

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

purpose of this campaign has always been to build a strong coalition to oppose privatization. Arca is continuing to meet with other minority shareholders to bolster this coalition. Arca has led the way in demanding transparency and reform at AmTrust through its numerous demands for documents from management to assess if the decline in share price may have been due to purposeful manipulations pushed by Barry Zyskind.

"*AmTrust Financial is a fundamentally strong company but actions by Mr. Zyskind and his allies have undermined it. Whether or not these actions were purposeful, the result was a significant stock devaluation that hurt ordinary investors but allowed the prospect of a cheap sale to the very same Barry Zyskind. At very minimum, AmTrust management took advantage of the uncertainty in the company's situation and the unfavourable market conditions to attempt to take AmTrust private on the cheap*," said Pavol Krúpa, Chairman of Arca Capital.

373.    Several days later, Plaintiff Arca urged its fellow stockholders to reject the Transaction and reiterated that "AmTrust is a fundamentally strong company that we believe is on the cusp of a major rebound in share price."

374.    On May 25, 2018, ISS issued its greatly anticipated report on the Merger, which criticized the Special Committee's "less-than-robust sale process," and which concluded that "a standalone scenario seems to be a preferable alternative to the currently proposed transaction" and, accordingly, "a vote AGAINST the merger is warranted." ISS suggested a valuation range between *$14.35 and $20.82* per share.

375.    Among many other things, ISS questioned the Special Committee's independence, observing that its leader, Defendant DeCarlo, "has served since 2006

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

as an AmTrust director and since 2010 as a director of [NGHC], an insurance company where Zyskind has been a director since 2013 and whose CEO is Barry Karfunkel, [Barry] Zyskind's brother-in-law." ISS also noted that "[a]nother concerning item is the long gap between when Stone Point approached Chairman/CEO Barry Zyskind with its offer to jointly bid for the company and when Zyskind informed directors." All told, "[t]he board appears not to have prepared for the possibility that its management would be involved in purchasing the company" and that "[o]ne result of that lack of preparation was that after the special committee was formed, it did not formally engage a financial advisor for three weeks, during which the buyer group made its initial offer for the company."

376. ISS also took issue with the Proxy's suggestion that AmTrust's growth was slowing down:

> However, the publicly available information paints a less dire picture of the company's prospects. It's important to recall that the board did not conclude that near-term prospects appeared dim and thus the best solution was to sell the company; its decision to begin the sale process was in response to an inquiry from a potential buyer after AmTrust's stock had fallen sharply. The buyer group eventually included the company's CEO, who would appear to know the company as well as anyone; if he is willing to buy at this price, does that not imply that the company's challenges are not so severe?

377. Accordingly, and consistent with analyst observations—as well as Zyskind's own acknowledgment that AmTrust's stock price was "not indicative" of the Company's "fair value"—it was clear that the Karfunkel-Zyskind Family and

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Stone Point took advantage of the 2017 market-overreaction, and would acquire AmTrust at a considerable discount, at the expense of AmTrust's minority stockholders.

378.   Even after Icahn's involvement and intense opposition to the Merger, there is no indication that the Special Committee reconsidered its decision to recommend the Merger Agreement.   Indeed, the Proxy notes that in the week following ISS's May 25, 2018 recommendation against the Merger, the Special Committee "met with representatives of the Company's largest stockholders [not including Arca] to solicit their support for the merger and also met with representatives of the proxy advisory firms to seek such firms' endorsement of the merger."

## B.    THE SPECIAL COMMITTEE FAILED TO ADEQUATELY VALUE THE DERIVATIVE CLAIMS

### 1.    The Special Committee Made No Good Faith Valuation of the Cambridge Derivative Claims

379.   On January 18, 2018, eight days after the Company publicly disclosed the potential Transaction, counsel to Cambridge sent a letter to Willkie Farr requesting that the Special Committee ensure that AmTrust's shareholders receive appropriate value for the Cambridge Derivative Claims in connection with any going-private transaction (the "Cambridge Letter"). The Cambridge Letter advised

-163-
THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

that Cambridge's experts valued the Cambridge Derivative Claims in excess of $300 million.

380.    The Special Committee, however, failed to negotiate for or receive appropriate value for the Cambridge Derivative Claims or the Accounting Derivative Claims as part of the Transaction consideration. Indeed, the Special Committee wholly failed to conduct any meaningful analysis about the value of such claims as they were required to do as fiduciaries. Rather, the 220 Documents evidence only vague discussions at a few Special Committee meetings about the Derivative Claims.

381.    For example, according to the meeting minutes for a telephonic Special Committee meeting held on January 24, 2018, Willkie Farr merely "addressed" the Cambridge Letter and the meeting minutes provide no further information about the substance of this address.

382.    The Proxy then states that on February 1, 2018, the Special Committee purportedly received an update from "the Special Committee's Delaware counsel, [RLF]" concerning "the various pre-existing shareholder lawsuits involving the Company, including the Cambridge Derivative Action, and counsel's analysis concerning the valuation of certain shareholder derivative claims asserted on the Company's behalf."  Proxy at 29.  The Special Committee minutes do not, however, reflect that any such an update ever took place and RLF is not even listed as an attendee at any of the three Special Committee meetings held that day. While there

-164-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

was an "update" about derivative claims at the 2:15 p.m. Special Committee meeting, it was given by Willkie Farr and the meeting minutes merely state that it concerned "an update regarding the status of the Company's pending federal and state litigation proceedings and the investigation of the Company by the [SEC]."

383.   On February 15, 2018, the Special Committee held a telephonic meeting at which Willkie Farr addressed the Cambridge Derivative Claims, among other things. The meeting minutes reflect that at the end of Willkie Farr's update, DeCarlo informed the Special Committee that he was recusing himself "from all discussions and decisions made by the Special Committee in respect of the Cambridge Litigation" as a result of his "involvement" in that litigation. DeCarlo's admission of his inability to disinterestedly and independently consider the Cambridge Derivative Claims (after having participated in two prior Special Committee meetings where derivative claims were mentioned), is equally applicable to the other members of the Special Committee who are also defendants in the Derivative Actions who never recused themselves.

384.   On February 20, 2018, the same day that the Special Committee received a draft merger agreement from the Karfunkel-Zyskind Family and Stone Point, counsel for Cambridge finally received a response to the January 18, 2018 Cambridge Letter from Willkie Farr, who asked to set up a call. The next day, attorneys from Willkie Farr and counsel for Cambridge held a conference call, but

-165-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

very early in the call it became clear that Willkie Farr had not taken even the most basic steps to assess the value of the claims asserted in the Cambridge Derivative Action. In fact, neither Willkie Farr nor RLF had signed-on to the existing confidentiality and protective order in the Cambridge Derivative Action as was necessary in order for them to review the actual litigation record. Neither firm did so until February 22, 2018, at Cambridge's counsel's request.

385.   Cambridge's counsel also asked Willkie Farr on the February 21, 2018 call about the timing of the Special Committee's process, and Willkie Farr responded that the committee "was working through the various issues with its advisors." Later developments reveal the lack of candor in that representation, as Willkie Farr had to know at the time that negotiations were in the very final stages and that the Transaction—which was publicly announced on March 1, 2018—was imminent.

386.   As the Special Committee was racing to finalize the Take-Private Merger Agreement on February 27, 2018, the Proxy claims that the Special Committee met with "representatives of Willkie Farr and RLF to discuss their legal advisors' review and analysis concerning the valuation of the claims asserted in the Cambridge Derivative Action, which included review of the litigation record, mediation submissions and other relevant documents as well as discussions with plaintiff's and defendants' counsel in the Cambridge Derivative Action." Proxy at 34. The Special Committee meeting minutes, however, reflect otherwise.

-166-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

387.   First, RLF is not listed as an attendee at the February 27, 2018 telephonic Special Committee meeting. In fact, contrary to the Proxy, the 220 Documents do not evidence that the Special Committee ever met with RLF. Second, the meeting minutes merely state that a representative from Willkie Farr "discussed the current status of the [Cambridge Derivative Action], the associated claims and defenses as well as potential outcomes, including the potential range of settlement."

388.   On the final day when the Special Committee was finalizing the terms of the Take-Private Merger Agreement, a February 28, 2018 Deutsche Bank presentation vaguely made reference to a "contingent litigation asset (based on upper end of Willkie [Farr] estimate)" worth between $15 million and $25 million. This purported value lacks any reasonable basis and the Special Committee did not demand, negotiate for or receive even remotely sufficient value for the Cambridge Derivative Claims or any other Company asset, such as the Accounting Derivative Claims, as part of the Transaction consideration.  In sum, the eleventh hour mention of the Cambridge Derivative Claims at a Special Committee meeting and no substantial discussion or evaluation of the value of these claims or the Accounting Derivative Claims does not comport with the fiduciary duties of the Special Committee which required them to "'value and get full consideration for all of the corporation's material assets,' including litigation assets." *In re Primedia, Inc.*

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*S'holders Litig.*, 67 A. 3d 455, (Del. Ch. 2013) (quoting *In re Massey Energy Co.*,

C.A. No. 5430-VCS, 2011 WL 2176479, at *3 (Del. Ch. May 31, 2011)).

### 2.    The Special Committee Did Not Value the Accounting Derivative Claims at All

389.    While the process surrounding the sham evaluation of the Cambridge

Derivative Action shows that it was not undertaken in good faith, the situation

regarding the Accounting Derivative Action is worse still.  The Board and Special

Committee did not value the Accounting Derivative Claims *at all*.  The documents

Lead Plaintiffs obtained pursuant to Section 220 reveal no discussion whatsoever of

the recovery the Company could obtain from the Accounting Derivative Action.

This failure is due to the self-interest of each of the Special Committee members.

Each is a defendant in the Accounting Derivative Action and each would stand to

gain if they could successfully cut off plaintiffs' standing to pursue the Accounting

Derivative Claims through the Transaction.

*    *    *

390.   As shown by the many deficiencies in the process and various

disclosures in the Proxy, the Special Committee viewed its mandate as an extremely

narrow one—to justify the MBO Group's proposed going-private deal—and never

seriously considered any alternative option, nor did it proactively take steps to

expand its mandate to include a market check or to obtain authorization to solicit

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

other proposals, despite the fact that Zyskind had informed the Board that he had

been contacted by several parties concerning a going-private transaction.  Indeed, in

the Proxy, the Company disclosed that the Special Committee consciously hemmed

itself in to its limited view of its responsibilities, constraining itself in advance rather

than seeking to defend the interests of minority public stockholders.

391.    In considering the MBO Group's initial bid, "[t]he Special Committee

discussed the limited potential alternatives available to the Company given that the

Karfunkel-Zyskind Family had indicated … that it was not interested in selling the

shares of common stock it held or controlled to a third party[.]"  Proxy at 30.  This

is not a legitimate factor for consideration (or, at a minimum, should not have been

the predominant factor that the Special Committee made it), because the Special

Committee was duty-bound, in the Court of Chancery's language from *Southern*

*Peru*, to "aggressively test[] the assumption that the [Transaction] was a good idea

in the first place."  *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d

761, 801 (Del. Ch. 2011), aff'd sub nom. *Americas Mining Corp. v. Theriault*, 51

A.3d 1213 (Del. 2012).

392.    The Special Committee was not empowered to say "no"

unconditionally.  It was there to bless a foregone conclusion, as demonstrated by its

own conduct in, inter alia, negotiating against itself, continually revising financial

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

projections downward, and giving away valuable benefits to the MBO Group for nothing.

393.   These deficiencies in process are all the more glaring in that the Take Private Special Committee—3/4 of which comprise the members of the Audit Committee (DeCarlo, Fisch, and Gulkowitz)—never considered the Company's November 2017 Form 10-Q representation that the then-current trading price ($13.46) undervalues the Company and reflects a short-term market overreaction to an earnings miss or the other statements by Zyskind and other management touting the Company's prospects.   According to the Audit Committee Charter, that committee was required to discuss that 10-Q with Company management.   Audit Committee Charter at 2.   The lack of any explanation or attempted harmonization of the Special Committee's March 1, 2018 endorsement of a $13.50 per share deal price, in light of the approval of a November 2017 statement forcefully arguing that a $13.46 share price undervalues the Company, speaks volumes about the fairness of the Transaction and the process deficiencies complained of herein.

### 3.    Defendants Are Forced to Improve the Terms to Buy Stockholder Support, but Still Fail to Provide an Entirely Fair Price

394.   Even after June 3, 2018, the day the majority of minority stockholders rejected the $13.50 per share offer, the Special Committee failed to negotiate at all for a better price from the Acquiring Group.   In fact, there is no suggestion whatsover

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

in the Proxy that the Special Committee even attempted to negotiate against the Acquiring Group for an improved offer.  Instead, negotiations (which lasted less than one day)[36] were solely between the Acquiring Group and Icahn.  The failure to meaningfully participate in negotiations for a better offer (despite the tremendous leverage obtained by minority stockholders as a result of the June 3, 2018 vote adjournment) constituted, at the very least, an abdication the Special Committee's responsibilities to AmTrust's public shareholders and a violation of its duty of care.

395.  Despite Icahn's success in obtaining a $1.25 price increase for AmTrust's minority stockholders (something the Special Committee failed to even attempt to accomplish) it must be noted that Icahn was merely a large minority stockholder, who acted for his own interests and who, unlike the Special Committee members, owed no fiduciary duties to other stockholders.  Minority stockholders should not have to rely on a well-resourced activist investor to advocate indirectly for their interests.

396.  On June 7, 2018, the Company announced that it had entered into an amendment to the Merger Agreement, whereby the Acquiring Group increased its

---

[36] According to the Proxy, on June 4, 2018, "Mr. Icahn advised [Zyskind] that he would support the merger if the merger consideration was increased to $14.75, an increase of $1.25 per share" and by the evening, Zyskind informed Icahn that the Acquiring Group was "prepared to increase the merger consideration to $14.75 per share subject to entering into a satisfactory Support Agreement with the Icahn Group."

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

offer from $13.50 to $14.75 per share. In connection with the Amended Merger Agreement, Defendants entered into a settlement with Icahn, whereby Icahn would agree to support the Merger, voluntarily dismiss his breach of fiduciary duty action with prejudice, and forego any appraisal rights.

397. One stockholder that was not satisfied, however, was Plaintiff Arca, which still maintained the offer price was far below AmTrust's true value (which Arca believed to be $22 per share). Pavol Krúpa ("Krúpa"), chairman of Arca, told Reuters after the announcement of the Amended Merger Agreement that "[Arca is] still opposed to the $14.75 [per share] deal value – we think this still undervalues the company and it's still not enough." Krúpa went on to clarify that "[t]he increased offer is just a cosmetic change to sway some shareholder's view."

398. The Arca chairman also noted that based on Arca's valuations, the original $13.50 transaction price was equivalent to a 0.93x Price to Book Value Ratio (P/BV), "but AmTrust should be trading at 1.8-2.2x P/BV which represents a share price of $26 to $31. This argument is supported by the Deutsche Bank initial analysis. In light of these figures, we feel like $22 per share is fair value."

399. The increased offer price, however, caused ISS to modify its recommendation, and now advise a vote in favor of the Merger, given that the $14.75 Merger Consideration was (barely) between its original valuation range of $14.35 and $20.82 per share. ISS's updated analysis was far from a ringing endorsement of

-172-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the Merger's fairness.  Specifically, ISS noted that "[t]he revised offer does not fully alleviate concerns related to the company's sales process highlighted in our original report. This may contribute to the skepticism among certain shareholders regarding the value that they are scheduled to receive, including Arca Capital, which continues to oppose the transaction." ISS also observed that AmTrust's June 11, 2018 filing submitted in opposition to Icahn's proxy campaign had walked back management's previous representation that it expected to produce a return on equity of 12.0%-15.0% over the long-term.

400.    On June 21, 2018, the Company reconvened the special meeting of its stockholders to vote on the adoption of the Amended Merger Agreement.[37]  While the Company had amended the Take-Private Merger Agreement between the adjournment of the special meeting and the reconvening, they did not set a new record date.  The proposal to adopt the Merger Agreement purportedly was approved by the requisite votes of all AmTrust stockholders (79.8%) and of the unaffiliated stockholders (67.4%).

401.    On July 3, 2018, A.M. Best removed AmTrust from "under review with negative implications" and downgraded the financial strength of AmTrust's

---

[37] The Special Meeting was previously adjourned from its originally scheduled date of June 4, 2018 after AmTrust failed to garner adequate stockholder support for the $13.50 deal price.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

insurance companies from an "A" to "A-."  Notwithstanding the downgrade, A.M. Best noted that "[t]he rating actions reflect AmTrust's balance sheet strength, which A.M. Best categorizes as very strong[.]"  A.M. Best also commented that AmTrust's risk-adjusted capitalization improved in the first quarter of 2018 due to "a reduction in investment risk following the sale of certain private and related party investments that carried substantial risk charges," and that AmTrust possesses "relatively modest exposure to natural catastrophe and terrorism events, which is reflected in favorable performance on stress tests[.]"  Thus, the ratings downgrade, the possibility of which management repeatedly used to strong-arm the Special Committee and public stockholders into accepting an inadequate merger offer, was not nearly as consequential as management had described.

402.   A.M. Best also noted that "[t]he recently approved plan under which AFSI will be privatized has a neutral impact on the rating . . . ." [38]

403.   Moreover, as reflected in the Amended Merger Agreement, the Acquiring Group had negotiated for the right to terminate the Merger in the event of a ratings downgrade.  But in the July 3, 2018 press release, the Acquiring Group stated that it would not be asserting that right:

---

[38] AmTrust stock price did not move based on this news, likely because the $14.75 per share Merger Agreement had already been approved by stockholders and was a *fait accompli*.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Barry Zyskind, Chairman and CEO of AmTrust, said, "With the completion of A.M. Best's review and the issuance of an "A-" (Excellent) rating, with a Stable outlook, we can move forward with certainty and confidence in AmTrust's ability to support its business globally and capitalize on opportunities for the long term. *On behalf of the Karfunkel-Zyskind Family and our partner Stone Point Capital, we remain fully committed to our proposed transaction to take AmTrust private and are looking forward to continuing to serve our clients, agents, partners and policyholders."*

404.    In other words, after having secured approval of the Merger, the Acquiring Group acknowledged that a ratings downgrade was a distraction, and not relevant to AmTrust's fair value and the overall financial merits of the Merger.

405.    On July 23, 2018, Evergreen Parent, K-Z Evergreen, and Trident Pine entered into agreements with Enstar Group Limited ("Enstar") and MDP pursuant to which MDP and Enstar would partially fund the Transaction by contributing $200 million and $150 million, respectively, to Evergreen Parent in exchange for equity interests. Enstar is an affiliate of Stone Point.

406.    On August 9, 2018, AmTrust filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2018, which was signed by Zyskind and Karkowsky and reviewed by the Audit Committee (*i.e.*, DeCarlo, Fisch and Gulkowitz). In stark contrast to Zyskind and Karkowsky's prior portrayal of a potential ratings downgrade as disastrous to AmTrust's business in connection with the Special Committee's consideration of the Transaction, the Form 10-Q essentially

-175-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

admitted that the downgrade had no material impact on the Company's business.

Indeed, the Form 10-Q states:

> On July 3, 2018, A.M. Best Company ("A.M. Best") removed our rating from under review with negative implications and assigned our insurance companies a financial strength rating of "A-" (Excellent) with a stable outlook.

> Although a ratings downgrade occurred, A.M. Best categorizes our balance sheet as very strong with a high-quality capital profile. In addition, our risk-adjusted capitalization, as measured by A.M. Best's Capital Adequacy Ratio (BCAR) strengthened materially through the first quarter of 2018. From a credit strength perspective, we are not aware of any significant implications to our business as a consequence of the downgrade, and do not believe it has materially impacted our access to the capital markets. We are not aware of any significant loss of business or change in business mix related to this event. The downgrade had no impact on any of our debt covenants or credit facilities, as we did not fall below any minimum credit rating requirements.

407. Accordingly, the Form 10-Q confirms that a potential ratings downgrade was nothing more than pretext designed to coerce the Special Committee into agreeing to the Transaction promptly on terms favorable to the Karfunkel-Zyskind Family and Stone Point.

408. The Transaction closed on November 29, 2018.

## VII.  THE STOCKHOLDER VOTE WAS COERCED

409. The Transaction was subject to the condition that "the holders of at least a majority of all outstanding shares of Common Stock" held by the public stockholders vote in favor of the Transaction (*i.e.*, a majority-of-the-minority voting

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

condition), but the Defendants manipulated the vote so as to render it coercive and meaningless.

410.   *First*, the Defendants manipulated the record date to determine who was entitled to vote on the Transaction to disenfranchise millions of shares held by those stockholders with a true economic interest in the outcome of the vote.

411.   The Defendants first filed the Preliminary Proxy concerning the Transaction on April 9, 2018.  The Preliminary Proxy had blanks inserted for the record date on the stockholder vote and the date of the vote itself, thus falsely implying they had not yet been set.  However, the final proxy statement that was filed on May 4, 2018 (previously defined as the "Proxy"), disclosed a back-dated record date of April 5, 2018 and that the vote would be held on June 4, 2018.  Since companies are prohibited from retroactively setting a record date, the Board necessarily must have set the date prior to the filing of the Preliminary Proxy and consciously and deliberately decided not to disclose that fact to stockholders.

412.   By failing to disclose that it had already set a record date, the Board disenfranchised the holders of tens of millions of shares bought between April 5 and May 4, unfairly tilting the scales in favor of approval.  As a result of its strategically timed, late disclosure of the record date, many of the "votes" cast on the Transaction were cast by holders who no longer had a financial interest in the outcome of the vote and were unlikely to scrutinize its merits.  The Board also maximized the

-177-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

number of empty votes that could be cast at the stockholder meeting by scheduling it sixty days after the record date, the maximum time permitted by Delaware law.

413.   For example, funds affiliated with Carl Icahn, who initially announced his strong opposition to the Transaction at the initial price, beneficially owned approximately 18.4 million AmTrust shares, or 9.3% of the Company's total outstanding shares, all of which were acquired after the belatedly disclosed record date.  Icahn's funds acquired beneficial ownership of nearly 8.6 million of these shares between the time the Company set and disclosed the record date because he thought the Transaction undervalued AmTrust and intended to vote against it.  In total, nearly 24 million shares were traded between the record date and its disclosure on May 4.[39]  As a result, despite his strong and vocal opposition to the Transaction, Icahn and other stockholders who may have opposed the deal lacked the ability to vote their stakes to defeat the Transaction directly.

414.   Thus, the Control Group ensured that the public stockholder vote on the Transaction was heavily tilted in its favor, thus depriving numerous stockholders of

---

[39] The 24 million shares traded number is based on total daily trading volumes published by *Yahoo! Finance* and may include shares that have been double counted if they traded hands multiple times.  Approximately 88 million shares were held by the public, half plus one of which, or approximately 44 million, must have been voted in support of the Transaction to satisfy the closing conditions.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the ability to vote with their wallets as Delaware law typically encourages.  It is extremely unusual for a company to manipulate a vote in this manner.

415.  For example, ISS reviewed a sample of thirty-eight stockholder meetings held within the last two years by S&P 1500 companies to seek stockholder approval of a merger.  While a large number of these entities filed a preliminary proxy, not a single one set a record date preceding that preliminary proxy.  The Control Group has no justification, let alone a compelling one, for its unique manipulation of the vote in this manner.

416.  *Second*, stockholders were more likely to vote to approve the Transaction because they were at an informational disadvantage to the Control Group.  Insurance companies, like AmTrust, primarily receive income through insurance premiums and investment returns.  The value of insurance companies is dependent on estimates of how much they will have to pay out to resolve claims associated with those premiums.  While the amount of premiums is known and disclosed, insurance companies only disclose summary information about the claims they receive.  Moreover, the quality of an insurance company's reinsurance is unknown to public stockholders.  This informational vacuum is heightened here since AmTrust utilized companies related to the Control Group for half of its reinsurance.  These critical pieces of information only known to corporate insiders, like the Control Group, are necessary to determine whether established loss reserves

-179-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and reinsurance will cover incoming claims. Thus, the Control Group took advantage of the uncertainty in the market resulting from AmTrust's accounting issues to exploit their informational advantage.

417.  *Third*, the Board prematurely scheduled the stockholder vote to be held before the expected bounce back in the Company's performance. The Transaction required numerous regulatory approvals before it could close, and ultimately the Closing did not occur until November 29, 2018. This had the effect of causing more stockholders to vote in favor of the Transaction than would have if the Company waited to hold the vote until its financial results began to improve.

418.  Finally, stockholders were coerced by the Control Group's pervasive and long-running misconduct. Stockholders were artificially more likely to vote to approve the Transaction not on its merits, but rather to seize whatever premium they could and escape what had proven to be a Control Group that prioritized its own interests, as explained above, over its fiduciary duties.

## VIII.  DEFENDANTS HAVE FAILED TO DISCLOSE ALL MATERIAL INFORMATION

419.  In addition to being coercive, the stockholder vote on the Transaction was not fully informed, as the Defendants have failed to accurately disclose all material information in the Proxy.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

420.   For example, the Proxy failed to disclose that in its 10-Q for the third quarter of 2017, which was signed by Defendant Zyskind, the Company explained that it conducted an analysis to determine whether it had to write down its goodwill and stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, *we believe the share price decline in the nine months of 2017 is relatively short-term in nature and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, and is not indicative of an actual decline in our fair value or our reporting units' fair value*. As a result, we have concluded that goodwill is not impaired as of September 30, 2017. We will continue to monitor the share price and underlying fundamentals of each of our reporting units during the remainder of 2017.

421.   In other words, the Company declared that, as of September 30, 2017, mere weeks before the Control Group began exploring taking the Company private, its trading price did not reflect its fundamental fair value because the market overreacted to its accounting issues. Additionally, on an investor conference call to discuss the Q3 2017 results, the Company's management touted that the Company would be able to generate its targeted 12-15% annual operating return on equity on its adjusted book value.

422.   At no time since the filing of that 10-Q on November 9, 2017, did the Company reverse course and disclose that it had taken a goodwill impairment or that it would not be able to generate its target returns, thus reflecting that AmTrust's

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

management and Board had not changed its view.  Rather, the Company's 10-Q for the first quarter of 2018, which it filed on May 10, 2018 (after the Proxy), reaffirmed that AmTrust's "overall financial objective is to produce a return on equity of 12.0%-15.0% over the long term."[40]  This is irreconcilable with the Proxy.

423.    On the last trading day prior to September 30, 2017, AmTrust's share price closed at $13.46, a mere four cents below the initial deal price.  At no point does the Proxy disclose that the Company's CEO, who is also the leader of the Control Group attempting to take the Company private, signed a 10-Q stating that he believes a price of $13.46 per share undervalues the Company.[41]  Nor does it disclose that the Company's management expected AmTrust to generate annual returns of 12-15%, which would justify a deal price well over $20 per share.  In fact, the projections that are disclosed in the Proxy reflect materially lower returns without disclosing any explanation for such a large discrepancy.

---

[40] The Company excised such disclosure from its later 10-Q filings, stating instead that "We have historically evaluated our operations by monitoring key measures of growth and profitability, including combined ratio and return on equity. However, in light of the Merger, management is re-evaluating these key measures and respective operation targets with the partners of Evergreen Parent."  AmTrust Form 10-Q filed August 9, 2018 at 40; AmTrust Form 10-Q filed November 9, 2018 at 42.

[41] Nor is the 10-Q among the specific SEC filings incorporated by reference in the Proxy.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

424.   This is material information to any stockholder considering whether to vote to approve a sale of the Company to corporate insiders and must be disclosed. Failing to do so rendered the Proxy materially false and/or misleading.[42]

425.   In addition to failing to disclose that the Company and its insiders believe that what is effectively the deal price undervalues the Company, the Proxy also failed to disclose or misrepresented a litany of other material information.

• The Proxy failed to disclose the basis for management's projected share repurchases. As discussed earlier, the Special Committee and Deutsche Bank failed to consider share repurchases reflected in the Case 1 projections, which had the effect of significantly manipulating downward the dividend discount model.

• As discussed herein, the Proxy falsely assured investors that AmTrust would continue to be bound by SEC regulations by virtue of the fact that the preferred stockholders would remain listed on the New York Stock Exchange. Given that a chief concern for those voting common stockholders who were also preferred stockholders was that the Karfunkel-Zyskind Family was orchestrating the Merger in order to evade public scrutiny, the Proxy's representation that preferred stock would remain listed worked to dispel these concerns. Those assurances have now been proven to be false. Also, many common stockholders also owned preferred stock, and likely voted with the interests of their preferred stock holdings in mind. Indeed, publicly available information available from Bloomberg demonstrates that several of the largest holders of AmTrust common stock also had significant holdings of preferred stock. Defendants did not state their true intentions regarding the delisting as they feared alienating those large and

---

[42] Notably, the Proxy does disclose that the day prior to the release of this 10-Q and the same day as the above-referenced investor conference call, the Board held a meeting to discuss the release of the financial results for the third quarter of 2017, where Zyskind raised for the first time the possibility of a going-private transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

influential shareholders of common stock who also owned large holdings of preferred stock.

- The Proxy stated that the Merger was fair, given "the risk of a potential ratings downgrade by A.M. Best below 'A', especially in light of the fact that such ratings [are] 'under review with negative implications.'" As noted earlier, the Acquiring Group's conduct once a downgrade was announced and after the Merger was already approved suggests that this "risk" was illusory.

- The Proxy failed to disclose the true pervasive extent of the conflicts of interest faced by members of the Special Committee as discussed herein.

- The Proxy disclosed that one purported reason for forcing a downward revision of the Company's projections from its Ordinary Course Projections was the effect of the Tax Cuts and Jobs Acts of 2017 (the "Tax Bill"). However, the Tax Bill was widely regarded as providing an enormous benefit to corporations as it reduced the corporate tax rate from 35% to 21%. The Proxy did not explain why or how the Tax Bill would have had a negative impact on AmTrust.

- The Proxy disclosed that Deutsche Bank used the present value of an estimated range of $15-$25 million for a "contingent litigation asset," but the Proxy failed to explain this term or this valuation.[43] It also failed to disclose any information regarding the value the Company placed on the Accounting Derivative Action.

---

[43] AmTrust issued supplemental disclosures on May 24, 2018 stating that (supplemental disclosure in bold):

> On February 24, 2018, representatives of Deutsche Bank, Willkie Farr and Richards Layton met to discuss the review and analysis undertaken by Willkie Farr and Richards Layton concerning the valuation of claims asserted in the Cambridge Derivative Action, **which were estimated to be between $15 million and $25 million.**

However, Lead Plaintiffs did not receive any meeting minutes or other documents in the 220 Production evidencing this meeting or this valuation. Furthermore, this disclosure does not state when this estimate was made, nor by whom.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- Charles Davis, the CEO of Stone Point, is a member of Deutsche Bank's Advisory Board.  However, the Proxy failed to disclose that Celeste Guth, the Co-Head of Deutsche Bank's Global Financial Institutions Group and the lead banker on the Transaction, worked directly for Davis at Goldman Sachs from 1986-2015.

- The Proxy disclosed that BOA, which was engaged by the Company in connection with the Fee Business Sale in November 2017 and the Transaction, had discussions with the Control Group about also providing debt financing in connection with the Transaction.  However, the Proxy failed to disclose any details on the nature of such discussions.  Additionally, the Proxy disclosed that the senior member of the BOA team advising AmTrust in connection with the Transaction "has had an ongoing relationship with Stone Point and its senior principals over many years," but did not disclose any details regarding that ongoing relationship.  Moreover, the Proxy failed to disclose that BOA assisted management in preparing the Ordinary Course Projections.  (AFSI_220FDP_0679).

- The Proxy also fails to note that the Special Committee had sought to retain BOA as its financial advisor, even though it was AmTrust management's advisor.   This fact demonstrates the Special Committee's lack of independence from AmTrust management, which is material, given that stockholders are relying on the recommendation of the Special Committee when voting on whether to approve the Merger.

- The Proxy failed to disclose the details of any employment related negotiations that occurred between Stone Point and its affiliates and the Company's senior management, including Zyskind.

- The Proxy claimed that at a November 16, 2017 Board meeting, "the Board determined to permit Stone Point to conduct due diligence in connection with a potential going-private transaction."   However, nothing in that meeting's minutes indicates the Board ever gave such authorization.  (AFSI_220FDP_0694).

- The Proxy disclosed that the Company held discussions with five strategic and financial sponsor parties in November and December 2017 related to a potential going-private transaction, that some parties

-185-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

made inquiries about a potential going private transaction, and that some of those parties entered into confidentiality and standstill agreements. However, the Proxy failed to disclose any details regarding those discussions, whether any parties indicated interest in exploring a transaction, and whether any party was able to publicly disclose interest in submitting a superior offer. The Proxy also did not disclose that on December 21, 2017, the Board was advised that "senior management had been approached by a handful of interested parties," and that on December 27, 2017, Zyskind advised the Board that he had been contacted by "other parties" aside from Stone Point.

- The Proxy disclosed that on January 16, 2018, the Special Committee authorized Stone Point and the Control Group to engage in discussions with a potential co-investor in the Transaction, but it failed to disclose that the co-investor in question was MDP, the same entity to which the Company sold a majority stake in its fee business concurrently with Zyskind declaring his intent to explore a going private transaction. (AFSI_220FDP_0886).

- The Proxy is littered with vague, generic references, such as to "representatives of the Karfunkel-Zyskind Family" or "Company management," but frequently does not identify these individuals. Knowing the identities of these individuals was material to the minority stockholders in deciding how to vote on the Transaction because of Zyskind's conflicting roles as Chairman and CEO of the Company, on the one hand, and as a member of the Karfunkel-Zyskind Family and/or MBO Group, on the other.

- The Proxy disclosed that "representatives of Stone Point and the Karfunkel-Zyskind Family met with the ratings agency" on January 9, 2018. The Proxy also references "the Company's discussions with the ratings agency" in late February 2018, but fails to disclose that Stone Point participated in these meeting. Since one of the purported reasons for the Special Committee's support of the Transaction was "the risk of a potential ratings downgrade," minority stockholders deciding how to vote on the deal would have considered information regarding the substance of these meetings—including the identities of each meeting's attendees—material.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- The Proxy disclosed that Defendant DeCarlo recused himself from Special Committee discussions concerning the Cambridge Derivative Action "[i]n light of the allegations against him as a defendant" therein. However, the Proxy does not discuss why Defendants Gulkowitz and Fisch determined not to recuse themselves from the same discussions as they are also named defendants in the Cambridge Derivative Action.

- The Proxy disclosed that the Special Committee and its advisors valued the Cambridge Derivative Claims at approximately $15 million to $25 million. The Proxy did not, however, disclose that Cambridge had asserted that the value of the claim was greater than $300 million. Nor did the Proxy provide any explanation or support for the dramatically lower valuation ascribed to the claim by the Special Committee and its advisors.

426. Furthermore, as noted extensively herein, there are material factual discrepancies between the Proxy and the internal documents produced by the Company in response to the 220 Demand.

427. The coercive nature of the vote and the omission of material information makes the Proxy false and/or misleading as stockholders were unable to make a fully informed decision regarding whether to approve the Transaction on its merits. As such, the Defendants cannot rely on the outcome of the stockholder vote to avoid entire fairness review of the Transaction.

## IX. TROUBLING POST-MERGER DEVELOPMENTS

428. Developments since the closing of the Merger have made clear that the Acquiring Group seeks to freeze out all remaining public stakeholders in AmTrust, and with it, any corresponding regulatory scrutiny.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

429.   As noted earlier, the Proxy stated that preferred shares of AmTrust would continue to be listed on the New York Stock Exchange and that "the reporting obligations with respect to such shares under the Exchange Act will therefor continue."  Those statements were repeated in subsequent quarterly reports filed in August 2018 and November 2018, which assured that preferred shares would "remain outstanding."

430.   Defendants made the same assurances to state regulators when seeking approval of the Merger.  As reported in *Barron's*, the group's application to the state insurance commissions represented that "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange postmerger."

431.   Moreover, on or about January 22, 2018, earlier in the merger process, and in connection with the Acquiring Group's initial merger offer, the Karfunkel-Zyskind Family filed Amendment Number 14 to their Schedule 13D, which assured that "it is the Group's current intention that, following completion of the proposed transaction, each series of the Issuer's preferred stock will continue to be listed on the New York Stock Exchange."  The Amendment appears to have been in response to inquiries raised by *Barron's* concerning the status of preferred stockholders under the Acquiring Group's January 9, 2018 Offer.

-188-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

432.   Notwithstanding these representations, on January 18, 2019, less than two months after the Merger closed, AmTrust announced that its Board (which contained all the same members pre-Merger, in addition to Karkowsky; Mark Serock, who joined the Board following the execution of the Merger Agreement; and two Stone Point executives) had approved "the delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange."

433.   The delisting became effective on or about February 7, 2019, "at which time AmTrust's SEC reporting obligations with respect to the [securities] will be suspended."

434.   The Board purportedly made this decision based on its "determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume."   The press release also identified "the Company's new ownership structure" since the Merger, and made a vague reference to the "resulting changes to its long-term strategy" as reasons for the delisting.   No explanation was given as to why these facts were only anticipated *after* approval for the Merger was already secured.

435.   The announcement's effect on the trading price of preferred shares (of which there were over $1 billion outstanding) was swift.   As *Barron's* reported, "The

-189-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

announcement of the delisting resulted in a 40% decrease in the trading price of the preferred stock and some of AmTrust's notes." *Barron's* also noted that the delisting was a "seeming reversal of promises that AmTrust managers made to the [SEC] and state insurance regulators." Bill Alpert, "Troubled Insurer AmTrust to Delist Preferred Stock," *Barron's*, Jan. 23, 2019.

436.   Investors were apoplectic.  For example, Jan Martinek, the principal of Central European Capital Partners and holder of preferred stock issued an open letter to Stone Point, challenging the delisting decision and stating that Stone Point was compromising its reputation by agreeing to the delisting decision, which enriched it and the Karfunkel-Zyskind Family at the expense of "retail" investors.  Martinek also submitted a letter to the SEC objecting to the delisting, and noting that he purchased preferred equity specifically in reliance on AmTrust's assurances that the shares would remain listed, and urging the SEC to commence an investigation.

437.   Other investors have expressed similar sentiments, and have contacted AmTrust directly to note their disapproval.

438.   Others have commenced litigation. For example, Mark Gottlieb, a holder of Series B and C Preferred Stock commenced suit against Defendants in this Court alleging breaches of fiduciary duty in connection with the delisting.  Gottlieb alleges that Defendants have approved the delisting

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

in order to pave the way for the Karfunkel-Zyskinds and Stone Point to become the only resort for would-be sellers of Preferred Stock at an extraordinarily depressed price, a depressed price that they caused. By taking out the Preferred at these depressed prices, the Karfunkel-Zyskinds will have effectively transferred the hundreds of millions of dollars of value they destroyed through the Delisting away from the Preferred Stock and into their own pockets.

439.   And it was not only investors who expressed outrage at this squeeze-out of the remaining public equity-holders.  Specifically, On February 4, 2019, Keefe, Bruyette & Woods, Inc. ("KBW"), an underwriter for AmTrust preferred securities and debt notes, sued AmTrust in New York State Supreme Court, asserting claims for breach of contract (among others) and alleging reputational harm in connection with AmTrust's delisting announcement.  KBW moved to preliminarily enjoin AmTrust from moving forward with the delisting and also contacted the SEC, urging it to postpone the effectiveness of the delisting.  As explained in its complaint:

> One of the selling features for the Depositary Shares was the fact that they were to be listed on the NYSE. A listing on a national securities exchange, such as the NYSE, triggers a company's reporting requirements under the Securities Exchange Act of 1934. The reporting requirements provide securities holders with continuous information material to their investment in the company including quarterly reports, annual reports, proxy solicitations and notice of unscheduled material events or corporate changes. Listing on the NYSE also provides securities holders with a liquid trading market.
>
> In the Underwriting Agreement for the Series F Depositary Shares dated September 20, 2016 (the "Underwriting Agreement"), AmTrust explicitly covenanted that it would keep the Depositary Shares listed on the NYSE. AmTrust gave the exact same covenant in the Underwriting

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Agreements for all of the Preferred Shares (series A-F) and the two issues of Subordinated Debt Notes.

440.   KBW alleges that "it is extremely important that investors have faith in [its] strategies and solutions" and that the delisting deprived the holders of the preferred securities of "material company information," and "remove[d] a liquid trading market for these securities."  As a result, "the delisting will significantly damage KBW's and its affiliate's customer relationships" and "significantly impair KBW's and its affiliate's reputation and goodwill."

441.   On February 6, 2019, a justice in New York State Supreme Court, New York County, denied KBW's request for a temporary restraining order to enjoin the delisting, stating that a resulting decrease in share price was a harm to be suffered by investors, not an underwriter like KBW.

442.   The following day, on February 7, 2019, AmTrust filed a Form 15 advising that it had terminated listing of the preferred stock.

## X.    CLASS ACTION ALLEGATIONS

443.   Lead Plaintiffs bring this action pursuant to Rule 23 of the Rules of the Court of Chancery, individually and on behalf of all other holders of AmTrust's common stock (except defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who

-192-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

are or will be threatened with injury arising from defendants' wrongful actions, as more fully described herein.

444.    This action is properly maintainable as a class action.

445.    The Class is so numerous that joinder of all members is impracticable. The Company has thousands of stockholders who are scattered throughout the United States.  As of the April 5, 2018 record date, there were 196,355,229 shares of AmTrust's common stock outstanding.

446.    There are questions of law and fact common to the Class including, *inter alia*, whether:

    a.    The Individual Defendants breached their fiduciary duties by agreeing to the Transaction;

    b.    The Individual Defendants acted in furtherance of their own self-interests to the detriment of the Class;

    c.    Stone Point and its affiliates aided and abetted the wrongful conduct alleged herein; and

    d.    Lead Plaintiffs and the other members of the Class have been injured by the wrongful conduct alleged herein and, if so, what is the proper remedy and/or measure of damages; and

    e.    Lead Plaintiffs and the other members of the Class have been damaged irreparably by Defendants' conduct.

447.    Lead Plaintiffs are committed to prosecuting the action and have retained competent counsel experienced in litigation of this nature.  Lead Plaintiffs' claims are typical of the claims of the other members of the Class, and Lead Plaintiffs

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

have the same interests as the other members of the Class. Lead Plaintiffs are adequate representatives of the Class.

448. Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class.

## XI.    COUNTS

### COUNT I
### BREACH OF FIDUCIARY DUTY
### AGAINST THE DIRECTOR DEFENDANTS

449. Lead Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

450. The Director Defendants, as AmTrust directors, owe the Class the fiduciary duties of due care, good faith, candor and loyalty. By virtue of their positions as directors of AmTrust, the Director Defendants had the power to influence and/or cause, and did influence and/or cause, the Company to engage in the practices complained of herein. Each Director Defendant was required to: (a) use their ability to manage AmTrust in a fair, just and equitable manner; (b) act in furtherance of the best interests of AmTrust and its stockholders and not their own; and (c) fully disclose the material circumstances, procedures, and terms of the Transaction so that stockholders can make a fully informed decision.

451. The Director Defendants breached their fiduciary duties by supporting and/or acquiescing to the Transaction that greatly undervalued AmTrust and

-194-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provided consideration to AmTrust's minority stockholders that was grossly unfair. The Director Defendants knowingly supported and/or acquiesced to the Transaction even though the transaction process was woefully deficient given that, among other things: (a) the Karfunkel-Zyskind Family were permitted to manipulate and control the transaction process, including the Company's financial projections and valuation process used by the Special Committee and its respective advisors; (b) the Special Committee was conflicted; and (c) the financial advisors retained by the Company and the Special Committee were conflicted.

452.    The Director Defendants also utterly failed to (a) ascribe appropriate value to the Derivative Claims and (b) insist that the Karfunkel-Zyskind Family compensate the minority stockholders for that value. Instead of conducting any meaningful investigation into the value of the lost corporate opportunities in the Tower Transaction and instead of hiring a financial advisor to assess such value, the Director Defendants unreasonably relied upon an uninformed valuation of a "contingent litigation asset" by a lawyer at a time when the deal price for the Transaction was virtually agreed upon.

453.    The Director Defendants failed to fulfill their fiduciary duties in connection with the inadequate and unfair Transaction, which resulted in an unfair price through an unfair process.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

454.   As a result of the AmTrust directors' breaches of fiduciary duty in agreeing to the Transaction, the Class has been harmed.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**AGAINST ZYSKIND AS AN OFFICER**

455.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

456.   Defendant Zyskind, in his capacity as an AmTrust officer, owed the public stockholders of AmTrust the fiduciary duties of loyalty, due care and good faith.  To fulfill these fiduciary duties, Defendant Zyskind is obligated to act in the best interests of AmTrust's public stockholders and not sacrifice those interests in favor of his own interests.

457.   In negotiating the unfair Transaction, Zyskind breached his fiduciary duties by placing his own interests ahead of those of AmTrust's public stockholders. Zyskind abused his position of trust by orchestrating a deal that guaranteed that AmTrust's insiders would take the Company private at an artificially low price rather than seeking the best transaction available for AmTrust's public stockholders.

458.   As a result of Zyskind's breaches of fiduciary duty, the Class has been harmed.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## AGAINST ZYSKIND, G. KARFUNKEL, AND L. KARFUNKEL

459.   Lead Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

460.   Zyskind, G. Karfunkel, and L. Karfunkel, as controlling stockholders of AmTrust, owed the Class the fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as controlling stockholders (in addition to being directors and/or officers) of AmTrust and their exercise of control and ownership over the business and corporate affairs of the Company, they at all relevant times had the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.

461.   AmTrust had an interest in acquiring Tower, as evidenced by the Company's overtures to Tower and its advisors, including but not limited to the offer to purchase Tower submitted by the Company in December 2013.

462.   An acquisition of Tower and/or its ongoing business lines, including both Tower's commercial and personal lines, was a business opportunity that AmTrust was financially able to undertake.

463.   Without first informing the AmTrust Board, the Karfunkel-Zyskind Family improperly and self-interestedly caused the Company to abandon its pursuit of Tower and instead initiated its own pursuit of Tower in a manner that diverted

-197-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

valuable business opportunities away from AmTrust and redirected them to two other Karfunkel-Zyskind Family-controlled entities, ACP and NGHC.

464.    In connection with the Tower Transaction, the Karfunkel-Zyskind Family's improper conduct included, among other things, (a) misappropriating due diligence conducted by AmTrust in connection with its exploration of a deal with Tower; (b) usurping a corporate opportunity from the Company through ACP and NGHC, including by siphoning the valuable Personal Lines businesses to NGHC; (c) simultaneously representing AmTrust, ACP, and NGHC in connection with the Tower Transaction; (d) shifting additional risk to AmTrust through the modifications to the Tower Transaction; (e) causing the Company to participate in a $250 million loan to ACP to facilitate its acquisition of Tower, and (f) demanding the Earn-Out. This conduct constitutes a breach of the Karfunkel-Zyskind Family's fiduciary duties owed to the Company and its stockholders.

465.    AmTrust has been and continues to be harmed by the Karfunkel-Zyskind Family's improper usurpation of the Company's corporate opportunity to acquire Tower and breaches of fiduciary duty in causing the Company to enter into related agreements unfair to the Company.

466.    The Company is entitled to restitution including disgorgement of any profits received by ACP or the Karfunkel-Zyskind Family as a result of the Tower Transaction.

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

467.   Cambridge informed the Karfunkel-Zyskind Family and the Special Committee's counsel that Cambridge's financial advisor valued the Cambridge Derivative Claims in excess of $300 million.

468.   Nevertheless, the Special Committee and its advisors valued a "contingent litigation asset" at between $15 million and $25 million.  The Special Committee apparently took no action to value the Accounting Derivative Action. While it is unclear what the "contingent litigation asset" refers to, to the extent it refers to the Cambridge Derivative Claims or Accounting Derivative Claims, singularly or collectively, such a valuation is wholly inadequate and uninformed.

469.   As detailed above, the minority stockholders of AmTrust received grossly inadequate compensation for the valuable derivative claim asset of AmTrust while the Karfunkel-Zyskind Family intended to receive the valuable benefit of extinguishing the Derivative Claims upon the consummation of the Transaction. It is inconceivable that the Karfunkel-Zyskind Family would choose to pursue the Derivative Claims on AmTrust's behalf now.

470.   Additionally, as detailed above, the Transaction is neither procedurally nor financially fair to AmTrust's minority stockholders. The Karfunkel-Zyskind Family manipulated and controlled the Transaction process, including the Company's financial projections and the valuation process used by the conflicted Special Committee. The Transaction also greatly undervalued AmTrust and

-199-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provided severely inadequate and unfair compensation to AmTrust's minority stockholders. The financial unfairness of the Transaction stems in part from the failure of the Karfunkel-Zyskind Family to fairly compensate AmTrust's minority stockholders for the valuable Derivative Claims.

471.    As a result of the Karfunkel-Zyskind Family's conduct in this regard, AmTrust's minority stockholders have suffered and will continue to suffer substantial harm.

472.    The Transaction was inadequate and unfair, reflecting an unfair price and an unfair process.

473.    Zyskind, G. Karfunkel, and L. Karfunkel failed to fulfill their fiduciary duties in connection with the unfair Transaction.

474.    As a result of the breaches of fiduciary duty by Zyskind, G. Karfunkel, and L. Karfunkel in connection with the Transaction, the Class has been harmed.

**COUNT IV**
**AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**
**AGAINST STONE POINT, TRIDENT PINE, AND THE TRIDENT FUNDS**

475.    Lead Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

476.    Stone Point, Trident Pine, and the Trident Funds knowingly assisted, by reason of their status as parties to the Take Private Merger Agreement, their possession of non-public information, and their involvement with the Control Group

-200-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

throughout the deal negotiation process, and have aided and abetted the Director

Defendants and Zyskind as an officer defendant, in the aforesaid breach of their

fiduciary duties.  Such breaches of fiduciary duties could not and would not have

occurred but for the conduct of Stone Point, Trident Pine, and the Trident Funds,

477.   As a result of this conduct, the Class has been harmed.

478.   Lead Plaintiffs and the Class have no adequate remedy at law.

## XII.   RELIEF REQUESTED

**WHEREFORE**, Lead Plaintiffs demand judgment as follows:

a.      Finding the Director Defendants liable for breaching their fiduciary duties to the Class;

b.      Finding the Officer Defendant Zyksind liable for breaching his fiduciary duties to the Class;

c.      Finding Zyskind, G. Karfunkel, and L. Karfunkel liable for breaching their fiduciary duties to the Class;

e.      Finding that Stone Point, Trident Pine, and the Trident Funds aided and abetted the other breaches of fiduciary duty by the other Defendants;

f.      Awarding the Class damages, together with pre- and post-judgment interest;

g.      Awarding Lead Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

h.    Awarding such other and further relief as is just and equitable.

OF COUNSEL:

FRIEDMAN OSTER & TEJTEL PLLC
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY  10075
(888) 529-1108

KESSLER TOPAZ MELTZER
  & CHECK, LLP
Eric L. Zagar
Robin Winchester
Michael C. Wagner
Christopher M. Windover
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706

BERNSTEIN LITOWITZ
  BERGER & GROSSMANN LLP
David Wales
Edward Timlin
1251 Avenue of the Americas
44th Floor
New York, NY  10020
(212) 554-1400

SAXENA WHITE P.A.
Joseph E. White, III
Adam D. Warden
150 East Palmetto Park Road, Suite 600
Boca Raton, Florida 33432
(561) 394-3382

LABATON SUCHAROW LLP

*/s/ Thomas Curry*
Ned Weinberger (#5256)
Mark D. Richardson (#6575)
Thomas Curry (#5877)
300 Delaware Ave., Suite 1340
Wilmington, Delaware 19801
(302) 573-2540

GRANT & EISENHOFER P.A.

*/s/ Michael J. Barry*
Jay W. Eisenhofer (#2864)
Michael J. Barry (#4368)
Kyle J. McGee (#5558)
Joseph L. Christensen (#5146)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

PRICKETT, JONES & ELLIOTT, P.A.

*/s/ Marcus E. Montejo*
Marcus E. Montejo (# 4890)
John G. Day (#6023)
1310 King Street
Wilmington, Delaware 19801
(302) 888-6500

WOLF POPPER LLP
Carl L. Stine
Adam J. Blander
Antoinette Adesanya
845 3rd Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
*Co-Lead Counsel for Plaintiffs*

-202-

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

Steven B. Singer
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
(914) 437-8576

*Counsel for Plaintiffs*

Dated: May 8, 2019

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.

## CERTIFICATE OF SERVICE

I, Marcus E. Montejo, do hereby certify on this 8th day of May, 2019, that I caused a copy of the Amended Verified Consolidated Class Action Complaint to be served by eFiling via File & ServeXpress upon the following counsel of record:

Ned Weinberger
Thomas Curry
Labaton Sucharow LLP
300 Delaware Avenue
Suite 1340
Wilmington, Delaware 19801

Jay W. Eisenhofer
Michael J. Barry
Kyle J. McGee
Joseph L. Christensen
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, Delaware 19801

Edward B. Micheletti
Bonnie W. David
Skadden, Arps, Slate, Meagher &
   Flom LLP
920 North King Street
Wilmington, Delaware 19801

Daniel A. Mason
Paul, Weiss, Rifkind, Wharton &
   Garrison LLP
500 Delaware Avenue
Suite 200
Wilmington, Delaware 19801

Gregory P. Williams
Blake Rohrbacher
Daniel E. Kaprow
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

/s/ Marcus E. Montejo
Marcus E. Montejo (DE Bar No. 4890)

THIS DOCUMENT IS CONFIDENTIAL. ACCESS IS PROHIBITED EXCEPT
AS AUTHORIZED BY COURT ORDER.